# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

**CHERYL ANN LEACH and Husband,**
**JOHN LEACH, SR.**
211 Brookside Street
Sweetwater, Tennessee 37874

**Plaintiffs,**

-vs-

No. V20-_____

**CIRCLE K STORES, INC.**
Principle Address:
*1130 West Warner Road*
*Building B*
*Tempe, Arizona 85284*

Registered Agent:
*Corporation Service Company*
*2908 Poston Avenue*
*Nashville, Tennessee 37203*

**and**

**MAC'S CONVENIENCE STORES, LLC**
Principal Address:
*4080 West Jonathan Moore Pike*
*Columbus, Indiana 47201*

Registered Agent:
*Corporation Service Company*
*2908 Poston Avenue*
*Nashville, Tennessee 37203*

**Defendants.**

---

## COMPLAINT FOR DAMAGES

---

The Plaintiffs, Cheryl Ann Leach and husband, John Leach, Sr., sue the

Defendants, Circle K. Stores, Inc. and Mac's Convenience Stores, LLC, and for their

cause of action state the following:

## I. The Parties

1.     The Plaintiffs, Cheryl Ann Leach and husband, John Leach, Sr. are citizens and residents of Monroe County, Tennessee. They reside at 211 Brookside Street, Sweetwater, Tennessee.

2.     The Defendant, Circle K Stores, Inc. is a corporation that conducts business in the State of Tennessee, specifically as a convenience store located at 708 South Main Street, Sweetwater, Tennessee. Its principal address is 1130 West Warner Road, Building B, Tempe, Arizona. Its Registered Agent for service of process is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

3.     The Defendant, Mac's Convenience Stores, LLC is a corporation that conducts business in the State of Tennessee, and specifically possessed a Tennessee Consumer and Industry Services Permit for the gasoline pumps located at 708 South Main Street, Sweetwater, Tennessee. Its principal address is 4080 West Jonathan Moore Pike, Columbus, Indiana. Its Registered Agent for service of process is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

## II. Factual Background

4.     The incident out of which this lawsuit arose occurred on August 8, 2019 in Sweetwater, Monroe County, Tennessee.

5.     On August 8, 2019, the Plaintiff, Cheryl Ann Leach was on the premises of Defendant's Circle K Store #4703627 located at 708 South Main Street, Sweetwater, Tennessee, filling her vehicle with gasoline at pump #4, when the pump did not automatically stop pumping when the tank was filled to capacity. This resulted in gasoline spilling from the vehicle's gas tank and onto the ground where Mrs. Leach was standing. When she took a step, the gasoline on the ground was slippery and caused her to slip and fall, sustaining injuries.

## III. Wrongs Complained of Circle K Stores, Inc.
### &
### Mac's Convenience Stores, LLC

6.     The Defendant, Circle K Stores, LLC was negligent in:

a. Failing to properly inspect its premises to ensure there were no dangerous or hazardous conditions existing on its premises that could, and in this instance did, cause injury to a member of the general public who came upon the premises for the purpose of purchasing goods from the Defendant, Circle K;

b. Failing to warn the general public of the dangerous conditions existing on its premises;

c. Failing to take all reasonable steps to assume that visitors coming upon its premises were not injured;

d. Knew or should have known by the exercise of due care that the inspections of the areas used by the general public who came upon its premises to purchase goods needed to be carried out frequently to ensure there were no dangerous or hazardous conditions existing that would, and in this instance did, create a danger to Defendant, Circle K's customers, and specifically, Cheryl A. Leach;

e. Knew or should have known by the exercise of due care that gasoline pump #4 had a broken, defective, or faulty nozzle and thus created a dangerous and hazardous condition to customers who were not aware of this dangerous and hazardous condition; and

f. The Defendant, knowing of the dangerous conditions that existed on August 8, 2019, failed to take all necessary steps to protect the general public.

7. The Defendant, Mac's Convenience Stores, LLC was negligent in:

a. Failing to frequently and properly inspect and maintain its gasoline pumps at Circle K Store #4703627 to ensure there were no dangerous or hazardous conditions that could, and in this instance did, cause injury to a member of the general public who pumped and purchased gasoline from Defendant, Circle K;

b. Failing to warn the general public of the dangerous conditions that existed on Circle K's premises as a result of the broken, defective or faulty nozzle on pump #4;

c.     Knew or should have known by the exercise of due care that the inspections of the gasoline pumps used by the general public who came upon Circle K's premises to pump gasoline needed to be carried out frequently by Mac's Convenience Stores to ensure there were no dangerous or hazardous conditions existing that would, and in this instance did, create a danger to Circle K's customers, specifically Cheryl Ann Leach;

d.     Knew or should have known by the exercise of due care that pump #4 had a broken, defective or faulty nozzle, and thus created a dangerous and hazardous condition to Circle K's customers who were not aware of this dangerous and hazardous condition; and

e.     The Defendant, Mac's Convenience Stores, knowing of the dangerous conditions that existed on August 8, 2019, failed to take all necessary steps to protect the general public.

8.     The property, as well as the building that contains Circle K Store #4703527, is either owned by or leased by the Defendant, Circle K Stores, Inc., and it is responsible for the general maintenance and upkeep of the property. Circle K was negligent in that it failed to properly inspect its premises in order to ensure that no dangerous or hazardous condition existed which could, and in this instance did, cause injury or damage to the general public coming upon the premises. By failing to make proper inspections and by failing to warn the Plaintiff, Cheryl Ann Leach, which caused her injuries and damages as a result of its negligence.

9.     Circle K and Mac's Convenience Stores had actual knowledge of the dangerous and hazardous condition which existed on the Circle K premises on August 8, 2019, and failed or otherwise neglected to take all necessary steps to provide a safe environment for those persons coming upon these premises or to verbally warn the Plaintiff, Cheryl Ann Leach. The Defendants had a duty to ensure their customers would not be injured due to gasoline spills from broken, defective or faulty gasoline pumps, and had a duty to train their employees to inspect and maintain their gasoline pumps to avoid dangerous and hazardous conditions.

10. The dangerous and hazardous conditions that existed at Circle K Store #4703627 located in Sweetwater, Tennessee were reasonably foreseeable to the Defendants. Circle K and Mac's Convenience Stores knew or should have known by the exercise of due care that broken, defective or faulty gasoline pumps would cause the general public, and in this case, Cheryl Ann Leach, to slip and fall due to a gasoline spill. The Defendants knew that frequent inspections were required to the gasoline pumps to ensure there would be no gasoline spills where customers would be walking to ensure not to cause injury to the general public, and in this case, Cheryl Ann Nelson, to slip and fall.

11. As a result of the negligence of the Defendants, Circle K and Mac's Convenience Stores, their agents, servants and employees, as hereinabove set out, Mrs. Leach sustained injuries to her arms and legs, and other parts of her body. These injuries are permanent in nature. As a result of these injuries, Plaintiff has experienced pain and suffering, and will continue to suffer in the future. As a result of these injuries, Plaintiff has incurred medical expenses for treatment and will continue to incur medical expenses. As a result of these injuries, Plaintiff, Cheryl Ann Leach has been handicapped in carrying out her normal daily routine and will continue to be handicapped. As a result of these injuries, the Plaintiff has suffered a loss of enjoyment of life and will continue to suffer the same in the future.

12. As a result of the negligence of the Defendants, Plaintiff John Leach, Sr. has incurred medical expenses for treatment of his wife, Cheryl Ann Leach, and will continue to incur same in the future. Further, as a result of these injuries, Plaintiff has been deprived of the services and consortium of his wife and will continue to suffer same in the future.

WHEREFORE, Plaintiffs, Cheryl Ann Leach and John Leach, Sr., request a jury to try this case, and demand judgment against the Defendants, Circle K Stores, Inc. and Mac's Convenience Stores, LLC, in an amount the jury feels is just and reasonable. The Plaintiffs also pray the Court award Plaintiffs all taxable costs of this proceeding.

Respectfully submitted, this ___9___ day of July, 2020.

_W. Holt Smith_
W. Holt Smith (BPR #04557)
*Attorney for Plaintiffs*
209 Tellico Street North
Madisonville, Tennessee 37354
(423) 442-4012

## COST BOND

We acknowledge ourselves as surety for all costs, taxes and damages in this case in accordance with **T.C.A.** 20-12-120.

*SURETY*

_Cheryl Ann Leach_
Cheryl Ann Leach

_John Leach, Sr._
John Leach, Sr.

*PRINCIPAL*

_W. Holt Smith_
W. Holt Smith

## IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

| | |
|---|---|
| CHERYL ANN LEACH and Husband, | * |
| JOHN LEACH, SR. | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *  No. V20-0187S |
| | * |
| CIRCLE K STORES, INC. and | *  JURY DEMANDED |
| MAC'S CONVENIENCE STORES, LLC, | * |
| | * |
| Defendants. | * |

*TIME FILED 1:00 AM/PM*

*AUG 14 2020*

*MARTHA M. COOK*
*CIRCUIT COURT CLERK*

### ANSWER OF MAC'S CONVENIENCE STORES, LLC

COMES NOW the Defendant, Mac's Convenience Stores, LLC ("Mac's"), by and through counsel, and in answer to the Plaintiff's Complaint, states as follows:

### FIRST DEFENSE

In response to the specifically enumerated paragraphs of the Plaintiff's Complaint, Mac's states as follows:

1.    Mac's is without sufficient information to admit or deny the allegations in paragraph 1 of the Plaintiff's Complaint.

2.    Mac's admits Circle K Stores, Inc. conducts business in the State of Tennessee, its principal place of business is 1130 West Warner Road, Building B, in Tempe, Arizona, and its registered agent for service of process is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203. The remaining allegations in paragraph 2 of the Plaintiff's Complaint are denied.

3.    Mac's admits it is a limited liability company conducting business in the State of Tennessee with its principal office address at 4080 West Jonathan Moore Pike in Columbus, Indiana and registered agent for service of process as Corporation Service Company, 2908 Poston

Avenue, Nashville, Tennessee 37203. The remaining allegations in paragraph 3 of the Plaintiff's Complaint are denied as pled.

4.     The allegations in paragraph 4 of the Plaintiff's Complaint are admitted.

5.     Mac's admits the Plaintiff was on the premises located at 708 South Main Street in Sweetwater, Tennessee on August 8, 2019. The remaining allegations in paragraph 5 of the Plaintiff's Complaint are denied.

6.     The allegations in paragraph 6, including subparagraphs a. through f., of the Plaintiff's Complaint are denied.

7.     The allegations in paragraph 7, including subparagraphs a. through e., of the Plaintiff's Complaint are denied.

8.     The allegations in paragraph 8 of the Plaintiff's Complaint are denied.

9.     The allegations in paragraph 9 of the Plaintiff's Complaint are denied.

10.    The allegations in paragraph 10 of the Plaintiff's Complaint are denied.

11.    The allegations in paragraph 11 of the Plaintiff's Complaint are denied.

12.    The allegations in paragraph 12 of the Plaintiff's Complaint are denied.

## SECOND DEFENSE

The Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## THIRD DEFENSE

Plaintiff Cheryl Ann Leach so carelessly and negligently conducted herself that she, by her own negligence, contributed directly and proximately to her own injuries. The Plaintiff's fault is greater than that of Mac's, if Mac's is at fault at all, and therefore the Plaintiff should recover nothing from Mac's. In the alternative, the Plaintiff's damages should be reduced in proportion to the percentage of negligence attributed to her.

2

## FOURTH DEFENSE

Mac's pleads modified comparative fault in mitigation or bar of any recovery by the Plaintiff against Mac's, if any. Specifically, Mac's avers the Plaintiff's own actions and omissions were such that they constitute negligence which caused or contributed to cause the accident and injuries alleged in the Complaint.

## FIFTH DEFENSE

Mac's did not breach any duty owed to the Plaintiff. Mac's exercised due care and diligence in all of the matters alleged.

## SIXTH DEFENSE

No act or omission of Mac's was the proximate cause of any damage, injury, or loss to the Plaintiff.

## SEVENTH DEFENSE

The Plaintiff failed to take reasonable steps to minimize or prevent the damages she claims to have suffered.

## EIGHTH DEFENSE

The Plaintiff had superior knowledge of any alleged condition, and, as such, Mac's cannot be held liable.

## NINTH DEFENSE

The Plaintiff's Complaint fails to specify a dollar amount sought for damages; therefore, the Plaintiff is barred from receiving such damages.

## TENTH DEFENSE

Mac's reserves the right to amend its Answer to the Complaint to include such other and further defenses that later may become apparent through further investigation and discovery.

3

## ELEVENTH DEFENSE

All allegations not heretofore admitted, explained, or denied are here and now denied as set forth as though specifically denied therein.

WHEREFORE, having answered the Plaintiff's Complaint, Mac's prays to be hence dismissed, or in the alternative, demands a jury of twelve to try the issues when joined.

Respectfully submitted,

**CARR ALLISON**

BY: _____
**SEAN W. MARTIN, BPR #020870**
**CHANCEY R. MILLER, BPR #036124**
Attorneys for Defendants
736 Market Street, Suite 1320
Chattanooga, TN 37402
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
cmiller@carrallison.com

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

This _14th_ day of _August_, 2020.

BY: _____
**SEAN W. MARTIN, ESQ.**
**CHANCEY R. MILLER, ESQ.**

4

## IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

| | |
|---|---|
| **CHERYL ANN LEACH and Husband,** <br> **JOHN LEACH, SR.** | * <br> * <br> * |
| Plaintiffs, | * <br> * |
| v. | * No. V20-0187S |
| | * |
| **CIRCLE K STORES, INC. and** <br> **MAC'S CONVENIENCE STORES, LLC,** | * JURY DEMANDED <br> * <br> * |
| Defendants. | * |

### AGREED ORDER TO DISMISS CIRCLE K STORES, INC.

The parties, by and through counsel, hereby agree Circle K Stores, Inc. is an improperly

and misjoined defendant and should be dismissed from this matter without prejudice in accordance

with Tenn. R. Civ. P. 21. By agreement of the parties, it is hereby

**ORDERED, ADJUDGED, and DECREED** that Circle K Stores, Inc. is dismissed from

this matter without prejudice.

**ENTERED** this _3rd_ day of _____, 2020.

_____
**JUDGE**

**APPROVED FOR ENTRY:**

**LAW OFFICE OF W. HOLT SMITH**

BY: _____
**W. HOLT SMITH, BPR #04557**
Attorney for Plaintiff
209 Tellico Street North
Madisonville, TN 37354
(423) 442-4012

**CARR ALLISON**

BY: _____
**SEAN W. MARTIN, BPR #020870**
**CHANCEY R. MILLER, BPR #036124**
Attorneys for Defendants
736 Market Street, Suite 1320
Chattanooga, TN 37402
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
cmiller@carrallison.com

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

This _2nd_ day of _September_ , 2020.

BY: _Chancey R. Miller_
SEAN W. MARTIN, ESQ.
CHANCEY R. MILLER, ESQ.

2

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and )
JOHN LEACH, SR., )
)
    Plaintiffs, )
)
v. )    Docket No. V200187S
)
CIRCLE K STORES, INC. and )
MAC'S CONVENIENCE STORES, LLC, )
)
    Defendants. )

## NOTICE OF APPEARANCE

Please be advised that W. Tyler Weiss hereby enters an appearance as attorney of record

on behalf of the Plaintiffs, CHERYL ANN LEACH and JOHN LEACH, SR., in the above-

captioned matter.

Respectfully submitted this _____ day of September, 2020.

WORTHINGTON & WEISS, P.C.

W. Tyler Weiss (TN BPR #028801)
409 N. College Street, Suite 1
Madisonville, Tennessee 37354
Office: 423.442.5353
Fax:    423.442.3866
Email: tweiss@worthingtonweiss.com

*Counsel for Cheryl and John Leach, Sr.*

## CERTIFICATE OF SERVICE

I certify that a true and complete copy of this pleading has been delivered by United States
Mail, postage prepaid, Facsimile and/or Hand Delivery to W. Holt Smith, 209 Tellico Street North,
Madisonville, Tennessee 37354 and Defendant's counsel, Sean W. Martin and Chancey R. Miller,
736 Market Street, Suite 1320, Chattanooga, Tennessee 37402 this the ___ day of September,
2020.

WORTHINGTON & WEISS, P.C.

W. Tyler Weiss

Case 3:21-cv-00159-JRG-HBG   Document 1-1   Filed 04/28/21   Page 13 of 178   PageID #: 17

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and Husband,　　＊
JOHN LEACH, SR.　　　　　　　　　＊
　　　　　　　　　　　　　　　　　＊
　　　Plaintiffs,　　　　　　　　　　＊
　　　　　　　　　　　　　　　　　＊
v.　　　　　　　　　　　　　　　　　＊　　　No. V20-0187S
　　　　　　　　　　　　　　　　　＊
MAC'S CONVENIENCE STORES, LLC,　＊　　　JURY DEMANDED
　　　　　　　　　　　　　　　　　＊
　　　Defendant.　　　　　　　　　　＊

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Mac's Convenience Stores, LLC ("Mac's"), by and through counsel, to move the Court for summary judgment pursuant to Rule 56 of the *Tennessee Rules of Civil Procedure*.

As grounds, and as discussed in more detail in the contemporaneously filed memorandum of law, the Plaintiff created and had superior knowledge of the gasoline spill that caused her fall. Mac's did not have actual or constructive notice of the gasoline spill prior to the Plaintiff's fall. Therefore, Mac's did not owe the Plaintiff a duty to remove or warn of the gasoline spill. Accordingly, summary judgment is appropriate.

In addition to its memorandum of law and the record as a whole in this matter, Mac's relies on the following additional materials in support of its Motion for Summary Judgment:

> Exhibit 1　　Excerpts of Plaintiff Cheryl Ann Leach's deposition testimony; and

> Exhibit 2　　Photograph of Mac's Premises with Identifying Markings by Plaintiff.

WHEREFORE, Mac's respectfully requests the Court grant its Motion for Summary Judgment and dismiss this matter in its entirety with prejudice.

## NOTICE OF HEARING

This Motion will be heard on March 2, 2021 in Monroe County Circuit Court at 4500 New

Hwy 68 in Madisonville, Tennessee.

Respectfully submitted,

**CARR ALLISON**

BY: _____
**SEAN W. MARTIN, BPR #020870**
**CHANCEY R. MILLER, BPR #036124**
Attorneys for Defendant
736 Market Street, Suite 1320
Chattanooga, TN 37402
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
cmiller@carrallison.com

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

W. Tyler Weiss
409 N. College Street, Suite 1
Madisonville, TN 37354

This _11th_ day of _January_____, 2021.

BY: _____
**SEAN W. MARTIN, ESQ.**
**CHANCEY R. MILLER, ESQ.**

2

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and     )
husband JOHN LEACH, SR.      )
             )
     Plaintiffs     )
             )
vs.            )   No.:  V20-0187S
             )
CIRCLE K STORES, INC. and MAC'S   )
CONVENIENCE STORES, LLC     )
             )
     Defendants     )

APPEARANCES:

     MR. HOLT SMITH
     MR. TYLER WEISS
     Attorneys for the Plaintiffs
     Cheryl and John Leach

     MR. CHANCEY MILLER
     Attorney for the Defendants
     Circle K Stores and MAC'S Convenience Stores

DEPOSITION

OF

CHERYL ANN LEACH

November 2, 2020

DONNA D. TOUSEULL, LCR
HOOD & McMASTERS
P. O. BOX 894, SEYMOUR, TN 37865-0894
865-577-5181

**EXHIBIT**

1

1                              INDEX

2       WITNESS                                          PAGE

3       CHERYL LEACH

4              Examination by Mr. Miller.....................3

5

6

7                             EXHIBITS

8       NO.                  DESCRIPTION                 PAGE

9        1    Goggle Maps Photograph of the Scene..........86

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    The deposition of CHERYL LEACH taken for any
2    and all purposes allowable under the Tennessee Rules of
3    Civil Procedure, before DONNA D. TOUSEULL, Licensed Court
4    Reporter in the State of Tennessee, on the 2nd day of
5    November 2020, at the law office of W. Holt Smith, 208
6    Tellico Street, Madisonville, Tennessee.
7        It is agreed that the reporter may swear the
8    witness, take the deposition stenographically, and
9    afterwards reduce the same to typewritten form when the
10   completed deposition may be used in the above-styled
11   cause.
12       All objections except as to the form of the
13   question are reserved until the time of hearing.  All
14   formalities are expressly waived as to caption,
15   certificate, transmission, and the reading and signing of
16   the deposition by the witness.
17                    CHERYL LEACH,
18      having been first duly sworn, was examined and
19      testified as follows:
20                    EXAMINATION
21   BY MR. MILLER:
22       Q     Ms. Leach, my name's Chancey Miller.
23   I'll be taking your deposition today as part of your
24   lawsuit.  Could you state your full name for us.
25       A     Cheryl Ann Leach.

1          Q       Do you remember the date of your

2  accident?

3          A       I think it was August the 8th.  I

4  know my daughter's birthday is August 7th, and I think it

5  was the day after her birthday.

6          Q       August 8th, 2019?

7          A       It was on Thursday, yeah.  Yes.

8          Q       Do you recall the time of day?

9          A       I think it was around 9:00 in the

10 morning.

11         Q       What was the weather like that day?

12         A       I think the sun was shining.

13         Q       Had it been raining or anything?

14         A       No, not that I remember.

15         Q       Do you remember where your accident

16 occurred?

17         A       It was at the Exxon station, Circle K

18 in Sweetwater next to Walgreens.

19         Q       Does 708 South Main Street,

20 Sweetwater ring a bell?

21         A       I know it's on Main Street.  I don't

22 know the street number.

23         Q       Let me show you a photo, and I have

24 copies.  This is a Google photo.  Does that resemble the

25 gas station where your accident occurred?

1          A        Yes.

2                   MR. HOLT:  Are you going to make

3          that an exhibit?

4                   MR. MILLER:  I'll mark it in a little

5          bit.

6                   MR. HOLT:  Okay.

7          Q        You can keep that one.

8          A        Okay.

9          Q        Does the photo generally reflect what

10    the gas station looked like on August 8th, 2019?

11         A        Yes.

12         Q        Other than the vehicles, are there

13    any differences that you notice between that photo and

14    what the gas station looked like on the date of the

15    accident?

16         A        It looks about right, the same.

17         Q        Have you been to that gas station

18    before?

19         A        Yes.

20         Q        How many times?

21         A        I don't know.  I usually -- I usually

22    try to shop local, but the gas in Lenoir City is cheaper,

23    and I usually go to the Exxon right off the Lenoir City

24    exit is my -- is the one I mainly go to now.

25         Q        Is that a Circle K as well?

1        A        I don't know if it's a Circle K or

2    not.  I've got an Exxon card.  I did have a Marathon

3    card, but after I got the Exxon card, I started trying to

4    go to Exxons.

5        Q        Could you give us an estimate of the

6    frequency of visits that you may have went to this

7    particular gas station?

8        A        Well, I mainly went to the one across

9    the street that used to be the Jiffy, but since I got the

10   Exxon card, I started going to Exxon.  I got the Exxon

11   card, I think, around January of last year, so that's

12   when I started going.

13       Q        So you got an Exxon card January

14   2019.

15       A        Yes.

16       Q        And that's when you started

17   frequenting Exxons.

18       A        Exxons, yes.

19       Q        And you had been to this gas station

20   multiple times before?

21       A        Yes.

22       Q        Do you remember your last visit to

23   this gas station prior to your accident?

24       A        No, I don't remember.

25       Q        Did you always use a particular pump

1    or just whichever was available?

2            A        Whichever was available.

3            Q        Have you ever had any problems out of

4    this gas station before?

5            A        No.

6            Q        Any prior issues with the gas pump at

7    this particular Exxon, Circle K?

8            A        No.

9            Q        Have you been back to this gas

10   station since your accident?

11           A        Yes.

12           Q        Do you know how many times?

13           A        I went last November to take a

14   picture.

15           Q        Is that the only time you've been

16   back to this one?

17           A        I believe it is.  I don't think I've

18   been back since I fell.  I mostly -- like I said, I

19   mostly go to the Exxon now in Lenoir City.  It's cheaper.

20           Q        Are there other Exxons in Sweetwater?

21           A        There may be one.  I don't know if

22   it's an Exxon or not, though.  I think it's the only

23   Exxon, but if there is one, I think it's over next to the

24   Brown Elementary School, but I don't know if that's an

25   Exxon or not.

1    to support her at the other one.

2            Q        At this one or the --

3            A        The other one, the Jiffy one.

4            Q        What used to be the Jiffy one.

5            A        Yes.

6            Q        Okay.  When you say support, does she

7    own it or have some stake in it?

8            A        No, she works there.  She makes the

9    Jiffy hotdogs.

10           Q        Let's go to the day of the accident.

11           A        Yes.

12           Q        Prior to the accident, where were

13   you?

14           A        I think I went straight to get gas

15   because I was having to go to Knoxville that day.

16           Q        So you were at home?

17           A        I may have been at the office, but

18   I'm not for sure.  I think I went to go get gas and then

19   went to the office.

20           Q        Did you go anywhere else besides --

21   so you're just saying you woke up that day, got in your

22   car and went to the gas station?

23           A        Yes.  I had a doctor's appointment in

24   Knoxville that day, so I probably got in the car, saw I

25   needed gas before I went to Knoxville and went to go get

1 this direction (indicating).  Daniel Johnson, Sweetwater

2 City police officer, was at the other pump, so I was --

3 my pump is on the passenger side of the car, and I always

4 set my -- I always fill my car up with gas.  I don't just

5 get $10 or 15, something like that; I fill it up.

6               So I had the nozzle set for it to

7 fill up, and I was talking to Daniel Johnson that was

8 getting gas on the other side.  We had National Night Out

9 two nights before that on Tuesday night, and we were

10 talking about the National Night Out.  Then I heard water

11 or liquid, whatever you call it, and I looked, and the

12 nozzle didn't stop, and gas was pouring out down the side

13 of my car and on the ground.

14               So I went and got the nozzle and put

15 it up and slipped on the gas, and when I slipped on the

16 gas, my left foot slipped and went outward, and my left

17 knee went inward and hit the ground.  Daniel saw me fall,

18 and he came over and helped me up, and he went and got

19 the stuff that you sprinkle on it and sprinkled it down,

20 and he told the guy that was with him to go inside and

21 get somebody inside the store.  So that woman came out

22 and wrote down on a piece of paper her name and phone

23 number to call if there was ever any issues and asked if

24 I was okay.

25               Then as the day went on, my knee kept

1  go ahead and schedule for me to go ahead and come in and

2  see them instead of saying it would be next Wednesday.

3          Q          Okay.

4          A          Because he was asking why I didn't

5  come and see him when I had hurt my knee, and I said,

6  "Well, I wanted to come see you, but you weren't going to

7  be able to see me until Wednesday, and this was Friday."

8  You know, I hurt it Thursday, but I was needing a Friday

9  appointment, and I couldn't wait that long, it hurt, and

10  so he was upset that they didn't make an appointment for

11  me to come in that Friday to see him.

12          Q          Let's go back to the accident.

13          A          Okay.

14          Q          You can look at the picture because I

15  have a copy here.

16          A          Okay.

17          Q          Now, you pull up in your vehicle;

18  correct?

19          A          Yes.

20          Q          And was it the Ford Explorer?

21          A          Yes.

22          Q          Do you remember what pump number you

23  were?

24          A          I don't know what the number is, but

25  it's the first one you see in the picture, and my car was

1    facing the direction that that car in that picture is,

2    but my gas tank is on the passenger's side, so I was on

3    the other side of the tank -- or the pump.

4           Q        So your car was parked with the

5    driver's side closest to the highway.

6           A        Yes.

7           Q        And you were at the pump that's

8    closest to the highway right there.

9           A        Yes.

10          Q        Closest to Main Street.

11          A        Yes.

12          Q        And your car was facing, I guess --

13          A        South toward Walgreens.

14          Q        Okay.  Could you draw an arrow on

15   your picture just to the pump.

16          A        I'm sorry, I'm going to use my own

17   pen.

18          Q        That's fine, I understand.

19          A        Not that I believe you have COVID,

20   but --

21          Q        No, that's actually really smart.

22          A        -- it's a habit.

23          Q        So if you could just draw an arrow to

24   which pump you were using.

25          A        Well, I thought I would use this pen.

1    MR. HOLT:  Here, use this one.  This
2    is an extra pen.  Just keep it.
3    THE WITNESS:  Okay.  (Witness
4    complies with request.)
5    Q    Thank you.  Did you use your Exxon
6    card?
7    A    I certainly did, yeah.
8    Q    Now, that card, does it automatically
9    connect to your bank account, or do you still have to
10   swipe your debit card as well?
11   A    No, it -- it goes to -- it's an Exxon
12   credit card, and I get a monthly bill with it every
13   month.
14   Q    So you inserted and pulled out your
15   Exxon card.
16   A    Uh-huh.
17   Q    All right.  Did you see any stickers
18   on the pump?
19   A    No.
20   Q    You don't recall?  Did you look at --
21   A    No, I didn't look.
22   Q    Do you see any pictures on the pump
23   in that picture?
24   A    Oh, my gosh.  No.  That's awful
25   small, though.

1          Q        But just to clarify, you don't

2   remember seeing any stickers.

3          A        No.

4          Q        Did you read anything that was on the

5   pump?

6          A        No.

7          Q        Did you see any warning signage?

8          A        No.  Usually when I get gas, I insert

9   my card.  They want the mileage of the vehicle and the

10   driver ID number.  So I usually look at the pad, the

11   keypad, and some gas stations, like, the one in Lenoir

12   City, they have a little TV that comes on, but I don't

13   even pay attention to it when the TV comes on.

14          Q        So is it fair to say that you

15   generally don't read the stickers or anything that's on

16   the pump?

17          A        No.

18          Q        Have you ever seen a sign that says,

19   "Don't leave pump unattended."

20          A        Yeah, most of them have that, surely

21   they do.

22          Q        So are you familiar that generally

23   you don't leave your pump unattended?

24          A        Yes, and I never walk away from it.

25          Q        Do you recall a sign on this gas pump

1    occur?

2           A        Oh, my goodness, I have no idea.  It

3    was minutes maybe because usually it takes, you know,

4    about three minutes or something to fill up the car.  I'm

5    not for sure.

6           Q        But did it fill up your car on this

7    date?

8           A        Yeah, and overfilled it.  It ran out.

9           Q        Was the gas station busy?

10          A        I don't know.  They only have the two

11   pumps, and you have one on each side on the two, so you

12   could probably have four vehicles.  I know that no one

13   was on the other side where I was getting gas, but on the

14   other pump, Daniel Johnson was getting gas over there.

15          Q        So Officer Johnson, you said he was

16   with the Sweetwater City police department.

17          A        Yes.

18          Q        He was at one of the pumps closest to

19   the store.

20          A        To be honest, I don't remember which

21   one he was at.  I was just standing there talking to him.

22   He had another gentleman with him.  He does landscaping

23   on the side, and I believe he was there getting gas for

24   his lawn mowers or something like that.  I'm not for

25   certain, but I think he had his lawn service equipment

1    there getting gas for it.

2          Q          So to clarify, he wasn't directly

3    across from you.

4          A          No, he was at the other pump.

5          Q          At that other pump, which would be

6    the one closest to the building.

7          A          Yes.

8          Q          Is he the only one that saw the

9    accident, Officer Johnson?

10         A          I don't know if the gentleman with

11   him saw it or not, but I know I was talking to him, and

12   he saw me fall.

13         Q          Do you know the other gentleman's

14   name?

15         A          No.

16         Q          Are you familiar with Officer

17   Johnson?  Had you known him a while?

18         A          Yes.  He's in charge of National

19   Night Out.  I don't know if you're familiar with that or

20   not, but he does it every year for Sweetwater City, and

21   every year I donate cheese nachos, my business.  We do

22   the National Night Out, and we give out free cheese

23   nachos, and that's what we were talking about was

24   National Night Out when it happened.

25         Q          So you had some point of, I guess, a

1   Shelter My Sheep.  I was on the board with them, and we

2   built two tiny houses in Tellico Plains, and we're

3   building two in Sweetwater.  The goal is to have two in

4   Madisonville and two in Vonore, have them in each city in

5   Monroe County so the kids that are homeless, they don't

6   have to drive so far and can stay in the school that

7   they're in.

8           Q       Was there anybody else there when you

9   fell besides Officer Johnson and the person that was with

10  them?

11          A       Those are the only two that I

12  remember.

13          Q       All right.  I want to take you

14  through just step by step with this accident.

15          A       Okay.

16          Q       So you pay for your gas, and you put

17  your mileage and your number in.

18          A       Uh-huh.

19          Q       You pull the pump out, pump handle

20  out, and you put it in your car; right?

21          A       Yes.

22          Q       I assume you push a button to pick

23  which grade of gasoline you want.

24          A       Uh-huh.

25          Q       And then you pull the handle to begin

1    pumping your vehicle full of gas.

2         A         Yeah, I always lock it in the little

3    notch there so it will run on its own.

4         Q         So did you immediately engage the

5    little automatic pump mechanism?

6         A         I usually do, so, yes.

7         Q         But, like, did you pump for a while

8    and then you engaged it, or you did it --

9         A         I always get it started, set the

10   little notch, the thing that you lock it in the notch so

11   it will pump on its own.  That's what I always do.

12        Q         Did you have any difficulty locking

13   that in?

14        A         I don't think so.  I think it was,

15   you know, the same as always, just hit the notch.

16        Q         Did you have any difficulty when you

17   put the pump in your car about getting the gas going?

18        A         No.

19        Q         For example, sometimes when I put gas

20   in a vehicle, sometimes it wants to act like it's already

21   full of gas and you know it isn't.  You know, it won't

22   keep going; it will keep clicking off.  Did that happen?

23        A         No.

24        Q         Do you know what I'm talking about?

25        A         Yeah, but, no, I don't -- I don't

1    remember it, but I don't think it did.

2              Q         All right.  So did you stay right

3    next to the pump?

4              A         No.  My gas tank is right beside the

5    back passenger side door.  I was right at the front

6    driver's side door talking to Daniel.  So I wasn't right

7    next to it, standing right there next to it.

8              Q         So you went from close to the back

9    passenger door where your pump was.

10             A         Uh-huh.

11             Q         And then you walked to the front of

12   your car.

13             A         No, it wasn't to the front of the

14   car.  It was next to the driver's side door, which is

15   maybe from here -- I don't know how wide doors are, so

16   maybe from here to here (indicating).

17             Q         So are you signifying about four feet

18   or so?

19             A         Yeah.  I'm not very good with the

20   feet, but --

21             Q         But you were far enough away where

22   you could see around the pump to where Officer Johnson

23   was so you could communicate?

24             A         Yes.  Well, if you look at the

25   picture, the back of my car where the pump is, I usually

1  park to where the gas tank is right there where the

2  nozzle is right there with the tank. So if you're going

3  to use the car in here as an example, I'm assuming that I

4  was probably from here to here (indicating), to that

5  side.

6      Q      Okay. If you could, right here where

7  we can see on the light part, could you draw a triangle

8  where you were standing talking to Officer Johnson.

9      A      I don't know. It was probably right

10  in here, I'm assuming. (Witness complies with request.)

11      Q      And that would have been near the

12  front passenger side of your vehicle.

13      A      Yes.

14      Q      And you guys were just talking,

15  chatting back and forth?

16      A      Uh-huh, and then I heard the sound of

17  what sounded like water.

18      Q      Now, what did you talk with Officer

19  Johnson about, the National Night Out?

20      A      National Night Out.

21      Q      So how did you know that the gasoline

22  was spilling?

23      A      I heard it.

24      Q      Like, dripping water sounds or --

25      A      Yeah, it sounded like a gushing of

1    water.

2         Q       Did you ever hear the mechanism click

3    off?

4         A       No.

5         Q       Did the handle stay inside your gas

6    tank?

7         A       Yes.

8         Q       Was it in there all the way?

9         A       I'm assuming it was.

10         Q       But you're not sure?

11         A       No.  I mean, I usually put it all the

12    way in.

13         Q       Did you see the gas spilling?

14         A       Yes.  Well, after I heard it and I

15    looked and it was running down my car and on the road.

16    It was running down the side of my car.

17         Q       Did Officer Johnson tell you, "Hey,

18    your gas is spilling."

19         A       No.  He was at the other pump.

20         Q       So you heard it.

21         A       Yes.

22         Q       And then you looked and saw it.

23         A       Yes.

24         Q       Did anybody else know that it was

25    spilling?

1          A          I don't think so.  I don't think

2     anyone else was around.

3          Q          Would you say you have the most

4     knowledge about it spilling?

5          A          Yes.

6          Q          So where did you see the gas?

7          A          It was running down the side of my

8     car on the ground.

9          Q          So you saw it on the ground.

10          A          Uh-huh.

11          Q          You saw it on the side of your car.

12          A          Yes.

13          Q          Did it get on the pump platform?

14          A          Are you talking about that little

15     island that it's on?

16          Q          The little island, yeah.

17          A          No, it was on the ground.

18          Q          Just on the ground next to your

19     vehicle.

20          A          Yeah.  Well, I'm assuming it was.  I

21     didn't really pay attention, but it was running down the

22     car and on the ground, so I'm assuming it wasn't on the

23     island.

24          Q          Okay.  Was it a lot of gas?

25          A          No, I think I caught it pretty quick.

1    heard it, I went over and grabbed the nozzle out.

2            Q        Did you hurry over there to try to

3    save some money?

4            A        No, I was trying to save the gas from

5    going all over the place.  It didn't have anything to do

6    with money.

7            Q        But you rushed back over there; is

8    that a fair way to say it?

9            A        Yes.  Yeah, I remember seeing it, and

10   it was like, "Oh," and I ran to go get it.  Well, there

11   really wasn't much running because I wasn't that far.  It

12   was maybe, what, four steps or five?

13           Q        Would you characterize it as a

14   hustle?

15           A        Yeah.

16           Q        Faster than a walk?

17           A        Yeah, a quick move.

18           Q        But you managed to get there.

19           A        Uh-huh.

20           Q        And you pulled the pump, you pull it

21   out -- or you stopped it first, I assume.

22           A        Yes.

23           Q        And then you pulled the handle --

24           A        Well, when you grab hold of the

25   nozzle, when I got it out, it, I guess, unlocked.  When I

1   grabbed hold of it, it loosened it or something to where

2   it wasn't doing automatic anymore, and so it stopped when

3   I grabbed hold of it, and it released it, I guess.

4            Q       So when you grabbed the pump handle,

5   it stopped pumping.

6            A       Yes, it released from the latch or

7   that notch or whatever you want to call it.

8            Q       And did you pull it out of your car?

9            A       Yes.

10           Q       Did you put it in the holder on the

11  pump?

12           A       Yes.

13           Q       And you hadn't fallen at that point.

14           A       Well, it was just about the same

15  time.  After I got it in is when my foot hit the gas and

16  I slipped.

17           Q       So I assume you turned around.

18           A       Well, it wasn't really a matter of

19  turning around because, when I got hold of it and got it

20  out, then it was a matter of just moving the nozzle or

21  the handle from here to here (indicating) because I

22  always park with my gas tank right there at the nozzle.

23  So I didn't have to turn around.  I just grabbed hold of

24  it and got it out here and then put it in.

25           Q       So if you didn't have to turn around,

1   it or not, to be perfectly honest, because it hurt.  It

2   hurt pretty bad, but I'm pretty sure that I did get the

3   nozzle back in.

4           Q       Would it be fair to say that the fall

5   occurred when you were going from the front portion of

6   your vehicle to where the gas tank portion of your

7   vehicle was?

8           A       No.  I had already gotten to there

9   and gotten the nozzle out of the car.  I do remember

10  getting it and getting it to stop and just putting the

11  nozzle -- yeah, I'm pretty sure that I did reach it and

12  get it in the tank -- or the pump.

13          Q       It was at that point that you fell

14  when you were kind of putting it in its holder.

15          A       Yeah.

16          Q       Okay.  If you could, on the picture

17  could you mark an X where you fell.

18          A       I'm guessing it was right in here.

19  (Witness complies with request.)

20          Q       Okay.  And that X --

21          A       Is that an island, or is that a

22  shadow (indicating)?

23          Q       I believe that's a shadow from the

24  roof.

25          A       Okay.

1    FURTHER THE DEPONENT SAITH NOT.

2              CHERYL LEACH

3

4

5

6

7

8

9

10

11   Sworn to before me when

12   taken November 2, 2020.

13

14

15

16   _____

17          Donna D. Touseull

18        Licensed Court Reporter

19   LCR No. 342 / License Expires:  06-30-2022

20

21

22

23

24

25

REPORTER'S CERTIFICATE


STATE OF TENNESSEE:

COUNTY OF KNOX     :

I, Donna D. Touseull, Licensed Court Reporter in the State of Tennessee, do hereby certify that the above testimony was reported by me and that the foregoing 118 pages of the transcript constitute a true and accurate record of the proceedings to the best of my knowledge, skills, and ability.

I further certify that I am not related nor an employee of counsel to any of the parties connected with the action; nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter so evidenced by the LCR number and expiration date following my name below.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this 12th day of November 2020.


_____

DONNA D. TOUSEULL
Licensed Court Reporter
LCR No. 342 / License Expires: 06-30-2022



Image capture: Jun 2018   © 2020 Google

Sweetwater, Tennessee

 Google

Street View







CHERYL ANN LEACH and Husband,        *
JOHN LEACH, SR.                        *
                                    *
      Plaintiffs,                *
                                    *
v.                                  *     No. V20-0187S
                                  *
MAC'S CONVENIENCE STORES, LLC,   *     JURY DEMANDED
                                  *
      Defendant.                *

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Mac's Convenience Stores, LLC ("Mac's"), by and through counsel, to submit its Memorandum of Law in Support of its Motion for Summary Judgment filed pursuant to Rule 56 of the *Tennessee Rules of Civil Procedure*.

## SUMMARY OF ARGUMENT

The Plaintiff had superior knowledge of the gasoline spill prior to her fall. This superior knowledge bars her from recovering against Mac's for the fall as a matter of law. Therefore, summary judgment is appropriate.

## STATEMENT OF FACTS

On August 8, 2019, the Plaintiff stopped at the Mac's located at 708 South Main Street in Sweetwater, Tennessee doing business as Circle K to get gasoline in her Ford Explorer. (Compl. ¶ 5; Exhibit 1, p.49:1-10, 55:14-19). The Plaintiff had been to this Mac's gas station multiple times before this date. (Exhibit 1, p.51:5-21). Prior to August 8, 2019, the Plaintiff had not experienced any problems with this gas station or its pumps. (Exhibit 1, p.52:3-8).

The Plaintiff parked in front of the pump closest to Main Street and furthest from the Mac's convenience store building. (Exhibit 1, p.64:22-66:4; Exhibit 2). The Plaintiff paid for the gasoline

at the pump with her Exxon credit card. (Exhibit 1, p.66:5-7). The Plaintiff selected a grade of gasoline and inserted the pump into her vehicle's gasoline tank. (Exhibit 1, p.73:16-24). The Plaintiff pulled the handle to begin pumping the gasoline and engaged the automatic pumping mechanism. (Exhibit 1, p.73:25-74:11). The Plaintiff did not have trouble placing the pump in her vehicle's tank or engaging the automatic pumping mechanism of the gasoline pump handle. (Exhibit 1, p.74:12-23). The Plaintiff described the process as "the same as always." (Exhibit 1, p.74:12-15).

The Plaintiff testified she was familiar with "Don't leave pump unattended" signage on gasoline pumps and the general principle that a gasoline pump should not be left unattended while pumping. (Exhibit 1, p.67:1-24). Specifically, when asked "are you familiar that generally you don't leave your pump unattended," the Plaintiff testified, "[y]es, and I never walk away from it." (Exhibit 1, p.67:22-24). Nevertheless, on August 8, 2019, after engaging the automatic pump mechanism on the handle, the Plaintiff walked toward the front of her vehicle to speak with Sweetwater Police Officer Daniel Johnson, who was standing at the pump closest to the Mac's convenience store building. (Exhibit 1, p.75:2-76:13; Exhibit 2). When asked, "did you stay right next to the pump," the Plaintiff answered, "[n]o." (Exhibit 1, p.75:2-7). The Plaintiff indicated she was approximately four feet away from where the engaged gasoline pump was inserted into her vehicle. (Exhibit 1, p.69:8-70:7, 75:17-23; Exhibit 2).

While talking with Officer Johnson, the Plaintiff heard gasoline spilling. (Exhibit 1, p.76:14-23). The Plaintiff described the sound as "a gushing of water." (Exhibit 1, p.76:25-77:1). The Plaintiff looked and saw the gasoline handle still in her vehicle's tank with gasoline running down the side of vehicle onto the pavement. (Exhibit 1, p. 60:5-24, 77:5-7, 13-16, 20-23). When asked "did you see the gas spilling," the Plaintiff answered, "[y]es. Well, after I heard it and I

2

looked and it was running down my car and on the road." (Exhibit 1, p.77:13-16). The Plaintiff saw the gasoline on the ground. (Exhibit 1, p.60:5-24, 78:6-10). The Plaintiff testified she had the most knowledge about the spill prior to her fall. (Exhibit 1, p.78:3-5). She ran back to the gasoline handle. (Exhibit 1, p.80:7-17). She grabbed the handle, stopped the gasoline from pumping, and fell as she was putting the pump handle back in its holder on the pump. (Exhibit 1, p.60:5-24, 81:4-16).

The photograph below and attached as <u>Exhibit 2</u> to the Motion for Summary Judgment provides an illustration of the premises, what pump the Plaintiff used (arrow), where she was standing when talking with Officer Johnson while her pump was engaged (triangle), and where she fell (X). (Exhibit 1, p.49:23-50:16, 65:14-66:4, 76:6-10, 84:16-19; Exhibit 2).



## LAW AND ARGUMENT

"To establish prima facie proof of negligence in a premises liability claim, a plaintiff must prove five essential elements: (1) a duty of care owed by defendant to the plaintiff; (2) conduct by the defendant that was below the standard of care, amounting to a breach of a duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation." *Cartee v. Morris*, 2019 Tenn. App. LEXIS 443, at *9 (Tenn. Ct. App. Sept. 6, 2019) (internal citations omitted). The Plaintiffs' evidence at the summary judgment stage is insufficient to establish the duty and causation elements in this matter. *Id.* at *7 (citing *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015)).

## I.    The Plaintiff had superior knowledge of the gasoline spill that caused her fall.

"Business proprietors are not insurers of their patrons' safety." *Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004). "In cases involving premises liability, the premises owner has a duty to exercise reasonable care under the circumstances to prevent injury to persons lawfully on the premises." *Green v. Roberts*, 398 S.W.3d 172, 177 (Tenn. Ct. App. 2012). However, "[t]his duty is based upon the assumption that the owner has superior knowledge of any perilous condition that may exist on the property." *Id.*; *see Blair*, 130 S.W.3d at 764 ("Liability in premises liability cases stems from superior knowledge of the condition of the premises.").

The Plaintiff admitted she had superior knowledge of the gasoline spill prior to her fall. (Exhibit 1, p.78:3-5). The Plaintiff testified she saw the gasoline spill. (Exhibit 1, p.77:13-23). She further testified nobody else knew the gas was spilling. (Exhibit 1, p.77:25-78:2). Most notably, however, when asked "[w]ould you say you have the most knowledge about it spilling," the Plaintiff answered, "[y]es." (Exhibit 1, p.78:3-5).

4

The Plaintiff's acknowledgement that she had the most knowledge about the spill prior to her fall bars her from recovery as premises liability stems from the owner's superior knowledge of the perilous condition on the premises. *Blair*, 130 S.W.3d at 764; *Green*, 398 S.W.3d at 177. Simply put, the Plaintiff cannot recover because she had greater knowledge of the gasoline spill than Mac's. *Id.*; (Exhibit 1, p.78:3-5). As such, no duty arose, and summary judgment is warranted as a matter of law.

In *Jones v. Exxon Corp.*, the Tennessee Court of Appeals affirmed summary judgment based on similar facts. *Jones v. Exxon Corp.*, 940 S.W.2d 69, 73 (Tenn. Ct. App. 1996).[1] In *Jones*, the plaintiff stopped to purchase gasoline at an Exxon station in Memphis. *Id.* at 70. The plaintiff "parked at a concrete pumping island, got out of her vehicle and walked toward the Exxon shop to pay for her gasoline prior to pumping it." *Id.* "***When she stepped out of her vehicle, she noticed that gas was spilling rapidly out of a jeep-like vehicle on the opposite side of the concrete pumping island.***" *Id.* (emphasis added). "In the Exxon shop she announced that gasoline was spilling out of someone's vehicle." *Id.* After paying for her gasoline, the plaintiff "left the Exxon shop and, using the same route she had used to enter the shop, walked back to her car." *Id.* "She then pumped her gas and, as she was walking to the driver's side door of her automobile, slipped and fell on the concrete which was wet due to the overflowing gasoline." *Id.* She filed suit against Exxon for negligence. *Id.* at 71. The trial court granted summary judgment. *Id.* On appeal, the Tennessee Court of Appeals found "***[t]he record is clear that Mrs. Jones saw the gasoline which caused her fall.***" *Id.* at 73 (emphasis added). The Court of Appeals stated, "We do not believe that Exxon could or should have foreseen that Mrs. Jones would fall into the very gasoline spill of which she made Exxon aware." *Id.* "***[P]ersons using ordinary prudence would***

---

[1] Current Tennessee Supreme Court Judge Holly Kirby was a member of this appellate panel and concurred in the decision.

*not step in gasoline and, knowing that gasoline had been spilled onto the pavement, would have been on the lookout for the spill.*" *Id.* (emphasis added). The Court of Appeals affirmed summary judgment, holding "the defendant owed no duty to the plaintiff. Where there is no duty, there is no negligence." *Id.*

The result of this case should be no different. The Plaintiff knew of the spill, stepped in it anyway, and fell. However, unlike Exxon in *Jones*, Mac's was not made aware of the spill prior to the fall. The Court should follow this authority and grant summary judgment.

## CONCLUSION

The Plaintiff cannot establish the duty element of her negligence claim against Mac's because she had superior knowledge of the gasoline spill. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015) ("Our overruling of *Hannan* means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim . . .."). Indeed, Mac's did not have any knowledge of the spill prior to the Plaintiff's fall. Accordingly, Mac's respectfully requests the Court grant its Motion for Summary Judgment.

Respectfully submitted,

**CARR ALLISON**

BY: _____

**SEAN W. MARTIN, BPR #020870**
**CHANCEY R. MILLER, BPR #036124**
Attorneys for Defendant
736 Market Street, Suite 1320
Chattanooga, TN 37402
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
cmiller@carrallison.com

6

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

W. Tyler Weiss
409 N. College Street, Suite 1
Madisonville, TN 37354

This _11th_ day of _January_____, 2021.

BY: _____
   **SEAN W. MARTIN, ESQ.**
   **CHANCEY R. MILLER, ESQ.**

7



# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

| | | |
|---|---|---|
| CHERYL ANN LEACH and Husband, | * | |
| JOHN LEACH, SR. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | No. V20-0187S |
| | * | |
| MAC'S CONVENIENCE STORES, LLC, | * | JURY DEMANDED |
| | * | |
| Defendant. | * | |

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Mac's Convenience Stores, LLC ("Mac's"), by and through counsel, to submit its Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment filed pursuant to Rule 56 of the *Tennessee Rules of Civil Procedure*.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following is a statement of each undisputed material fact for which Mac's contends there is no genuine issue to be tried:

1.    On August 8, 2019, the Plaintiff stopped at the Mac's located at 708 South Main Street in Sweetwater, Tennessee to get gasoline. (Compl. ¶ 5; Exhibit 1, p.49:1-10, 55:14-19).

**RESPONSE:**

2.    The Plaintiff parked in front of the pump closest to Main Street and furthest from the Mac's convenience store building. (Exhibit 1, p.64:22-66:4; Exhibit 2).

**RESPONSE:**

3.    The Plaintiff paid for the gasoline at the pump with her Exxon credit card. (Exhibit 1, p.66:5-7).

**RESPONSE:**

4.      The Plaintiff selected a grade of gasoline and inserted the pump into her vehicle's gasoline tank. (Exhibit 1, p.73:16-24).

**RESPONSE:**

5.      The Plaintiff pulled the handle to begin pumping the gasoline and engaged the automatic pumping mechanism. (Exhibit 1, p.73:25-74:11).

**RESPONSE:**

6.      After engaging the automatic pump mechanism on the handle, the Plaintiff walked toward the front of her vehicle to speak with Sweetwater Police Officer Daniel Johnson. (Exhibit 1, p.75:2-76:13; Exhibit 2).

**RESPONSE:**

7.      The Plaintiff was approximately four feet away from where the engaged gasoline pump was inserted into her vehicle. (Exhibit 1, p.69:8-70:7, 75:17-23; Exhibit 2).

**RESPONSE:**

8.      While talking with Officer Johnson, the Plaintiff heard gasoline spilling. (Exhibit 1, p.76:14-77:1).

**RESPONSE:**

9.      The Plaintiff looked and saw gasoline running down the side of vehicle onto the pavement. (Exhibit 1, p. 60:5-24, 77:5-7, 13-16, 20-23).

**RESPONSE:**

10.      The Plaintiff saw the gasoline on the ground. (Exhibit 1, p.60:5-24, 78:6-10).

**RESPONSE:**

11.      The Plaintiff had the most knowledge about the gasoline spilling. (Exhibit 1, p.78:3-5).

2

**RESPONSE:**

12.     Nobody else knew the gasoline was spilling. (Exhibit 1, p.77:25-78:2).

**RESPONSE:**

13.     The Plaintiff fell as she was putting the pump handle back in its holder on the pump.

(Exhibit 1, p.60:5-24, 81:4-16).

**RESPONSE:**

Respectfully submitted,

**CARR ALLISON**

BY: _____
       **SEAN W. MARTIN, BPR #020870**
       **CHANCEY R. MILLER, BPR #036124**
       Attorneys for Defendant
       736 Market Street, Suite 1320
       Chattanooga, TN 37402
       (423) 648-9832 / (423) 648-9869 FAX
       swmartin@carrallison.com
       cmiller@carrallison.com

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

W. Tyler Weiss
409 N. College Street, Suite 1
Madisonville, TN 37354

This _____ day of _____, 2021.

BY: _____
       **SEAN W. MARTIN, ESQ.**
       **CHANCEY R. MILLER, ESQ.**

3

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and Husband,
JOHN LEACH, SR.,

      Plaintiffs,

-vs-

                                   Civil Action No. V20-0187S

MAC'S CONVENIENCE STORES, INC.

      Defendant.

---

## PLAINTIFFS' MOTION TO CONTINUE HEARING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO T.R.Civ.P 56.07

---

Come the Plaintiffs, pursuant to Tennessee Rule of Civil Procedure 56.07, and move the Court to continue the hearing on Defendant's Motion for Summary Judgment until such time as discovery is completed.

As grounds for this Motion, Plaintiffs show to the Court the following:

1.     Suit was filed on July 9, 2020 in the Circuit Court for Monroe County, Tennessee.

2.     An Answer was filed on August 14, 2020 by the Defendant.

3.     By agreement, the deposition of the Plaintiff, Cheryl Ann Leach was taken on November 2, 2020.

4.     As of this date, the discovery depositions of the Defendant's employees present at the time of Mrs. Leach's fall, or any corporate representative of Defendant have not been taken.

5.     Pursuant to Tennessee Rule of Civil Procedure 56.07, the Court may continue a motion for summary judgment until such time as discovery is completed to allow the plaintiff to file a response to the motion.

1

6.      Following the deposition of Mrs. Leach, the Plaintiffs sought dates to set the depositions of the Defendant's employees present at the time of Mrs. Leach's fall. *(See Exhibit 1 and Exhibit 2 - email correspondence concerning the setting of employees' depositions)*

7.      At the time of filing this Motion, the depositions of Defendant's employees have neither been scheduled nor taken.

WHEREFORE, Plaintiffs respectfully request the Court to continue the Defendant's Motion for Summary Judgment until such time as discovery is completed.

Respectfully submitted, this ___4th___ day of February, 2021.


_____
W. Holt Smith (BPR #04557)
*Attorney for Plaintiffs*
209 Tellico Street North
Madisonville, Tennessee 37354
(423) 442-4012


_____
W. Tyler Weiss (BPR #028801)
*Attorney for Plaintiffs*
WORTHINGTON & WEISS, P.C.
409 North College Street, Suite 1
Madisonville, Tennessee 37354
(423) 442-5353

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY a copy of the foregoing has been furnished this _4th_ day of February 2021, by U.S. mail, postage prepaid, to the following:

Sean W. Martin, Esquire
Chancey R. Miller, Esquire
*Attorneys for Mac's Convenience Stores, LLC*
CARR ALLISON
736 Market Street
Suite 1320
Chattanooga, Tennessee 37402

W. Holt Smith

3

 **Gmail**                          **Tamara Vanderwerf <tam.holtsmithlaw@gmail.com>**

## Leach v. Mac's

**Tamara Vanderwerf** <tam.holtsmithlaw@gmail.com>          Tue, Jan 19, 2021 at 7:49 AM
To: "Martin, Sean W" <swmartin@carrallison.com>, Chancey Miller <cmiller@carrallison.com>
Cc: Tyler Weiss <tweiss@worthingtonweiss.com>, Darby Baker <dbaker@worthingtonweiss.com>
Bcc: Tamara Vanderwerf <tam.holtsmithlaw@gmail.com>

Sean & Chancey:

We would like to schedule the depositions of Renee Howell and Laura
Angell. Holt would be happy to host.

Please forward your available March/April dates.

Thank you,
Tam

--
Tamara L. Vanderwerf
LAW OFFICE OF W. HOLT SMITH
209 Tellico Street North
Madisonville, Tennessee 37354
(423) 442-4012
(423) 442-1038 - Fax
**My Hours are Monday - Friday, 8 a.m - 2 p.m.**

**CONFIDENTIALITY NOTICE:** This electronic mail transmission has been sent by a law office. It
may contain information that is confidential, privileged, proprietary, or otherwise legally exempt
from disclosure. If you are not the intended recipient, you are hereby notified that you are not
authorized to read, print, retain, copy or disseminate this message, any part of it, or any
attachments. If you have received this message in error, please delete this message and any
attachments from your system without reading the content and notify the sender immediately of
the inadvertent transmission. There is no intent on the part of the sender to waive any privilege,
including the attorney-client privilege, that may attach to this communication. Thank you for your
cooperation.

**EXHIBIT 1**

 **Gmail**      **Tamara Vanderwerf <tam.holtsmithlaw@gmail.com>**

## Leach v. Mac's

**Tamara Vanderwerf** <tam.holtsmithlaw@gmail.com>      Wed, Feb 3, 2021 at 9:51 AM
To: Chancey Miller <cmiller@carrallison.com>, Sean Martin <swmartin@carrallison.com>
Cc: Tyler Weiss <tweiss@worthingtonweiss.com>, Darby Baker <dbaker@worthingtonweiss.com>, "W. Holt Smith (holtsmithlaw@gmail.com)" <holtsmithlaw@gmail.com>
Bcc: Tamara Vanderwerf <tam.holtsmithlaw@gmail.com>

Much to my chagrin, I misread Chancey's response of January 19 that included some February deposition dates. At this point, the only dates Chancey gave that Holt is available are February 16 and 17, which may be too close to get these depositions set.

Holt has February 24, 25 and 26 available.
He is also available March 3, 4, 9-12, 15-19, 22-26, 29-31

I look forward to hearing from everyone.

Thanks,
Tam

[Quoted text hidden]

**EXHIBIT 2**

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and Husband,     *
JOHN LEACH, SR.                    *
                                   *
        Plaintiffs,                *
                                   *
v.                                 *     No. V20-0187S
                                   *
MAC'S CONVENIENCE STORES, LLC,     *     JURY DEMANDED
                                   *
        Defendant.                 *

## AGREED ORDER GRANTING PLAINTIFFS' MOTION TO CONTINUE HEARING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

By agreement of the parties, the Plaintiffs' Motion to Continue Hearing on Defendant's

Motion for Summary Judgment is **GRANTED** and the hearing on Defendant's Motion for

Summary Judgment is continued to April 5, 2021 at 9:00 a.m.

ENTERED this _3_ day of _____, 2021.

TIME _11:00_ AM/PM

FILED

MAR 08 2021

_____
JUDGE

MARTHA M. COOK
CIRCUIT COURT CLERK

**APPROVED FOR ENTRY:**

**CARR ALLISON**                          **LAW OFFICE OF W. HOLT SMITH**

BY: _____              BY: _____
SEAN W. MARTIN, BPR #020870              W. HOLT SMITH, BPR #04557
CHANCEY R. MILLER, BPR #036124           Attorney for Plaintiffs
Attorneys for Defendant                  209 Tellico Street North
736 Market Street, Suite 1320            Madisonville, TN 37354
Chattanooga, TN 37402                    (423) 442-4012
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
cmiller@carrallison.com                  **WORTHINGTON & WEISS**

CERTIFICATE OF SERVICE                   BY: _____
The undersigned hereby certifies that a true and exact copy of      W. TYLER WEISS, BPR #028801
this the foregoing document has been served upon all parties of     Attorney for Plaintiff
interest in this case by delivering a true and exact copy to the    409 North College Street, Suite 1
offices of said parties or by placing a copy in the United States   Madisonville, TN 37354
mail addressed with sufficient postage thereon to carry it to its   (423) 442-5353
destination.
This the _8_ day of _March_ 2021
Martha M. Cook, Circuit Clerk

Copies to Martin, Smith, Weiss

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

W. Tyler Weiss
409 N. College Street, Suite 1
Madisonville, TN 37354

This _15th_ day of _February_, 2021.

BY: _____
**SEAN W. MARTIN, ESQ.**
**CHANCEY R. MILLER, ESQ.**

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and )
JOHN LEACH, SR., )
         )
         Plaintiffs, )
v. )      Docket No. <u>V200187S</u>
         )
MAC'S CONVENIENCE STORES, LLC, )
         )
         Defendant. )

## **NOTICE OF SERVICE**

Comes the Plaintiff, CHERYL ANN LEACH, by and through counsel, and gives NOTICE

that Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production

of Documents to Plaintiff was served upon MAC'S CONVENIENCE STORES, LLC, (hereinafter

the "Defendant") by and through their attorneys, Chancey R. Miller and Sean W. Martin, on this

date. Plaintiff requests that this Notice be placed in the records and filed by the Clerk.

Respectfully submitted this _____ /*6* _____ day of February, 2021.

WORTHINGTON & WEISS, P.C.

W. Tyler Weiss (TN BPR #028801)
409 N. College Street, Suite 1
Madisonville, Tennessee 37354
Office: 423.442.5353
Fax:     423.442.3866
Email: tweiss@worthingtonweiss.com

*Counsel for Cheryl and John Leach, Sr.*

## CERTIFICATE OF SERVICE

I certify that a true and complete copy of this pleading has been delivered by United States Mail, postage prepaid, Facsimile and/or Hand Delivery to Defendant's counsel, Sean W. Martin and Chancey R. Miller, 736 Market Street, Suite 1320, Chattanooga, Tennessee 37402 this the /6 day of February, 2021.

WORTHINGTON & WEISS, P.C.

W. Tyler Weiss

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

**CHERYL ANN LEACH and husband,**
**JOHN LEACH, SR.,**

**Plaintiffs,**

**v.**

**MAC'S CONVENIENCE STORES, LLC,**

**Defendant.**

*TIME FILED*
*MAR 1 8 2021*
*MARTHA M. COOK*
*CIRCUIT COURT CLERK*

**Docket No. V20-187S**

**JURY DEMANDED**

---

## CERTIFICATE OF ELECTRONIC SERVICE

---

Pursuant to Tenn. R. Civ. P. 5.02(2)(a), the Plaintiff gives notice that the below-signed counsel served the following document(s) electronically on **March 18, 2021** at **1:50 p.m. (EDT):**

1.  Plaintiffs' Response to Motion for Summary Judgment filed on behalf of Defendant, Mac's Convenience Stores, LLC (3 pages).

2.  Plaintiffs' Memorandum in Response to Motion for Summary Judgment (11 pages).

3.  Portions of the Deposition of Cheryl Ann Leach (16 pages).

4.  Affidavit of Daniel Johnson (2 pages).

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE
## AT MADISONVILLE

TIME **FILED**
_____AM/PM
MAR 1 8 2021
MARTHA M. COOK
CIRCUIT COURT CLERK

**CHERYL ANN LEACH and husband,**
**JOHN LEACH, SR.**
    **Plaintiffs**

**v.**

                                     **No. V20-0187S**
                                     **Jury Demanded**

**MAC'S CONVENIENCE STORES, LLC**
    **Defendant**

---

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF DEFENDANT, MAC'S CONVENIENCE STORES, LLC

Come the Plaintiffs, pursuant to Rule 56 and files this Response to the

Motion for Summary Judgment filed on behalf of Defendant, Mac's Convenience

Stores, LLC, and in support of the Response filed the following docuemnts:

1.    Plaintiff's Memorandum in Response to Motion for Summary Judgment;

2.    Portions of the deposition of Cheryl Ann Leach;

3.    Affidavit of Daniel Johnson;

4.    Deposition of Delores Renee Howell (manager of Circle K Convenience

        Store in Sweetwater, Tennessee on the date of the injury, August 8, 2019);

1

5.    Three cases setting forth the method of operation theory in the State of Tennessee (Hale v. Blue Boar Cafeteria Co., Barrett v. Red Food Stores, Inc. and Bledsoe v. Delta Ref. Co.); and

6.    Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

Plaintiffs contend that there is a genuine issue as to a material fact as to whether or not the Defendant by its method of operation created an unsafe condition at its store located in Sweetwater, Tennessee.  Furthermore, there is a genuine issue as to material fact as to whether or not the Plaintiff, Cheryl Ann Leach, was guilty of comparative fault as a matter of law.

Wherefore, the Plaintiffs respectfully request the Court to deny the Motion for Summary Judgment and allow the case to proceed to a jury trial.

THIS the 18th day of March, 2021.

_____
W. HOLT SMITH, BPR # 004557
209 Tellico Street North
Madisonville, Tennessee  37354
Phone:        (423) 442-4012
Fax:            (423) 442-1038

2

W. TYLER WEISS, BPR # 028801
WORTHINGTON & WEISS
409 N. College Street
Madisonville, Tennessee 37354
Phone:       (423) 442-5353
Fax:          (423) 442-3866

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of March, 2021 a true and exact copy of this document emailed to:

Sean W. Martin - swmartin@carrallison.com
Chancey R. Miller - cmiller@carrallison.com
CARR ALLISON
736 Market Street, Suite 1320
Chattanooga, Tennessee 37402

W. HOLT SMITH

3

# CHERYL ANN LEACH



# PLAINTIFF'S MEMORANDUM IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE
## AT MADISONVILLE

F I L E D

TIME_____AM/PM

MAR 1 8 2021

MARTHA M. COOK
CIRCUIT COURT CLERK

**CHERYL ANN LEACH and husband,**
**JOHN LEACH, SR.**
    **Plaintiffs**

v.

            **No. V20-0187S**
            **Jury Demanded**

**MAC'S CONVENIENCE STORES, LLC**
    **Defendant**

## PLAINTIFFS' MEMORANDUM
## IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### FACTS

Ms. Cheryl Leach was injured on August 8, 2019 at the Circle K market located in Sweetwater, Tennessee, when the automatic shut-off device for the pump malfunctioned and caused gasoline to spill on the ground. Ms. Leach saw the gas spilling and hurried over to replace the nozzle. When she did so she slipped causing injury to her knee. Ms. Leach states the cause of the gasoline spill was when the tank in her car got full and the pump did not automatically stop like it normally does. (Deposition Cheryl Leach p. 60, 74, 89). Thus, the cause of Ms. Leach's fall was the malfunction of the gasoline pump automatic shut-off device

1

which should shut off the pump when the gas tank is full. When the customer wants to fill the gas tank he or she can automatically place the pump on a fill-up position and when the customer's gas tank is full the device automatically shuts off preventing the spill of gasoline. However, on this day, when Ms. Leach's gas tank got full, for some reason, the pump did not automatically stop the gas from pumping and the gas spilled on the ground causing a slick condition resulting in injury to Ms. Leach.

## ISSUE

Is the Defendant entitled to judgment as a matter of law on the issues of notice and comparative fault on the part of Ms. Leach?

## NOTICE REQUIREMENT
## AND THE METHOD OF OPERATION EXCEPTION

Ordinarily, a Plaintiff must show that the owner of property had either constructive or actual knowledge of a dangerous or unsafe condition or the Defendant created the unsafe condition. If the Defendant created the unsafe condition, no notice is required. As a corollary, the Courts have found it is logical not to require notice of a hazardous or unsafe condition created by the <u>method</u> by which the person operates its business. *Hale v. Blue Boar Cafeteria Co.*, 1980 Tenn.App. Lexis 321. (See attached copy of opinion); *Barrett v. Red Food Stores,*

2

*Inc.*, APP NO. 01-A-01-9108-CV-00302 (Tenn.App. 1992) (See attached copy of opinion); *Bledsoe v. Delta Refining Co.*, 1983 Tenn.App. Lexis 694 (See attached copy of opinion). As the Court stated in *Delta Refining*, with the advent of self-service merchandising Courts began to recognize certain hazards were created by this method of doing business which were not normally associated with the operation of the business before self-serving merchandising became prevalent. For this reason, the Courts have backed away from the strict application of the actual or constructive notice requirement. These cases have been described as an exception to the notice requirement.

> However, with the advent of self-service merchandising, first evidenced in the retail food industry, the courts began to recognize that certain hazards were created by this method of doing business that were not normally associated with food stores that were non-self-service. Therefore, the courts have backed away from a strict application of the actual or constructive notice requirement. This trend of cases, which has been described as either expanding the notice requirement or representing an exception to the notice requirement.
>
> *Bledsoe v. Delta Refining Co.*, p. 4.

The notice requirement is met if the Plaintiff can prove that the Defendant's method of operation created a hazardous condition foreseeably harmful to others. *Martin v. Washmaster Auto Center, USA*, 946 S.W.2d 314 (Tenn.App. 1996). The requirements of the method of operation theory are as follows: (1) whether the condition created by the chosen method of operation constitutes a hazardous

3

situation foreseeably harmful to others, (2) whether the proprietor used reasonable and ordinary care towards its invitees under these circumstances, and (3) whether the condition created was a direct and proximate cause of the Plaintiff's injury. *Martin*, Id at 320.

It is not disputed that the condition created by the malfunction of the automatic shut-off device caused Ms. Leach to fall. As Ms. Leach stated, the cause of the gasoline leak was a failure of the automatic shut-off valve to work on the pump. This is a condition created by the Defendant, Circle K. Knowing the hazardous situation created by the failure of the automatic shut-off valve to function properly, Circle K, had a duty to assure that the automatic shut-off valve was operating correctly to prevent injury to its customers.

Employees of the Defendant were responsible for inspecting the pumps as part of their duties. In fact, they were charged with the responsibility of checking the pumps every day. The employees acknowledge that the automatic shut-off valve will from time to time malfunction. (Deposition Delores Renee Howell p. 22-29).

## MS. LEACH'S INJURY WAS FORESEEABLE

The Defendant, Circle K, chose to operate in a self-service manner allowing the customer to pump the gasoline. As part of the process, as convenience to the

4

customers, Circle K allowed an automatic pumping system to be used at the pump. The failure of the automatic pumping system to operate correctly allowed the gasoline tanks to be overfilled causing a dangerous condition.

The issue of negligence, ie, foreseeability, is particularly an issue for the trier of fact, not the Court. *Brookins v. The Round Table, Inc.*, 624 S.W.2d 547 (Tenn. 1981). The mere fact that no one can point to a previous episode of the automatic fill-up mechanism having failed at this location does not relieve Circle K of responsibility. Actual notice is not required.

Although the facts as to Ms. Leach's fall are virtually undisputed, the inference to be drawn from the facts and circumstances must be construed in the light most favorable to the non-moving party. "Reasonable" inferences need not be necessarily more probable or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one inference creates a genuine dispute of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 1552 (1999).

In Tennessee facts may be inferred from circumstantial evidence, and an inferred fact may be the basis of a further inference to the ultimate or sought-for fact. *Stinson v. Daniel*, 414 S.W.2d 7 (Tenn. 1967). In a civil case depending on circumstantial evidence, it is sufficient for a party having the burden of proof to

5

make out a more probable hypothesis, and the evidence need not arise to that degree of certainty which will exclude every other reasonable conclusion. *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560 (Tenn. App. 1985). The Plaintiff need only present proof, which if believed by the jury, makes Plaintiff's theory of the case more probable than not. *Browder v. Pettigrew*, 541 S.W.2d 402 (Tenn. 1976).

The Plaintiff met her burden of proof that a dangerous condition existed, and the Defendant had constructive notice when the Plaintiff testified she was in the store late one night, she slipped and fell on a wet wax floor, that the wax stained her white pants, and that the area where she fell was in plain view of two store employees. *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560, at 561 (Tenn.App. 1985).

A customer who slipped and fell when she stepped on a soap like substance proved constructive notice because both the manager and the front store supervisor had passed the scene of the fall shortly before the customer fell. The front store supervisor admitted it was her duty to inspect the floors. *Henson v. F.W. Woolworth's Co.*, 537 S.W.2d 923 (Tenn. App. 1974).

Where a lady who was entering the City Hall of Savannah tripped and fell over a three-eighths of an inch hole between brick pavers and the sidewalk, the Tennessee Supreme Court agreed with the trial court that this hole made the

6

sidewalk defective, unsafe or dangerous. *Coln v. City of Savannah*, 966 S.W.2d 34 (Tenn. 1998).

In *Moon v. SCOA Industries*, Inc., 764 S.W.2d 550 (Tenn. App. 1988), the Court upheld a jury verdict for Moon who fell while walking down a store aisle due to a slippery substance on the floor. The Court found evidence of constructive notice because the location of the accident was in close proximity to the security guard and the sales personnel of SCOA. It could thus be inferred that SCOA's employees could have and should have seen the actual spilling of the liquid or the liquid on the floor after the spill in time to remove it or alert others to its existence. The Court noted that actual or constructive notice may be proven by circumstantial evidence. *Id*, at 553.

Here, a reasonable jury could draw the following inferences:

1.  The Defendant, Circle K, decided to use the automatic fill system for its convenience and the convenience of the customers;

2.  As part of this process the automatic pumping system was incorporated into the pump;

3.  From time to time the automatic pumping system would not work correctly and the tank would overflow allowing gasoline to accumulate on the ground;

7

4.   As a direct result of the gasoline having been spilled on the ground and a slippery substance of the gasoline on the surface, Ms. Leach fell and was injured; and

5.   Ms. Leach is not more than fifty percent (50%) at fault as a matter of law.

## MS. LEACH WAS NOT MORE THAN 50% AT FAULT AS A MATTER OF LAW

Whether Ms. Leach left the gas pump unattended is a question of fact for the jury. After she had started the process of filling up her tank, Ms. Leach walked one or two steps to the front right side passenger door and started talking to Officer Johnson. According to her, she was less than four (4) feet away from the pump at the time this occurred. Once Ms. Leach saw that the gas was running down the side of her car and onto the ground she quickly stepped one or two steps and stopped the pumping of the gas and replaced the nozzle in the pump. When she did, her foot slipped on the gas causing her injury. (Deposition Cheryl Leach pp. 75-84, 87). Whether her actions constitute more than fifty percent (50%) fault is a question of fact for the jury.

This issue should be submitted to the jury.

8

## MOTION FOR SUMMARY JUDGMENT STANDARD

The Tennessee Supreme Court reinstated the federal standard for a Motion for Summary Judgment in *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015). However, even using the federal standards, the trial court should be hesitant to grant a Motion for Summary Judgment.

The trial Court should act with caution in granting summary judgment and should deny summary judgment in a case in which there is reason to believe that the better course would be to proceed to a full trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In ruling on a Motion for Summary Judgment the Court will never weigh the evidence or find the facts. *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001). A Court may not make credibility determinations nor weigh the evidence when reviewing a Motion for Summary Judgment; rather, the evidence must be viewed in the light most favorable to the nonmoving party, where all reasonable inferences inure to that parties benefit. *Id.*, at 570. "Reasonable" inferences need not be necessarily more probable or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one inference creates a genuine dispute of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 1552 (1999). Finally, the Court will not weigh the credibility of witnesses or other evidence in ruling on a

9

Motion for Summary Judgment. Evaluating credibility, weighing evidence and drawing factual inferences are all functions reserved for the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

THIS the 18th day of March, 2021.

W. HOLT SMITH, BPR # 004557
209 Tellico Street North
Madisonville, Tennessee 37354
Phone:    (423) 442-4012
Fax:     (423) 442-1038

W. TYLER WEISS, BPR # 028801
WORTHINGTON & WEISS
409 N. College Street
Madisonville, Tennessee 37354
Phone:    (423) 442-5353
Fax:     (423) 442-3866

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of March, 2021 a true and exact copy of this document emailed to:

Sean W. Martin - swmartin@carrallison.com
Chancey R. Miller - cmiller@carrallison.com
CARR ALLISON
736 Market Street, Suite 1320
Chattanooga, Tennessee 37402


_____
W. HOLT SMITH

11

# CHERYL ANN LEACH



# PORTIONS OF THE DEPOSITION OF CHERYL ANN LEACH

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and            )
husband JOHN LEACH, SR.         )
                                )
                Plaintiffs      )
                                )
vs.                             )      No.:  V20-0187S
                                )
CIRCLE K STORES, INC. and MAC'S )
CONVENIENCE STORES, LLC         )
                                )
                Defendants      )


APPEARANCES:

        MR. HOLT SMITH
        MR. TYLER WEISS
        Attorneys for the Plaintiffs
        Cheryl and John Leach

        MR. CHANCEY MILLER
        Attorney for the Defendants
        Circle K Stores and MAC'S Convenience Stores

TIME ___ FILED ___ AM/PM
MAR 1 2 2021
MARTHA M. COOK
CIRCUIT COURT CLERK


                    DEPOSITION

                       OF

                CHERYL ANN LEACH

               November 2, 2020            


_____

            DONNA D. TOUSEULL, LCR
               HOOD & McMASTERS
    P. O. BOX 894, SEYMOUR, TN 37865-0894
               865-577-5181

1  this direction (indicating).  Daniel Johnson, Sweetwater

2  City police officer, was at the other pump, so I was --

3  my pump is on the passenger side of the car, and I always

4  set my -- I always fill my car up with gas.  I don't just

5  get $10 or 15, something like that; I fill it up.

6          So I had the nozzle set for it to

7  fill up, and I was talking to Daniel Johnson that was

8  getting gas on the other side.  We had National Night Out

9  two nights before that on Tuesday night, and we were

10  talking about the National Night Out.  Then I heard water

11  or liquid, whatever you call it, and I looked, and the

12  nozzle didn't stop, and gas was pouring out down the side

13  of my car and on the ground.

14          So I went and got the nozzle and put

15  it up and slipped on the gas, and when I slipped on the

16  gas, my left foot slipped and went outward, and my left

17  knee went inward and hit the ground.  Daniel saw me fall,

18  and he came over and helped me up, and he went and got

19  the stuff that you sprinkle on it and sprinkled it down,

20  and he told the guy that was with him to go inside and

21  get somebody inside the store.  So that woman came out

22  and wrote down on a piece of paper her name and phone

23  number to call if there was ever any issues and asked if

24  I was okay.

25          Then as the day went on, my knee kept

1    that said that?

2            A          No, but I'm assuming it has it.

3            Q          But you would agree you're generally

4    familiar with that principle?

5            A          Yeah, I know they should have them on

6    there.

7            Q          So you start pumping.  Let's go back.

8    You hit your button.  Unleaded, I assume?

9            A          Uh-huh.  Well, no -- yeah.  Well,

10   when I first put the Exxon card in, -- and this is just

11   overall general -- I have to put my mileage in.

12   Sometimes I forget and have to walk back to the driver's

13   side and get the mileage, sometimes I remember before I

14   get out of the car.  So I don't even remember what I did

15   that time, but I enter the mileage, and then they want

16   the driver ID number, and I enter my ID number in.

17                      Then when it says it's okay, then I

18   usually insert the gas pump into the car, the nozzle into

19   the car, and then I select what kind of gas that I want,

20   but I always set it for it to click on that little notch

21   for it to fill up because I always fill up my car.  It

22   usually stops automatically when a car is full, but for

23   some reason, it didn't stop that time.

24           Q          How long after you inserted the pump

25   into your tank, how long after that did the accident

1    pumping your vehicle full of gas.

2            A        Yeah, I always lock it in the little

3    notch there so it will run on its own.

4            Q        So did you immediately engage the

5    little automatic pump mechanism?

6            A        I usually do, so, yes.

7            Q        But, like, did you pump for a while

8    and then you engaged it, or you did it --

9            A        I always get it started, set the

10   little notch, the thing that you lock it in the notch so

11   it will pump on its own.  That's what I always do.

12           Q        Did you have any difficulty locking

13   that in?

14           A        I don't think so.  I think it was,

15   you know, the same as always, just hit the notch.

16           Q        Did you have any difficulty when you

17   put the pump in your car about getting the gas going?

18           A        No.

19           Q        For example, sometimes when I put gas

20   in a vehicle, sometimes it wants to act like it's already

21   full of gas and you know it isn't.  You know, it won't

22   keep going; it will keep clicking off.  Did that happen?

23           A        No.

24           Q        Do you know what I'm talking about?

25           A        Yeah, but, no, I don't -- I don't

1    remember it, but I don't think it did.

2              Q        All right.  So did you stay right

3    next to the pump?

4              A        No.  My gas tank is right beside the

5    back passenger side door.  I was right at the front

6    driver's side door talking to Daniel.  So I wasn't right

7    next to it, standing right there next to it.

8              Q        So you went from close to the back

9    passenger door where your pump was.

10             A        Uh-huh.

11             Q        And then you walked to the front of

12   your car.

13             A        No, it wasn't to the front of the

14   car.  It was next to the driver's side door, which is

15   maybe from here -- I don't know how wide doors are, so

16   maybe from here to here (indicating).

17             Q        So are you signifying about four feet

18   or so?

19             A        Yeah.  I'm not very good with the

20   feet, but --

21             Q        But you were far enough away where

22   you could see around the pump to where Officer Johnson

23   was so you could communicate?

24             A        Yes.  Well, if you look at the

25   picture, the back of my car where the pump is, I usually

1    park to where the gas tank is right there where the

2    nozzle is right there with the tank.  So if you're going

3    to use the car in here as an example, I'm assuming that I

4    was probably from here to here (indicating), to that

5    side.

6            Q        Okay.  If you could, right here where

7    we can see on the light part, could you draw a triangle

8    where you were standing talking to Officer Johnson.

9            A        I don't know.  It was probably right

10   in here, I'm assuming.  (Witness complies with request.)

11           Q        And that would have been near the

12   front passenger side of your vehicle.

13           A        Yes.

14           Q        And you guys were just talking,

15   chatting back and forth?

16           A        Uh-huh, and then I heard the sound of

17   what sounded like water.

18           Q        Now, what did you talk with Officer

19   Johnson about, the National Night Out?

20           A        National Night Out.

21           Q        So how did you know that the gasoline

22   was spilling?

23           A        I heard it.

24           Q        Like, dripping water sounds or --

25           A        Yeah, it sounded like a gushing of

1    water.

2           Q        Did you ever hear the mechanism click

3    off?

4           A        No.

5           Q        Did the handle stay inside your gas

6    tank?

7           A        Yes.

8           Q        Was it in there all the way?

9           A        I'm assuming it was.

10          Q        But you're not sure?

11          A        No.  I mean, I usually put it all the

12   way in.

13          Q        Did you see the gas spilling?

14          A        Yes.  Well, after I heard it and I

15   looked and it was running down my car and on the road.

16   It was running down the side of my car.

17          Q        Did Officer Johnson tell you, "Hey,

18   your gas is spilling."

19          A        No.  He was at the other pump.

20          Q        So you heard it.

21          A        Yes.

22          Q        And then you looked and saw it.

23          A        Yes.

24          Q        Did anybody else know that it was

25   spilling?

```
 1          A          I don't think so.  I don't think
 2   anyone else was around.
 3          Q          Would you say you have the most
 4   knowledge about it spilling?
 5          A          Yes.
 6          Q          So where did you see the gas?
 7          A          It was running down the side of my
 8   car on the ground.
 9          Q          So you saw it on the ground.
10          A          Uh-huh.
11          Q          You saw it on the side of your car.
12          A          Yes.
13          Q          Did it get on the pump platform?
14          A          Are you talking about that little
15   island that it's on?
16          Q          The little island, yeah.
17          A          No, it was on the ground.
18          Q          Just on the ground next to your
19   vehicle.
20          A          Yeah.  Well, I'm assuming it was.  I
21   didn't really pay attention, but it was running down the
22   car and on the ground, so I'm assuming it wasn't on the
23   island.
24          Q          Okay.  Was it a lot of gas?
25          A          No, I think I caught it pretty quick.
```

1   I don't think it was a lot, but it was a pretty big

2   puddle, but it wasn't a lot.

3              Q          So did it puddle, or did it kind of

4   spread out?

5              A          It was kind of spread out.

6              Q          But did it form any deepness?

7              A          I don't think so.

8              Q          Could you estimate?  I mean, was it

9   just completely flat, or did it puddle up at all?

10             A          I really don't know.  I didn't pay

11  attention to it, I'm sorry.

12             Q          So what did you do then?  You see it.

13             A          I got the nozzle, and I put the

14  nozzle up, and when I was putting the nozzle up, my foot

15  hit the gas.  I didn't even know until that instant that

16  gas was slippery like that.  I thought gas would have

17  been like water, but it was really slippery, and then my

18  foot just slid out from underneath it.  When I fell, my

19  left foot went out, and my knee hit the ground.

20             Q          So did you rush back over to stop it?

21  I mean, did you --

22             A          No, I had gotten the nozzle in.

23             Q          But you were up here at the front of

24  your car or at the front passenger door; correct?

25             A          Oh, okay, I see.  Yeah, as soon as I

1 heard it, I went over and grabbed the nozzle out.

2         Q        Did you hurry over there to try to

3 save some money?

4         A        No, I was trying to save the gas from

5 going all over the place. It didn't have anything to do

6 with money.

7         Q        But you rushed back over there; is

8 that a fair way to say it?

9         A        Yes. Yeah, I remember seeing it, and

10 it was like, "Oh," and I ran to go get it. Well, there

11 really wasn't much running because I wasn't that far. It

12 was maybe, what, four steps or five?

13         Q        Would you characterize it as a

14 hustle?

15         A        Yeah.

16         Q        Faster than a walk?

17         A        Yeah, a quick move.

18         Q        But you managed to get there.

19         A        Uh-huh.

20         Q        And you pulled the pump, you pull it

21 out -- or you stopped it first, I assume.

22         A        Yes.

23         Q        And then you pulled the handle --

24         A        Well, when you grab hold of the

25 nozzle, when I got it out, it, I guess, unlocked. When I

1    grabbed hold of it, it loosened it or something to where

2    it wasn't doing automatic anymore, and so it stopped when

3    I grabbed hold of it, and it released it, I guess.

4            Q        So when you grabbed the pump handle,

5    it stopped pumping.

6            A        Yes, it released from the latch or

7    that notch or whatever you want to call it.

8            Q        And did you pull it out of your car?

9            A        Yes.

10           Q        Did you put it in the holder on the

11   pump?

12           A        Yes.

13           Q        And you hadn't fallen at that point.

14           A        Well, it was just about the same

15   time.  After I got it in is when my foot hit the gas and

16   I slipped.

17           Q        So I assume you turned around.

18           A        Well, it wasn't really a matter of

19   turning around because, when I got hold of it and got it

20   out, then it was a matter of just moving the nozzle or

21   the handle from here to here (indicating) because I

22   always park with my gas tank right there at the nozzle.

23   So I didn't have to turn around.  I just grabbed hold of

24   it and got it out here and then put it in.

25           Q        So if you didn't have to turn around,

1    did you have to take a step?

2         A        To be honest, I don't remember.

3         Q        At what point, I guess, did you fall?

4    Did the fall occur after a step?

5         A        I don't remember.  I just -- I think

6    if I thought I was going to be here today I probably

7    would have paid more attention, but I don't remember.  I

8    just remember my foot hitting it, and it was just

9    instant.  As soon as my foot it, it just slipped.  So I

10   don't remember if I took a step or not.

11        Q        So when you come back over from the

12   front portion of your vehicle to the pump, to the gas

13   tank part, did you have to go through any gasoline to get

14   there?

15        A        Well, the gas was there.

16        Q        The gas was on the ground.

17        A        Uh-huh.

18        Q        Did you have to go through the gas to

19   get to the pump?

20        A        I think the gas -- yeah, it was

21   there, so I think maybe when -- I just thought of

22   something.  You was asking about where I went afterwards.

23   I did have to go home because I had gas on my pants and

24   my shoes, so I had to go home and change, so I do

25   remember that now.  When I got it, got the nozzle out, I

1    just remember putting it in, and I don't remember if the

2    gas was right there or not or -- I really don't remember.

3              Q          Okay.  But you do --

4              A          I just remember my foot, my left

5    foot, is what touched the gas and slipped.

6              Q          But if I heard you correctly, you

7    said you did walk or hustle through the gasoline spill on

8    your way to the pump.

9              A          I don't know about through it.  I

10   mean, the gas was on the ground.  It ran down the side of

11   my car, and it was on the ground.  I don't -- I didn't

12   run through the gas, but exactly where it was, it was

13   right in front of the pump, I do know that, because

14   that's where my gas tank was because I park evenly from

15   the gas tank to the car.  So the gas was in front of the

16   pump.

17             Q          And you saw it when you were going

18   back to put the pump up; right?

19             A          I saw the gas on the ground, yes.

20             Q          Right.  Then did you manage to get

21   the pump back in its handle before you fell, in the

22   holder?

23             A          Well, I'm assuming I did because I

24   don't remember -- I don't remember falling with it in my

25   hand.  I don't know if Daniel -- if he came over and did

1    it or not, to be perfectly honest, because it hurt. It

2    hurt pretty bad, but I'm pretty sure that I did get the

3    nozzle back in.

4           Q       Would it be fair to say that the fall

5    occurred when you were going from the front portion of

6    your vehicle to where the gas tank portion of your

7    vehicle was?

8           A       No. I had already gotten to there

9    and gotten the nozzle out of the car. I do remember

10   getting it and getting it to stop and just putting the

11   nozzle -- yeah, I'm pretty sure that I did reach it and

12   get it in the tank -- or the pump.

13          Q       It was at that point that you fell

14   when you were kind of putting it in its holder.

15          A       Yeah.

16          Q       Okay. If you could, on the picture

17   could you mark an X where you fell.

18          A       I'm guessing it was right in here.

19   (Witness complies with request.)

20          Q       Okay. And that X --

21          A       Is that an island, or is that a

22   shadow (indicating)?

23          Q       I believe that's a shadow from the

24   roof.

25          A       Okay.

1    you remember at all?

2              A         I don't remember.  Like I said,

3    Daniel may be a better one because he sprinkled the stuff

4    on it, so he may be better at knowing how much of an area

5    it was.

6              Q         How do you know that the gasoline was

7    what you slipped in?

8              A         How do I know it was gasoline that I

9    slipped in?

10             Q         Uh-huh.

11             A         Because it was on the ground, and

12   that's what my foot hit.

13             Q         Did you see your foot hit it?

14             A         No, I felt it.  My foot just slipped

15   out from underneath it.

16             Q         I know you've mentioned this before:

17   You fell or you slipped forward; is that --

18             A         No, I didn't slip forward.  I think

19   when I slipped, my left foot gave out, went outward, and

20   my knee went inward and hit the ground.  The inside of my

21   knee hit the ground.  Do they have a camera there?  I

22   wish they had a camera there so you could see it, and

23   that would probably answer it all.

24             Q         I can't answer the questions.

25             A         Okay.

1          Q         Do you remember which arm?

2          A         No, I don't remember.

3          Q         Was there much space between your car

4 and the pump?

5          A         Yeah, I usually have enough to get --

6 enough room to get the nozzle out and to get it in the

7 tank.

8          Q         Did you lose consciousness in any

9 way?

10         A         No.

11         Q         What would you say caused the

12 gasoline to spill?

13         A         When it got full, for some reason,

14 the notch didn't automatically stop it like it normally

15 does.

16         Q         Have you ever had an issue with your

17 vehicle, it not stopping before?

18         A         No, that's the first time it's ever

19 happened.

20         Q         Is it possible that it could be an

21 issue with your vehicle?

22         A         It's never happened before or after,

23 so, I mean, I've had it for five -- almost five and a

24 half years now, and that's the only time it's ever

25 happened.

# CHERYL ANN LEACH



# AFFIDAVIT OF DANIEL JOHNSON

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

| | |
|---|---|
| CHERYL ANN LEACH and Husband,<br>JOHN LEACH, SR., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Docket No. <u>V200187S</u> |
| | ) |
| MAC'S CONVENIENCE STORES, LLC, | ) |
| | ) |
| Defendant. | ) |

TIME **F I L E D**
—————AM/PM

MAR 1 3 2021

MARTHA M. COOK
CIRCUIT COURT CLERK

## AFFIDAVIT OF DANIEL JOHNSON

STATE OF TENNESSEE    )
COUNTY OF MONROE     )

Comes Affiant, Daniel Johnson, who, after being first duly sworn, makes oath as follows based on his personal knowledge:

1.     My name is Daniel Johnson. I am over eighteen (18) years of age and have personal knowledge of the matters contained in this Affidavit.

2.     On August 8, 2019, at approximately 9:00 a.m., I was at the Circle K Gas Station in Sweetwater, Tennessee, getting gasoline for my vehicle.

3.     Cheryl Leach was pumping gasoline into her vehicle at pump number four (4), which is on the other side of the same gas pump that I was using.

4.     Mrs. Leach began to talk, and soon after, I noticed that the gas nozzle failed to automatically shut off when her car gas tank was full and gasoline began to spill out of her gas tank down her car and onto the ground. I told Mrs. Leach that gasoline was coming out of her gas tank.

5.     After Mrs. Leach stopped the gas nozzle from continuing to pump gasoline, she slipped and fell in the spilled gasoline that was on the ground between her car and the gas pump.

6.    I picked up Mrs. Leach from the ground and assisted in the cleanup of the gasoline spill.

Further the Affiant saith not.

Respectfully submitted this 1 day of March, 2021.

_____
DANIEL JOHNSON

Sworn to and subscribed before me this 11th day of March, 2021.

_____
NOTARY PUBLIC
My Commission Expires: 10.26.22

# CHERYL ANN LEACH



# DEPOSITION OF DELORES RENEE HOWELL

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE


CHERYL ANN LEACH and Husband,    )
JOHN LEACH, SR.,                  )
                                  )
                                  )
                                  )
              Plaintiffs,         )
                                  )
v.                                )    No. V20-0187S
                                  )
                                  )
MAC'S CONVENIENCE STORES, INC.,   )
                                  )
                                  )
                                  )
              Defendant.          )


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF DELORES RENEE HOWELL


February 24, 2021

FILED
TIME_____AM/PM
MAR 18 2021
MARTHA M. COOK
CIRCUIT COURT CLERK

===========================================================

Allison L. Gossett
Licensed Court Reporter
P.O. Box 50182
Knoxville, Tennessee 37950
(865) 696-6323
tennreporter@gmail.com

Page 2

```
1   APPEARANCES:
2
3   FOR THE PLAINTIFF:
4   W. Holt Smith, Esq.
    209 Tellico Street North
5   Madisonville, Tennessee 37354
6
    W. Tyler Weiss, Esq.
7   Worthington & Weiss
    409 North College Street, Suite 1
8   Madisonville, Tennessee 37354
9
10  FOR THE DEFENDANT:
11
    Chancey R. Miller, Esq.
12  Carr Allison
    736 Market Street, Suite 1320
13  Chattanooga, Tennessee 37402
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            DEPOSITION
2       The deposition of DELORES RENEE HOWELL, taken
3   at the request of the Plaintiffs, for purposes of
4   Discovery, pursuant to the Tennessee Rules of Civil
5   Procedure, on the 24th day of February, 2021, at the
6   offices of W. Holt Smith, 209 Tellico Street,
7   Madisonville, Tennessee, before Allison L. Gossett,
8   Licensed Court Reporter.
9       It is agreed that the deposition may be taken
10  in machine shorthand by Allison L. Gossett, Licensed
11  Court Reporter, and that she may swear the witness and
12  thereafter transcribe her notes to typewriting and sign
13  the name of the witness thereto, and that all
14  formalities touching caption, certificate, filing,
15  transmission, etc., are expressly waived.
16       It is further agreed that all objections except
17  as to the form of the questions are reserved to on or
18  before the hearing.
19
20
21
22
23
24
25
```

Page 3

```
1            INDEX TO EXAMINATION
2   Examination:                              Page
3   By Mr. Smith . . . . . . . . . . . . . . .  5
4
5            INDEX TO EXHIBITS
6
    No.      Description                       Page
7
    Exhibit 1  Incident report . . . . . . . . .  36
8
    Exhibit 1A Incident report, enlarged on . . . 36
9              posterboard
10  Exhibit 2  Google Maps image . . . . . . . .  42
11  Exhibit 3  Photograph . . . . . . . . . . . . 44
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1            DELORES RENEE HOWELL,
2   called as a witness at the instance of the Plaintiffs,
3   having been first duly sworn, was examined and deposed
4   as follows:
5       (Deposition commenced at 9:57 a.m.)
6            EXAMINATION
7   BY MR. SMITH:
8       Q      Will you give us your full name,
9   please, ma'am.
10      A      Delores Renee Howell.
11      Q      Now, Ms. Howell, I'm Holt Smith and
12  this is Tyler Weiss and we represent Ms. Leach, Cheryl
13  Leach. I'm going to ask you some questions. I have a
14  mask on; you have a mask on. If you don't understand
15  my question, please ask me to repeat it, okay --
16      A      Okay.
17      Q      -- before you answer?
18             And also it's better if you speak out
19  loud and say yes and no and not huh-uh or uh-huh. You
20  understand that, don't you?
21      A      Yes.
22      Q      If there's any question you don't
23  understand, please have me repeat it before you answer
24  it.
25      A      Okay.
```

1      Q      Now, we won't be here too long. If
2 you need to take a break, just go ahead and take a
3 break at any time.
4      A      Okay.
5      Q      But it's better if you wait until
6 after a question has been answered. It's better not to
7 take a break while a question is pending. Do you see
8 what I'm saying?
9      A      Yes.
10      Q      Okay. Where do you live, Ms. Howell?
11      A      Sweetwater.
12      Q      What's your street address, in case we
13 have to subpoena you?
14      A      172 County Road 312, Sweetwater.
15      Q      How long have you lived there?
16      A      Six years.
17      Q      And you don't plan to move, do you?
18      A      No.
19      Q      You've been there six years?
20      A      Yes.
21      Q      Where do you work, ma'am?
22      A      Circle K.
23      Q      How long have you worked there?
24      A      Five years.
25      Q      And where did you work before that?

1 Where did you work?
2      A      I didn't. I stayed home.
3      Q      With your children?
4      A      Do what?
5      Q      You stayed at home with your children?
6      A      Yeah.
7      Q      About how long did you do that?
8 18 years?
9      A      Probably 20.
10      Q      Have you worked anywhere else besides
11 Circle K?
12      A      No.
13      Q      All right. Who hired you over there?
14      A      Lisa Wallace was the first store --
15      Q      What was her job?
16      A      She was a manager at a different
17 store.
18      Q      And what's your job over there now?
19 What's your position?
20      A      Manager.
21      Q      What does a manager do?
22      A      What does she do?
23      Q      What do you do as a manager?
24      A      Take care of paperwork. Make sure my
25 people do what they're supposed to. Make sure

1 everything is in order.
2      Q      How many employees do you usually have
3 on duty on a particular day?
4      A      Through the day, one with me, one on
5 seconds, and one on thirds.
6      Q      What's your hours of working? What
7 hours do you work?
8      A      Usually 6:00 to 4:00 or 6:00 to 6:00.
9      Q      6:00 a.m. to 4:00 p.m.?
10      A      Yes.
11      Q      And back on August the 8th, 2019, what
12 shift were you working that day?
13      A      I was working first shift.
14      Q      And what time had you gotten there
15 that morning?
16      A      What time did I get in that morning?
17      Q      Yes, ma'am.
18      A      I would probably say 6:00. That's
19 what time I usually --
20      Q      Okay. And who else was working that
21 day?
22      A      Laura.
23      Q      Laura who?
24      A      Angell.
25      Q      Was she the only one that worked

1 during the day?
2      A      Yeah. She usually works with me.
3      Q      Okay. How long have you been manager
4 there at the Circle K in Sweetwater?
5      A      About two years.
6      Q      Two years before August of 2019 or two
7 years from today?
8      A      It will be two years in March,
9 March 16, I think. It might have been a little longer.
10 I'm not for sure.
11      Q      Who was the manager before you?
12      A      Terry. I don't remember her last
13 name.
14      Q      Okay. Now, when did you take over
15 being manager there? Two years ago?
16      A      Give or take. I can look it up.
17      Q      I mean, how would you know?
18      A      My Workday.
19      Q      Do what, ma'am?
20      A      My Workday.
21      Q      What do you mean by that? I don't
22 understand. I'm sorry.
23      A      It's like an app that we have that
24 shows the day that you start at the store or how long
25 you've been at the store, who all my people are, all

Page 10

1  that junk.
2  Q    So Circle K had an app saying that?
3  A    It's Workday.
4  Q    It's called Workday, the app is?
5  A    Uh-huh.
6       (Nods head up and down.)
7  Q    Does each employee have one?
8  A    Yes.
9  Q    Do you have your own?
10 A    Yes.
11 Q    How do you access it?
12 A    On the computer and my phone.
13 Q    On your phone?
14 A    Uh-huh.
15 Q    Can you print that out?
16 A    Can I print it out?
17 Q    Yes, ma'am. Not right now, but I mean
18 later?
19 A    Yeah, I'm sure I can.
20 Q    What will it show?
21 A    It will just show my name, my address,
22 phone number, how long I've been there, who all my
23 employees are, what my insurance is, ask for time off.
24 Q    Any personal information on there?
25 A    (Nods head up and down.)

Page 11

1  Q    Okay. Well, you can delete that,
2  okay? Can you delete that?
3  A    I can probably mark it out. I can't
4  delete it.
5  Q    Mark it out with a pen or pencil,
6  okay, if you print it.
7       All right, let's talk about your
8  training. You went to work as a manager two years ago.
9  What training did you receive?
10 A    It's usually all on the computer. Or
11 when we worked with the other manager when I was
12 assistant manager.
13 Q    What did you find out on the computer?
14 What training did you receive on the computer?
15 A    How to handle situations. How to do
16 paperwork. There's all kinds of stuff. It's just all
17 kinds of stuff.
18 Q    Is part of your duties to inspect the
19 store every day?
20 A    Yes.
21 Q    Tell us about that. Do you have a
22 form you fill out?
23 A    A form to fill out?
24 Q    Yeah.
25 A    Usually not. You just -- we have a --

Page 12

1  it's called a five-minute walk.
2  Q    Okay.
3  A    We walk through the store. Make sure
4  all the lights work. Make sure all -- there's no
5  debris anywhere or anything outside.
6  Q    Five-minute walk, it's called? Can
7  you print that too, ma'am?
8  A    Yeah. I have one.
9  Q    You have one?
10 A    Uh-huh.
11      (Nods head up and down.)
12 Q    Where do you have it?
13 A    It's at work.
14 Q    On the computer?
15 A    No. It's a daily routine that we do.
16 Q    The five-minute walk is?
17 A    Uh-huh.
18 Q    You have to do it every day?
19 A    Uh-huh.
20      THE COURT REPORTER: Can you answer
21 yes or no.
22      THE WITNESS: Oh.
23 A    Yes.
24 BY MR. SMITH:
25 Q    When you do the five-minute walk, do

Page 13

1  you inspect outside, too?
2  A    Yes.
3  Q    What all do you inspect outside?
4  A    Make sure there's not anything on the
5  ground to trip you, no spills, no nothing.
6  Q    How often do you check to make sure
7  there's no spills?
8  A    Yes.
9  Q    How often? Every day?
10 A    We're usually in and out all day
11 checking trash, taking trash out to the dumpster.
12 Q    How often do you inspect the pumps?
13 A    We inspect those daily.
14 Q    Yeah, but when you're in and out that
15 five minute -- is that part of your five-minute walk?
16 A    Yes.
17 Q    How often do you do the five-minute
18 walk, how often every day?
19 A    Every morning I get there.
20 Q    More than once a day or just once a
21 day?
22 A    I do it once a day, yes.
23 Q    What time? 6:00?
24 A    Sometimes 6:00. Sometimes when I --
25 it's actually when it's daylight out, I'm not going to

**Page 14**

1  lie. You can't see much in the dark.

2      Q    I understand. And I appreciate that.

3  But when you do the five-minute walk, do you make check

4  marks or say yes and no or how is that? How do you

5  know you've completed it?

6      A    You usually put your initials on it.

7      Q    So it has like a checklist and you put

8  initials after it asks you to do something?

9      A    Yes.

10      Q    Did you do one on August the 8th,

11  2019?

12      A    I'm sure I did, yeah.

13      Q    Would it still be available?

14      A    We usually throw stuff away after six

15  months, I'm not going to lie.

16      Q    Would it be on a computer?

17      A    No, we don't put it in the computer.

18      Q    It's just a paper form?

19      A    Yes.

20      Q    Where do you keep that paper form?

21      A    In my office, in a filing cabinet.

22      Q    But you have access to just the form

23  itself, though, don't you?

24      A    Uh-huh.

25      (Nods head up and down.)

**Page 15**

1      Yes.

2      Q    Can you give us a copy of that, the

3  form?

4      A    Yes.

5      Q    Without any check marks or anything?

6      A    Yeah.

7      Q    It's on paper, right?

8      A    Uh-huh.

9      (Nods head up and down.)

10      Q    Well, give it to Mr. Chancy there, and

11  he'll give it to -- let me have it, okay? Is that

12  okay?

13      A    Okay.

14      Q    All right, anything else you use to

15  make your inspections besides the five-minute walk?

16      A    You're in and out all day at the --

17  no.

18      Q    What I'm trying to ask you, were there

19  any other forms that you filled out?

20      A    Forms for what?

21      Q    Inspections.

22      A    No.

23      Q    Just the five-minute walk?

24      A    Yes.

25      Q    All right. Now, if you have a problem

**Page 16**

1  with the pump, who do you call?

2      A    If you what?

3      Q    If you have a problem with the pump,

4  who do you call?

5      A    We put a work order in.

6      Q    Where are the work orders kept? On

7  the computers?

8      A    Where are they kept?

9      Q    Yeah.

10      A    I would guess the people that I send

11  them to keep them.

12      Q    Do you have a copy of your work

13  orders?

14      A    Do I have a copy of the work orders?

15      Q    Yeah.

16      A    Usually not.

17      Q    Are they on paper or do you go through

18  the computer and do it?

19      A    We send it through the computer.

20      Q    It would be on the computer, wouldn't

21  it?

22      A    Not my end, it will not, no, more than

23  likely.

24      Q    Do you send it to the main office or

25  something?

**Page 17**

1      A    I send it to maintenance.

2      Q    Maintenance? Okay.

3      Who's the head of maintenance? Do you

4  know who you send it to in maintenance, the person's

5  name?

6      A    I know Richard is the head of

7  maintenance.

8      Q    Richard?

9      A    I don't remember his last name. I

10  just know him by Richard.

11      Q    Where does he live? Do you know?

12      A    No.

13      Q    Does he live in Tennessee?

14      A    Oh, I'm sure, yeah.

15      Q    Do you call him or you just send him a

16  notice?

17      A    We send in a work order.

18      Q    Send a what? I'm sorry.

19      A    Work order.

20      Q    Work order?

21      And how long does it take him to get

22  there, usually? Does he come the very day?

23      A    If it's a pump issue, yes. It's

24  usually within 24 hours.

25      Q    Does he do the repair, or does someone

1   else do the repair when there's a pump issue?
2       A      He's the head of maintenance.  He
3   sends people out.
4       Q      If it's a simple repair, can he do it
5   himself?
6       A      Would he do it himself?
7       Q      Yes.
8       A      I have no idea.
9       Q      You don't know his last name?
10      A      (Shakes head from side to side.)
11      Q      Would you have a document showing his
12  last name?
13      A      I guess I could look.  I don't -- I
14  really don't know his last name.  I just know him as
15  Richard.
16      Q      On the computer does it show where
17  he's located?
18      A      Where he's located?
19      Q      Yeah.
20      A      I have no idea.
21      Q      Well, just tell me -- you're trying to
22  get something repaired.  Walk me through how you do it.
23      A      Excuse me?
24      Q      Say you need something repaired and
25  you've got to get ahold of Richard, what would you do?

1       A      Call him.
2       Q      Do you have a phone number for him?
3       A      Yeah.  It's at work.
4       Q      Okay.  Can you get that phone number
5   and give it to Mr. Miller?
6       A      Yes.
7       Q      This is a phone number for Richard.
8   He's the head of maintenance, right?
9       A      Yeah.
10      Q      Okay.  Tell us what you do to check
11  the pumps every day.  Do you check the pumps out every
12  day?
13      A      Yes.  You lift the handle.  Make sure
14  it's connected.  There's not -- make sure the tape is
15  on there.  And that's about it.
16      Q      All right.  Lift the handle, make
17  sures it's connected to where?  What do you mean
18  "connected"?
19      A      To the little -- make sure it's
20  connected at the top.
21      Q      Okay.  Now, it has like a thing that
22  if a person drives away, then it comes apart, right,
23  automatically?
24      A      Yes.
25      Q      What's that called?

1       A      Tear-away.
2       Q      Tear-away.  What does a tear-away --
3       A      Break-away.  Tear-away.
4       Q      Where is that?
5       A      It's at the top.
6       Q      All right.  Have you ever had an
7   occasion where somebody's pulled away from the pump?
8       A      Huh?
9       Q      Have you ever had an occasion where
10  someone pulled away from the pump with the tear-away?
11      A      Yes.
12      Q      Have you ever had one tear away on
13  Number 4?
14      A      On Pump 4?
15      Q      Yeah.
16      A      No.
17      Q      Never on 4?
18      A      No.
19      Q      Okay.  Other pumps you have?
20      A      I have four.
21      Q      Do you have people tear away on other
22  pumps, is what I'm asking you?  I'm sorry I'm kind of
23  hard to --
24      A      Oh, yeah, but I don't remember which
25  pump it was.

1       Q      Okay.  Tell me how a pump works about
2   automatic filling.  You know, like where you set the
3   pump and it automatically fills your car.  Do you
4   understand my question?
5       A      Do I understand it, yes.
6       Q      Well, explain that, would you, please?
7       A      You put the hose in.  You turn it on.
8   And it fills up.
9       Q      Does it have an automatic, where you
10  don't have to stand there and you can just fill it and
11  it will do it on its own?
12      A      Does it have a shut-off valve?
13      Q      Yeah.
14      A      Is that what you're asking?
15      Q      No.  I'm asking you, can you
16  automatically -- can you do it without standing there
17  and holding the nozzle?
18      A      You should never leave a pump
19  unattended.
20      Q      I understand.  I'm asking you can you
21  do it without standing there filling the pump -- I'm
22  sorry.  Let me start all over again, okay?
23             And if you don't understand me, please
24  let me know, okay?  I know I sometimes slur, but what
25  I'm trying to ask you is:

1    Is there a device on that pump where
2 you can -- on Pump Number 4 where you can set the
3 nozzle and it will automatically go ahead and fill your
4 car up?
5    A    I still don't understand what you're
6 trying to --
7    Q    I'm sorry. Let's talk about a pump.
8 Have you ever used a gasoline pump at a self-service
9 store? Have you ever used one?
10   A    Yeah.
11   Q    Can you set it and click it and let
12 your hand go and it fills the gas tank?
13   A    Can you?
14   Q    What do you call that? Is there a
15 word for that?
16   A    That, honestly, I don't know.
17   Q    Okay.
18   A    You're talking about the little lock-y
19 thing?
20   Q    Yeah, the lock-y thing.
21   A    Uh-huh.
22   Q    Well, explain that to me, the little
23 lock-y thing. Explain it, if you can.
24   A    I don't use it.
25   Q    You never use it?

1    A    No.
2    Q    You stand there?
3    A    I will hold it, yes.
4    Q    But it's for the convenience of the
5 customer; you can do it if you want to, can't you?
6    A    You can, yeah.
7    Q    Okay. Explain how that works, the lock-y
8 thing, you called it.
9    A    You pull up the gas pump lever and you
10 lock the little lock on it.
11   Q    And then you can put it in there and
12 it will automatically fill your --
13   A    Let it fill your car.
14   Q    Does it shut off by itself?
15   A    It should, yes.
16   Q    Okay. Have you had an occasion where
17 a customer complained about Pump Number 4 not shutting
18 off?
19   A    No, sir.
20   Q    Never?
21   A    No.
22   Q    How about any other pumps?
23   A    I'm sure there is, but there's no
24 guarantee it's going to stop. And I don't -- I don't
25 know. I don't know what you're trying to get at, is

1 what I'm saying.
2    Q    I'm just asking questions. I'm not
3 trying to get at anything. I'm just asking you
4 questions, okay?
5    A    Yes.
6    Q    I'm trying to ask you how this works.
7         And you don't know why it stops,
8 though, right?
9    A    I would say it's full and it flips
10 a -- I'm never got inside of one. They don't teach us
11 about the guts.
12   Q    That's not your thing?
13   A    (No response.)
14   Q    That's not your responsibility, right?
15   A    Yeah, it's our responsibility to know
16 the pump, but not the guts.
17   Q    All right. What do you mean you need
18 to know the pump? I'm sorry. What do you mean you
19 need to know the pump?
20   A    Excuse me?
21   Q    You said it's your responsibility to
22 know the pump. What do you mean by that?
23   A    The break-away, the lever itself, make
24 sure everything's connected. That's what I check every
25 day. Make sure things are connected. Make sure it's

1 connected at the top.
2    Q    Do you have to do any anything to make
3 sure that lock-y thing works you're talking about?
4    A    The lock-y thing?
5    Q    Yeah. That's what you've called it.
6    A    Yeah. I know what I called it.
7    Q    Do you ever check it out and make sure
8 it works? That's all I asked.
9    A    I don't pump gas every day.
10   Q    I'm sorry, ma'am?
11   A    I don't pump gas every day.
12   Q    Do you have a diagram or something to
13 show you how the pump works, something from the
14 company?
15   A    Do we have diagrams?
16   Q    Of the pump, of the gas pump?
17   A    We have classes on it in our Workday.
18   Q    Who teaches you classes?
19   A    The computer teaches us. It's called
20 a Class C.
21   Q    A class what?
22   A    Class C.
23   Q    Okay. Can you tell us about the
24 Class C. Is that on the computer?
25   A    It tells us to check the lever, the

Page 26

1  handle, and the break-aways, is what it teaches. And
2  if those aren't working, we're supposed to turn a work
3  order in. And that's what you do.
4      THE COURT REPORTER: He asked "Is it
5  on the computer?"
6      THE WITNESS: What's on the computer?
7      THE COURT REPORTER: That training.
8      THE WITNESS: Yeah.
9  BY MR. SMITH:
10     Q     Is that training on the computer?
11     A     Yeah. Uh-huh.
12     Q     And you described what it is, right?
13     A     Describe what what is?
14     Q     What the training is, what it tells
15  you --
16     A     It's called a Class C training.
17     Q     Okay. The Class C training, do you do
18  that every day?
19     A     No.
20     Q     How often do you do it?
21     A     We usually do them -- it all depends
22  which one it is. That Class C, I believe, is a yearly.
23     Q     Okay. I'm asking you, what do you
24  check on a pump every morning?
25     A     I told you.

Page 27

1      Q     I'm sorry.
2      A     The handle. And to make sure the
3  break-away is good. And where the handle is connected
4  to the hose at the side and at the break-away.
5      Q     Okay. If you find a defect, what do
6  you do? If something is wrong, what do you do?
7      A     Turn a work order in. And put a bag
8  on it. If it's a bad defect.
9      Q     If it's a what? Now, tell me again
10  I'm sorry. I spoke instead of listening. Excuse me.
11     A     Defect. If there's a defect you have
12  to turn a work order in.
13     Q     And what do you do? Put a bag over
14  it?
15     A     If it's broken, yes.
16     Q     What does that mean, put a bag over
17  it? Out of order?
18     A     Yes.
19     Q     Is that a yellow --
20     A     It's a big yellow bag.
21     Q     Now, let me ask you this: If a pump
22  has a torn rubber covering, is that a defect?
23     A     No.
24     Q     Why not?
25     A     It's just to protect from the pump to

Page 28

1  hit your car and not scratch it.
2      Q     Okay. Now let me ask you this: Do
3  you have any products you can place on the ground to
4  absorb a leak?
5      A     Excuse me?
6      Q     Do you have a product that you can put
7  on the ground to absorb a leak?
8      A     Powder?
9      Q     Products. Any kind of products?
10     A     Yeah. It's in the tin outside. By
11  pump -- there's 1 and 2. You've got the tin right
12  there that's got like a Dry Spill in it.
13     Q     What's Dry Spill?
14     A     It soaks up the product that's been
15  seeped on the ground.
16     Q     And how often do you check and see if
17  there's anything -- any --
18     A     Oh, I make sure there's always some in
19  it.
20     Q     All right.
21     A     Not unless I'm on vacation.
22     Q     Do you make a report and report it to
23  your supervisor every time there's a leak of gas?
24     A     Every time there's a leak? Only a
25  certain amount. If there's a huge amount, I have to,

Page 29

1  yes. If not, I clean it up and we go on.
2      Q     The spill from Mrs. Leach's case, did
3  you clean it up yourself or did somebody else do it?
4      A     I cleaned it up.
5      Q     Tell us about that. What did you do
6  to clean it up?
7      A     Sprinkled the product that's in the
8  white tin.
9      Q     Do you sweep that up once you do that?
10     A     Yeah.
11     Q     And where do you --
12     A     It like soaks it up like a -- like a
13  big sponge.
14     Q     All right, now let me ask you about
15  Mrs. Leach's case, okay?
16          When were you first aware that
17  Mrs. Leach had fallen at the Circle K store?
18     A     Excuse me?
19     Q     When were you first aware that she had
20  fallen?
21     A     Someone come in, said someone had fell
22  on Pump 4. So I go out.
23     Q     Do you know who told you that she had
24  fallen at Pump 4?
25     A     I don't remember. My store was full.

1   And they said, "Renee, someone fell on Pump 4." I
2   said, "Okay." So I went outside.
3       Q       What did you do at that point?
4       A       I asked her if she was all right. She
5   said yes.
6       Q       Where was she located at that point?
7       A       At that point she was in between 4 and
8   2.
9       Q       Was she walking or laying -- or
10  sitting down or what, do you know?
11      A       She was finishing her conversation, I
12  would guess, with Daniel.
13      Q       Do you know Daniel Johnson?
14      A       Yes, I do.
15      Q       How do you know him?
16      A       He comes in the store every day.
17      Q       Is he a police officer in Sweetwater?
18      A       Yes.
19      Q       Did you ask him what happened?
20      A       Honestly I don't remember.
21      Q       Okay.
22      A       I'm not going to lie.
23              I asked her.
24      Q       What did she tell you about what had
25  happened? Did you talk to --

1       A       She was over talking to Daniel
2   Johnson, left her pump unattended, and it overflowed,
3   and she ran over there to try to stop it.
4       Q       And what happened then?
5       A       I guess when she ran over there she
6   fell.
7       Q       Okay. Did she say what had caused the
8   spill? Did she say?
9       A       Excuse me?
10      Q       Did she say what had caused the spill?
11      A       She left her pump unattended. That's
12  what she said. She said, "I was talking to Daniel.
13  Left my pump unattended."
14              And that's when I asked her, "Do you
15  need an ambulance?"
16              "No."
17              I asked her several times.
18      Q       Did she say she thought that it would
19  cut off automatically?
20      A       Excuse me?
21      Q       Did she say she thought it would cut
22  off automatically?
23      A       I don't remember.
24      Q       I mean, had it been working properly,
25  it would have cut off automatically before it spilled,

1   wouldn't it?
2               MR. MILLER: Object to the form.
3   BY MR. SMITH:
4       Q       Is that true?
5               MR. MILLER: Object to the form.
6               You can answer.
7   BY MR. SMITH:
8       Q       You can answer.
9       A       Okay. What was the question?
10      Q       If it was working properly, it would
11  have shut off in time for it not to spill, wouldn't it?
12              MR. MILLER: Object to the form.
13              But you can answer.
14  BY MR. SMITH:
15      Q       Go ahead and answer.
16      A       If it was working properly? You
17  leave -- well, I'm not going to say that. Was her car
18  working right? Was the little flap in there working
19  right? It's 50/50.
20      Q       What do you mean "50/50"?
21              MR. MILLER: Object to the form.
22      A       Well, there's, I'm sure, a device in
23  her car just as well as in my pumps. Which one wasn't
24  working? I have no idea. I'm not a mechanic. I'm not
25  a gas . . .

1   BY MR. SMITH:
2       Q       Are you saying that half the time it
3   doesn't work? Is that what you're saying?
4       A       No.
5               MR. MILLER: Object to the form.
6   BY MR. SMITH:
7       Q       What are you saying?
8       A       I've never had an issue with that
9   pump. Never.
10      Q       Did you talk with Daniel Johnson that
11  day about what happened?
12      A       Yes, I did.
13      Q       What did he say?
14      A       As well as I did her.
15      Q       What did he say?
16      A       He said she was over there talking to
17  him, left her gas pump unattended. Which you should
18  never do. Number one, it could fall out, gas go
19  everywhere. Number two, she was over there talking to
20  him, gas overflows, runs back, she falls.
21      Q       Is there a camera located at your
22  store in Sweetwater Circle K on Main Street?
23      A       Yes, there is. But at that time,
24  eight days later, they had moved -- removed the DVR.
25  She didn't call me until two weeks later.

1    Q    Where is the video located?  Where is
2    the camera located?  I'm sorry.
3    A    The front of the store.  Points
4    towards the road.
5    Q    Would it show where she fell?
6    A    Yeah, if I had the same DVR.
7    Q    Okay.  But it's been erased, right?
8    A    No, it wasn't erased.
9    Q    What happened?
10   A    They switched systems.
11   Q    Changed --
12   A    We got a -- yeah, we got new DVRs.  We
13   had an old 1902 DVR.  Now we've got the newer model.
14   Q    When did they change out the DVR?
15   A    Excuse me?
16   Q    When was the DVR changed out, ma'am?
17   I'm sorry.
18   A    It was like -- I honestly don't
19   remember the day, but it was changed out before she had
20   called.  And my boss called and asked, and I was like,
21   "I'm sorry, but it's gone."
22   Q    Your boss called and asked -- who is
23   your boss?
24   A    Lisa.
25   Q    Lisa?

1    A    Norris.
2    Q    Lisa Norris called and wanted to know
3    if you had the video, and you said it was gone?
4    A    Yeah.
5    Q    Did you fill out an incident report in
6    this case?
7    A    Yes.
8    Q    When did you fill it out?
9    A    I don't remember.
10   Q    Was it two weeks later or that day?
11   A    I don't remember.
12   Q    How do you do an incident report?
13   Tell me about that.
14   A    You go on the computer.
15   Q    Do you have to freestyle it, just type
16   it up yourself?
17   A    Everything is on the computer.
18   Q    I understand that.  I'm asking you,
19   can you just freestyle it, just type in what happened
20   yourself, or is there boxes or something to check?
21   A    I don't know.  That's -- I really
22   don't remember.  I don't fill out incident reports very
23   often.  I believe she is the first one, maybe the
24   second one, that I've ever filled out the whole time
25   I've ever been a manager, or an associate.

1    Q    All right, once you fill out the
2    incident report, is it printed out and kept somewhere
3    or does it stay on the computer?
4    A    It stays on the computer.
5    Q    All right.  Do you have access to
6    that?
7    A    Probably the main office.
8    Q    Have you seen the incident report?
9    A    Excuse me?
10   Q    Have you seen it?
11   A    Have I seen it?
12   Q    Yes, ma'am.
13   A    When I wrote it out.
14   Q    Have you seen it since then?
15   A    No.
16        MR. SMITH: Let's mark this Exhibit 1.
17        (Exhibit 1 marked.)
18   BY MR. SMITH:
19   Q    Exhibit 1 is the incident report.
20   Now, Ms. Howell, I can do this, but it's really small.
21   It's hard to read.  Can you read that?  Maybe with a
22   magnifying glass.
23        I've got an enlargement.
24        MR. SMITH: Let's mark it 1A.
25        (Exhibit 1A marked.)

1    A    Can I see that one?
2    BY MR. SMITH:
3    Q    Yeah.
4    A    Because that is no way.
5    Q    I know.  That was what I was supplied,
6    Ms. Howell.  I'm not trying to be difficult, but that's
7    what they gave me.
8         Let's look at the left side, all the
9    way to the left side.  Can you see where there's an
10   incident date?  On the left-hand side, ma'am.  Incident
11   date.  Can you read that?  Could I come around and
12   point it out to you?
13        MR. SMITH: You point it out to her,
14   Chancey.
15        MR. MILLER: He's referring to the top
16   left.
17   BY MR. SMITH:
18   Q    Can you read that?
19   A    It looks like 5/8.  I can't hardly see
20   that.
21   Q    I'm sorry.  But it's 8/8/2019.  I
22   think so.  It looks like 9:00.  Does that seem right to
23   you?  Can I walk around there and show you, ma'am?
24   A    (No response.)
25        THE COURT REPORTER: He said can he

Page 38

1  walk around there and show you.
2      A    Oh, I'm sorry.  I was trying to read
3  it.
4  BY MR. SMITH:
5      Q    See right there?  It looks like 8/8,
6  is what it looks like.  Does that seem right?
7      A    I don't remember when the incident
8  happened, no.
9      Q    You don't know when it happened?
10     A    Yeah, the day she fell.
11     Q    What day did she fall?
12     A    I'm not -- I don't remember.  I really
13  don't remember.
14     Q    You filled this form out, didn't you?
15     A    Yeah.
16     Q    When did you fill it out?
17     Created.  Do you see where it says
18  "created"?
19     A    Uh-huh.
20     Q    When was it created?  9/13, wasn't it?
21     A    Yeah.
22     Q    Is that correct?
23     A    Yeah.  I would say, I guess.  That's
24  what the computer says.
25     Q    Was it right or wrong?

Page 39

1      A    Well, that's what the computer says,
2  so it looks like it's right.
3      Q    And you did it, right?
4      A    I created it, yeah.
5      Q    You created this whole file, right,
6  this whole report, right?
7      A    Yes.
8      Q    Can you read what you said?
9      A    "She was at Pump 4 pumping gas and
10  walked over to Pump 2 to talk to Daniel Johnson and gas
11  started to overflow and she went back to stop it and
12  then she slipped and fell I went over and asked if she
13  was okay.  She said yes she was fine.  And then a week
14  later she called and said went to doctor, had something
15  wrong with knee."
16     Q    Okay.  And if you look right above the
17  end of that, it looks like this was created on 9/13,
18  right?
19     A    Uh-huh.
20     Q    Is that a "yes"?
21     A    Yes.  Sorry.
22     Q    Okay.  Now, why did you wait until
23  almost a month, more than a month, to fill it out?
24     A    Honestly, I don't remember.  I'm not
25  going to lie.

Page 40

1      Q    I don't want you to lie.  I'm just
2  asking you why.
3          Did you fill out an incident report or
4  make any notes the day this happened?
5      A    Yes, I did make notes that day.
6      Q    Do you have your notes?
7      A    No, I do not.
8      Q    What did you do with them?
9      A    From a year ago, I have no idea.
10     Q    Okay.  That's fine.  Did you ever look
11  at the video before you destroyed it or --
12         MR. MILLER:  Object to the form.
13  BY MR. SMITH:
14     Q    Did you ever look at the video?
15     A    Did I look at it?
16     Q    Yeah.
17     A    My associate and I did that day, yes.
18     Q    Who is your associate?
19     A    Laura.
20     Q    And what did it --
21     A    It showed her talking to Daniel and
22  she ran over to the pump and slid in her own gas that
23  she spilled.
24     Q    Okay.  Well, but that video is not
25  here now, is it?

Page 41

1      A    No, sir.
2      Q    And sometime it was -- well, tell me
3  exactly what happened.  I don't understand what
4  happened to it.  I'm sorry.
5      A    Happened to what?
6      Q    The video.
7      A    We had an old system.  They updated
8  everybody to a new system.
9      Q    All right.  Would there be a record at
10  Circle K as to when they updated everybody?
11     A    Huh?
12     Q    Would there be a record about that
13  somewhere?
14     A    That they updated my video system?
15  Oh, I'm sure.
16     Q    And it will show the date?  Was it
17  before September 13th, 2019?
18     A    I don't remember.
19     Q    All right.
20     A    I don't recall.
21     Q    All right.
22     A    It was before that, I guarantee you,
23  because it wasn't shortly after.
24     Q    Okay.  This helped (referring to
25  Exhibit 1A)?  This was bigger, wasn't it?

Page 42

1    A    Huh?
2    Q    This is easier to read than this one,
3    right?
4    A    Yeah.
5    Q    Did that help you?
6    A    Yeah.
7    Q    Thank you.
8         MR. SMITH:  This is 1 and 1A.  Thank
9    you.
10        Let's make this Exhibit 2.
11        (Exhibit 2 marked.)
12   BY MR. SMITH:
13   Q    This is Google Earth.  Is that the
14   store we're talking about?
15   A    Yes.
16   Q    What's the number for that store?
17   What do you call that store?  Has it got a number for
18   Circle K?
19   A    3627.
20   Q    3627?
21   A    Yes.
22   Q    And where is Pump 4?  Can you draw it?
23   A    Where that X is.
24   Q    The X shows Pump 4?
25   A    You have the X in front of Pump 4.

Page 43

1    Q    Where is the video camera located, if
2    you can tell me?
3    A    (Indicating.)
4    Q    Can you draw a circle around where the
5    video camera would be?  Let's get some pens where you
6    can see it. Let's do it with this (hands the witness a
7    green marker), if you don't mind, Ms. Howell.  Don't
8    get it on you, now.  It will stain your --
9    A    (Makes a green circle on the exhibit.)
10   Q    The video camera was there, right?
11   A    Uh-huh.  Yes.
12   Q    Is that a "yes"?
13        After Mrs. Leach fell and you went out
14   there, did you check the pump out?
15   A    Yes.  I put a bag on it and checked it
16   out.  I even made sure -- everything seemed to work
17   properly to me.
18   Q    Describe to me what you did, if you
19   don't mind.
20   A    I went out there and checked the
21   handle, checked the little flappy thing.
22   Q    Now, when you say "flappy thing," I
23   don't know what you mean.
24   A    The lock.
25   Q    Oh, the lock?

Page 44

1    A    Yes.
2    Q    The lock, that's the lock that locks
3    it when --
4    A    Uh-huh.
5         (Nods head up and down.)
6    Q    -- in your tank, right?
7    A    Yeah.  Yes.
8    Q    And if that thing is working properly,
9    it should cut off before --
10        MR. MILLER:  Object to the form.
11   A    I'm not an expert on that part.
12   BY MR. SMITH:
13   Q    All right, then.  Thank you.
14        Let me show you this photograph.
15        MR. SMITH:  Make this Exhibit
16   Number 3.
17        (Exhibit 3 marked.)
18   BY MR. SMITH:
19   Q    I'll show you the photograph of Pump
20   Number 4.  Now, there's a -- you can see there's a
21   plastic bag that says, "Sorry out of service."  Do you
22   see that?
23   A    Yeah, I see it.
24   Q    Did you do that, put a bag on that,
25   that day, that very day?

Page 45

1    A    Yes, I'm sure I did.  I'm not for
2    sure.  I'm not -- I was just upset that she fell, plain
3    and simple.
4    Q    But do you remember if you put a --
5    tell me about this bag, "Sorry out of service" bag.
6    You were talking about earlier --
7    A    That means don't touch the pump.
8    Q    Okay.
9    A    I mean, it's simple:  Don't touch the
10   pump.
11   Q    Where do you get those bags from?
12   A    We order them.
13   Q    When do you put that bag over the
14   pump, the handle?
15   A    Huh?
16   Q    When do you do it?
17   A    When do I do it?
18   Q    Yes, ma'am.
19   A    Either when it's not reading right,
20   when it -- the card reader is not working.  Could be a
21   gazillion things.
22   Q    Do you do it when there's something
23   wrong with the pump; is that right?
24   A    I --
25        MR. MILLER:  Object to the form.

Page 46

BY MR. SMITH:
2    Q    **Subject to his objection.**
3    A    What do you mean if there's something
4 wrong?
5    Q    **Well, why do you put it on there?**
6 **Because there's something wrong with the pump --**
7    A    There could be a million reasons.
8    Q    **But something, right?**
9        MR. MILLER:  Object to the form.
10    A    Yeah.
11 BY MR. SMITH:
12    Q    **All right. Thank you.**
13        **Now, again, did you put a bag, an**
14 **"Out of service" bag, on the pump on August the 8th,**
15 **2019 after Ms. Leach fell?**
16    A    I don't remember. I really don't
17 remember.
18    Q    **Was that in your incident report?**
19    A    What?
20    Q    **Was that in your incident report,**
21 **whether you put a bag on there or not?**
22    A    I didn't write it on there, didn't
23 look like it.
24    Q    **All right.**
25    A    But that don't mean I didn't put one

Page 47

1 on there.
2    Q    **So it might be in your notes, right?**
3    A    Yeah. If you --
4        MR. MILLER:  Object to the form.
5    A    I don't remember if I -- I don't -- I
6 don't remember. Plain and simple, I don't remember if
7 I put the bag on there or not. I was worried about her
8 leg because she said it hurt. I asked her.
9 BY MR. SMITH:
10    Q    **Do you know a Scott Scharfenberg?**
11    A    No.
12    Q    **He's over -- the director of HR and**
13 **training.**
14    A    (Shakes head from side to side.)
15    Q    **Do you know him?**
16    A    What's the name again?
17    Q    **I'll show you.**
18        (Indicating.)
19    A    Yeah, he's the man with the real loud
20 voice. Yes, I know who he is. Not personally, but,
21 yes. He is very loud.
22    Q    **Does he teach any -- does he train the**
23 **employees?**
24    A    We do all that on the computer.
25    Q    **All right. All right.**

Page 48

1    A    I'm sure he sits -- I don't know.
2 I -- we do what we do on -- what -- we do what was --
3 we do what is put on the computer for us to do, our
4 training.
5    Q    **Our training? That's right.**
6    A    Yes.
7    Q    **And can you access all that training**
8 **on the computer?**
9    A    Yes. Through Workday.
10    Q    **Workday.**
11        **And Workday is how you get the**
12 **training, right?**
13    A    Yes.
14    Q    **And you're going to try to get that**
15 **printed off for us, again, right?**
16    A    Yes.
17    Q    **Thank you.**
18        **I'm going to ask you just a few more**
19 **questions about the video, if I could, ma'am.**
20        **You've already marked where the video**
21 **is located here on Exhibit Number 2. The green circle**
22 **is where the video is located, right?**
23    A    Yes.
24    Q    **Okay. Now, where is that -- is that**
25 **recorded inside the store or how does that work?**

Page 49

1    A    What recorded inside the store?
2    Q    **The video. You said it had a DVD or**
3 **DVR or something where it was stored?**
4    A    I have one, yes.
5    Q    **Is that in the store? Now, I'm**
6 **talking about August the 8th, 2019 that I'm talking**
7 **about.**
8    A    Do what? I couldn't hear you.
9    Q    **I'm sorry. I'm asking you about**
10 **August the 8, 2019, okay?**
11        **Okay, so on that date where was the**
12 **video?**
13    A    Where was the video?
14    Q    **Yeah. The video camera was here, but**
15 **where was the monitor? Where was the monitor?**
16    A    It's in my office.
17    Q    **Okay. And the recording, is there a**
18 **DVR in there, a DVD in there, on August the 8th, 2019?**
19    A    The system is gone.
20    Q    **I'm talking about what it was like**
21 **then. What was it like then?**
22    A    Was the what?
23    Q    **What was it like then, on August 8th,**
24 **2019?**
25    A    Was it what -- like what?

**Page 50**

1    Q    What was the system like?  Describe it
2  to me, if you would.
3    A    Dinosaur.
4    Q    Well, I understand dinosaur, but that
5  doesn't tell me anything.  Explain it to me.
6    A    You go on there.  You pick a day, a
7  time, and it plays the video for that day.
8    Q    On a monitor in your office?
9    A    Yes.
10    Q    Is there a box there, like an old DVR
11  box, a DVD box, or what?
12    A    Yeah, there was.  They took it, yeah.
13    Q    What happened to that box?
14    A    Huh?
15    Q    Do you know what happened to that box?
16    A    No.
17    Q    Okay.
18    A    No.  They upgraded everybody's
19  systems.
20    Q    And you don't know when that was, but
21  it happened shortly after this, right?
22    A    Yes.
23    Q    Okay.  And there will be a record of
24  that.
25         MR. SMITH:  Let me talk to Tyler.

**Page 51**

1  Just a minute.
2  (Pause in proceedings from 10:39 a.m. to 10:41 a.m.)
3  BY MR. SMITH:
4    Q    Ms. Renee Howell, you're looking at a
5  dinosaur here.  I'm a dinosaur.  Help me understand
6  about this recorder, okay?
7         All right --
8    A    They just upgraded everybody's.
9    Q    I understand.  Did it record on a DVD
10  or?
11    A    No.  They had taken it before she had
12  called.
13    Q    I'm sorry?
14    A    They had already taken it before she
15  called and said she was hurt.
16    Q    Well, I understand.  But listen to me.
17  Here is my question.  My question is, when the machine
18  was working in August of 2019, did it record an image
19  on a DVD disc or an eight-track --
20    A    It just recorded on the black -- it's
21  like a black box, I would -- I'm guessing.  You know,
22  what I'm saying?  If we needed to download a DVD, we
23  stuck it in there and it would record it.
24    Q    It would store it on a DVD, right?
25    A    Yeah.

**Page 52**

1    Q    Did you store anything on a DVD ever?
2    A    No.  Like I said, she didn't call
3  until after they had taken the DVD player.
4    Q    If she had, you would have saved that,
5  right?
6    A    Oh, yeah.  In a heartbeat.  In a
7  heartbeat.
8    Q    Your boss called and asked you if you
9  had a recording, right, Lisa did?
10    A    Do what?
11    Q    Lisa Norris called you and asked you
12  if it was recorded, right?
13    A    No.  She asked if I still had the
14  recorder, because she knew everyone was getting new
15  ones.  I said, "No.  Mine's done gone."
16    Q    I guess that's all the questions.
17  Thank you, Ms. --
18         Wait just a minute.  Today I was
19  wearing a mask and you couldn't see my lips, so I want
20  to make sure:  Did you understand all of my questions?
21    A    Yes.
22    Q    If you get a chance to read the
23  deposition, if there's any changes you would like to
24  make, if there's something that I said that you didn't
25  understand, you're going to change your testimony, just

**Page 53**

1  review your deposition and you can change it, okay?
2    A    Okay.
3    Q    Because I know sometimes I'm hard to
4  understand.  And with this mask, it makes it worse.
5    A    Okay.
6    Q    Do you have any questions of me right
7  now?
8    A    (Shakes head from side to side.)
9    Q    Thank you.
10    (Deposition concluded at 10:43 a.m.)
11    FURTHER THIS DEPONENT SAITH NOT.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 54

```
1                      C E R T I F I C A T E
2    STATE OF TENNESSEE
3    COUNTY OF KNOX
4
5            I, Allison L. Gossett, Licensed Court
6    Reporter, do hereby certify that I reported in machine
7    shorthand the foregoing proceedings; that the foregoing
8    pages, numbered 1 to 54, inclusive, were typed by me
9    using computer-aided transcription and constitute a
10   true and accurate record of said proceedings.
11           I further certify that I am not an attorney
12   or counsel of any attorney or counsel connected with
13   the action, nor financially interested in the action.
14           Witness my hand this date, March 8, 2021.
15
16
17
             Allison L. Gossett, LCR
18           LCR 028, Exp. 06/30/2022
19
20
21
22
23
24
25
```

| Exhibits | 4 | Allison 4:7,10 | break 6:2,3,7 | Cheryl 5:12 |
|---|---|---|---|---|
| | | almost 39:23 | break-away 20:3 24:23 27:3,4 | children 7:3,5 |

**Exhibits**

**Exhibit 1** 3:7 36:16, 17,19

**Exhibit 2** 3:10 42:10,11 48:21

**Exhibit 3** 3:11 44:15,16,17

---

**1**

**1** 28:11 36:16,17,19 42:8

**10:39** 51:2

**10:41** 51:2

**10:43** 53:10

**13th** 41:17

**16** 9:9

**172** 6:14

**18** 7:8

**1902** 34:13

**1A** 36:24,25 41:25 42:8

---

**2**

**2** 28:11 30:8 39:10 42:10,11 48:21

**20** 7:9

**2019** 8:11 9:6 14:11 41:17 46:15 49:6,10, 18,24 51:18

**2021** 4:5

**209** 4:6

**24** 17:24

**24th** 4:5

---

**3**

**3** 44:16,17

**312** 6:14

**3627** 42:19,20

---

**4**

**4** 20:13,14,17 22:2 23:17 29:22,24 30:1, 7 39:9 42:22,24,25 44:20

**4:00** 8:8,9

---

**5**

**5/8** 37:19

**50/50** 32:19,20

---

**6**

**6:00** 8:8,9,18 13:23, 24

---

**8**

**8** 49:10

**8/8** 38:5

**8/8/2019** 37:21

**8th** 8:11 14:10 46:14 49:6,18,23

---

**9**

**9/13** 38:20 39:17

**9:00** 37:22

**9:57** 5:5

---

**A**

**a.m.** 5:5 8:9 51:2 53:10

**absorb** 28:4,7

**access** 10:11 14:22 36:5 48:7

**address** 6:12 10:21

**agreed** 4:9,16

**ahead** 6:2 22:3 32:15

**ahold** 18:25

---

Allison 4:7,10

almost 39:23

**ambulance** 31:15

**amount** 28:25

**Angell** 8:24

**answer** 5:17,23 12:20 32:6,8,13,15

answered 6:6

**app** 9:23 10:2,4

**asks** 14:8

**assistant** 11:12

**associate** 35:25 40:17,18

**August** 8:11 9:6 14:10 46:14 49:6,10, 18,23 51:18

**automatic** 21:2,9

**automatically** 19:23 21:3,16 22:3 23:12 31:19,22,25

**available** 14:13

**aware** 29:16,19

**away** 14:14 19:22 20:7,10,12,21

---

**B**

**back** 8:11 33:20 39:11

**bad** 27:8

**bag** 27:7,13,16,20 43:15 44:21,24 45:5, 13 46:13,14,21 47:7

**bags** 45:11

**big** 27:20 29:13

**bigger** 41:25

**black** 51:20,21

**boss** 34:20,22,23 52:8

**box** 50:10,11,13,15 51:21

**boxes** 35:20

---

**break** 6:2,3,7

**break-away** 20:3 24:23 27:3,4

**break-aways** 26:1

**broken** 27:15

---

**C**

**cabinet** 14:21

**call** 16:1,4 17:15 19:1 22:14 33:25 42:17 52:2

**called** 5:2 10:4 12:1, 6 19:25 23:8 25:5,6, 19 26:16 34:20,22 35:2 39:14 51:12,15 52:8,11

**camera** 33:21 34:2 43:1,5,10 49:14

**caption** 4:14

**car** 21:3 22:4 23:13 28:1 32:17,23

**card** 45:20

**care** 7:24

**case** 6:12 29:2,15 35:6

**caused** 31:7,10

**certificate** 4:14

**chance** 52:22

**Chancey** 37:14

**Chancy** 15:10

**change** 34:14 52:25 53:1

**changed** 34:11,16, 19

**check** 13:6 14:3 15:5 19:10,11 24:24 25:7,25 26:24 28:16 35:20 43:14

**checked** 43:15,20, 21

**checking** 13:11

**checklist** 14:7

---

Cheryl 5:12

children 7:3,5

**circle** 6:22 7:11 9:4 10:2 29:17 33:22 41:10 42:18 43:4,9 48:21

**class** 25:20,21,22, 24 26:16,17,22

**classes** 25:17,18

**clean** 29:1,3,6

**cleaned** 29:4

**click** 22:11

**commenced** 5:5

**company** 25:14

**complained** 23:17

**completed** 14:5

**computer** 10:12 11:10,13,14 12:14 14:16,17 16:18,19, 20 18:16 25:19,24 26:5,6,10 35:14,17 36:3,4 38:24 39:1 47:24 48:3,8

**computers** 16:7

**concluded** 53:10

**connected** 19:14, 17,18,20 24:24,25 25:1 27:3

**convenience** 23:4

**conversation** 30:11

**copy** 15:2 16:12,14

**correct** 38:22

**County** 6:14

**Court** 4:8,11 12:20 26:4,7 37:25

**covering** 27:22

**created** 38:17,18,20 39:4,5,17

**customer** 23:5,17

**cut** 31:19,21,25 44:9

**D**

daily 12:15 13:13

Daniel 30:12,13 31:1,12 33:10 39:10 40:21

dark 14:1

date 37:10,11 41:16 49:11

day 4:5 8:3,4,12,21 9:1,24 11:19 12:18 13:9,10,18,20,21,22 15:16 17:22 19:11, 12 24:25 25:9,11 26:18 30:16 33:11 34:19 35:10 38:10, 11 40:4,5,17 44:25 50:6,7

daylight 13:25

days 33:24

debris 12:5

defect 27:5,8,11,22

delete 11:1,2,4

Delores 4:2 5:1,10

depends 26:21

DEPONENT 53:11

deposed 5:3

deposition 4:2,9 5:5 52:23 53:1,10

Describe 26:13 43:18 50:1

described 26:12

destroyed 40:11

device 22:1 32:22

diagram 25:12

diagrams 25:15

difficult 37:6

dinosaur 50:3,4 51:5

director 47:12

disc 51:19

Discovery 4:4

doctor 39:14

document 18:11

down 10:6,25 12:11 14:25 15:9 30:10 44:5

download 51:22

draw 42:22 43:4

drives 19:22

Dry 28:12,13

duly 5:3

dumpster 13:11

duties 11:18

duty 8:3

DVD 49:2,18 50:11 51:9,19,22,24 52:1,3

DVR 33:24 34:6,13, 14,16 49:3,18 50:10

DVRS 34:12

**E**

earlier 45:6

Earth 42:13

easier 42:2

eight-track 51:19

employee 10:7

employees 8:2 10:23 47:23

end 16:22 39:17

enlargement 36:23

erased 34:7,8

everybody's 50:18 51:8

everything's 24:24

exactly 41:3

EXAMINATION 5:6

examined 5:3

Excuse 18:23 24:20 27:10 28:5 29:18 31:9,20 34:15 36:9

exhibit 36:16,17,19, 25 41:25 42:10,11 43:9 44:15,17 48:21

expert 44:11

explain 21:6 22:22, 23 23:7 50:5

expressly 4:15

**F**

fall 33:18 38:11

fallen 29:17,20,24

falls 33:20

February 4:5

fell 29:21 30:1 31:6 34:5 38:10 39:12 43:13 45:2 46:15

few 48:18

file 39:5

filing 4:14 14:21

fill 11:22,23 21:10 22:3 23:12,13 35:5, 8,22 36:1 38:16 39:23 40:3

filled 15:19 35:24 38:14

filling 21:2,21

fills 21:3,8 22:12

find 11:13 27:5

fine 39:13 40:10

finishing 30:11

first 5:3 7:14 8:13 29:16,19 35:23

five 6:24 13:15

five-minute 12:1,6, 16,25 13:15,17 14:3 15:15,23

flap 32:18

flappy 43:21,22

flips 24:9

follows 5:4

form 4:17 11:22,23 14:18,20,22 15:3

32:2,5,12,21 33:5 38:14 40:12 44:10 45:25 46:9 47:4

formalities 4:14

forms 15:19,20

four 20:20

freestyle 35:15,19

front 34:3 42:25

full 5:8 24:9 29:25

**G**

gas 22:12 23:9 25:9, 11,16 28:23 32:25 33:17,18,20 39:9,10 40:22

gasoline 22:8

gave 37:7

gazillion 45:21

give 5:8 9:16 15:2, 10,11 19:5

glass 36:22

good 27:3

Google 42:13

Gossett 4:7,10

green 43:7,9 48:21

ground 13:5 28:3,7, 15

guarantee 23:24 41:22

guess 16:10 18:13 30:12 31:5 38:23 52:16

guessing 51:21

guts 24:11,16

**H**

half 33:2

hand 22:12

handle 11:15 19:13, 16 26:1 27:2,3 43:21 45:14

hands 43:6

happened 30:19,25 31:4 33:11 34:9 35:19 38:8,9 40:4 41:3,4,5 50:13,15,21

hard 20:23 36:21 53:3

he'll 15:11

head 10:6,25 12:11 14:25 15:9 17:3,6 18:2,10 19:8 44:5 47:14 53:8

hear 49:8

hearing 4:18

heartbeat 52:6,7

help 42:5 51:5

helped 41:24

hired 7:13

hit 28:1

hold 23:3

holding 21:17

Holt 4:6 5:11

home 7:2,5

honestly 22:16 30:20 34:18 39:24

hose 21:7 27:4

hours 8:6,7 17:24

Howell 4:2 5:1,10, 11 6:10 36:20 37:6 43:7 51:4

HR 47:12

huge 28:25

huh-uh 5:19

hurt 47:8 51:15

**I**

idea 18:8,20 32:24 40:9

image 51:18

incident 35:5,12,22 36:2,8,19 37:10 38:7 40:3 46:18,20

**Indicating** 43:3
47:18

**information** 10:24

**initials** 14:6,8

**inside** 24:10 48:25
49:1

**inspect** 11:18 13:1,
3,12,13

**inspections** 15:15,
21

**instance** 5:2

**insurance** 10:23

**issue** 17:23 18:1
33:8

---

**J**

**job** 7:15,18

**Johnson** 30:13 31:2
33:10 39:10

**junk** 10:1

---

**K**

**keep** 14:20 16:11

**kept** 16:6,8 36:2

**kind** 20:22 28:9

**kinds** 11:16,17

**knee** 39:15

**knew** 52:14

---

**L**

**Laura** 8:22,23 40:19

**laying** 30:9

**Leach** 5:12,13 29:17
43:13 46:15

**Leach's** 29:2,15

**leak** 28:4,7,23,24

**leave** 21:18 32:17

**left** 31:2,11,13 33:17
37:8,9,16

**left-hand** 37:10

**leg** 47:8

**lever** 23:9 24:23
25:25

**Licensed** 4:8,10

**lie** 14:1,15 30:22
39:25 40:1

**lift** 19:13,16

**lights** 12:4

**lips** 52:19

**Lisa** 7:14 34:24,25
35:2 52:9,11

**listen** 51:16

**listening** 27:10

**live** 6:10 17:11,13

**lived** 6:15

**located** 18:17,18
30:6 33:21 34:1,2
43:1 48:21,22

**lock** 23:10 43:24,25
44:2

**lock-y** 22:18,20,23
23:7 25:3,4

**locks** 44:2

**long** 6:1,15,23 7:7
9:3,24 10:22 17:21

**longer** 9:9

**loud** 5:19 47:19,21

---

**M**

**machine** 4:10 51:17

**made** 43:16

**Madisonville** 4:7

**magnifying** 36:22

**main** 16:24 33:22
36:7

**maintenance** 17:1,
2,3,4,7 18:2 19:8

**make** 7:24,25 12:3,4
13:4,6 14:3 15:15
19:13,14,16,19
24:23,25 25:2,7 27:2

**28:18,22 40:4,5
42:10 44:15 52:20,
24

**makes** 43:9 53:4

**man** 47:19

**manager** 7:16,20,
21,23 9:3,11,15
11:8,11,12 35:25

**March** 9:8,9

**mark** 11:3,5 36:16,
24

**marked** 36:17,25
42:11 44:17 48:20

**marker** 43:7

**marks** 14:4 15:5

**mask** 5:14 52:19
53:4

**may** 4:9,11

**means** 45:7

**mechanic** 32:24

**Miller** 19:5 32:2,5,
12,21 33:5 37:15
40:12 44:10 45:25
46:9 47:4

**million** 46:7

**mind** 43:7,19

**Mine's** 52:15

**minute** 13:15 51:1
52:18

**model** 34:13

**monitor** 49:15 50:8

**month** 39:23

**months** 14:15

**morning** 8:15,16
13:19 26:24

**move** 6:17

**moved** 33:24

---

**N**

**needed** 51:22

**new** 34:12 41:8
52:14

**newer** 34:13

**nods** 10:6,25 12:11
14:25 15:9 44:5

**Norris** 35:1,2 52:11

**notes** 4:12 40:4,5,6
47:2

**nothing** 13:5

**notice** 17:16

**now** 5:11 6:1 7:18
9:14 10:17 15:25
19:21 27:9,21 28:2
29:14 34:13 36:20
39:22 40:25 43:8,22
44:20 46:13 48:24
49:5 53:7

**nozzle** 21:17 22:3

**number** 10:22 19:2,
4,7 20:13 22:2 23:17
33:18,19 42:16,17
44:16,20 48:21

---

**O**

**Object** 32:2,5,12,21
33:5 40:12 44:10
45:25 46:9 47:4

**objection** 46:2

**objections** 4:16

**occasion** 20:7,9
23:16

**office** 14:21 16:24
36:7 49:16 50:8

**officer** 30:17

**offices** 4:6

**once** 13:20,22 29:9
36:1

**one** 8:4,5,25 10:7
12:8,9 14:10 20:12
22:9 24:10 26:22
32:23 33:18 35:23,
24 37:1 42:2 46:25
49:4

**order** 8:1 16:5
17:17,19,20 26:3
27:7,12,17 45:12

**orders** 16:6,13,14

**outside** 12:5 13:1,3
28:10 30:2

**over** 7:13,18 9:14
21:22 27:13,16 31:1,
3,5 33:16,19 39:10,
12 40:22 45:13
47:12

**overflow** 39:11

**overflowed** 31:2

**overflows** 33:20

---

**P**

**p.m.** 8:9

**paper** 14:18,20 15:7
16:17

**paperwork** 7:24
11:16

**part** 11:18 13:15
44:11

**pause** 51:2

**pen** 11:5

**pencil** 11:5

**pending** 6:7

**pens** 43:5

**people** 7:25 9:25
16:10 18:3 20:21

**person** 19:22

**person's** 17:4

**personal** 10:24

**personally** 47:20

**phone** 10:12,13,22
19:2,4,7

**photograph** 44:14,
19

**pick** 50:6

**place** 28:3

**plain** 45:2 47:6

**Plaintiffs** 4:3 5:2

**plan** 6:17

**plastic** 44:21

**player** 52:3

plays 50:7

please 5:9,15,23
21:6,23

point 30:3,6,7 37:12,
13

Points 34:3

police 30:17

position 7:19

Powder 28:8

print 10:15,16 11:6
12:7

printed 36:2 48:15

problem 15:25 16:3

Procedure 4:5

proceedings 51:2

product 28:6,14
29:7

products 28:3,9

properly 31:24
32:10,16 43:17 44:8

protect 27:25

pull 23:9

pulled 20:7,10

pump 16:1,3 17:23
18:1 20:7,10,14,25
21:1,3,18,21 22:1,2,
7,8 23:9,17 24:16,
18,19,22 25:9,11,13,
16 26:24 27:21,25
28:11 29:22,24 30:1
31:2,11,13 33:9,17
39:9,10 40:22 42:22,
24,25 43:14 44:19
45:7,10,14,23 46:6,
14

pumping 39:9

pumps 13:12 19:11
20:19,22 23:22
32:23

purposes 4:3

pursuant 4:4

put 14:6,7,17 16:5
21:7 23:11 27:7,13,
16 28:6 43:15 44:24

45:4,13 46:5,13,21,
25 47:7 48:3

---

**Q**

question 5:15,22
6:6,7 21:4 32:9
51:17

questions 4:17
5:13 24:2,4 48:19
52:16,20 53:6

---

**R**

ran 31:3,5 40:22

read 36:21 37:11,18
38:2 39:8 42:2 52:22

reader 45:20

reading 45:19

real 47:19

reasons 46:7

recall 41:20

receive 11:9,14

record 41:9,12
50:23 51:9,18,23

recorded 48:25
49:1 51:20 52:12

recorder 51:6 52:14

recording 49:17
52:9

referring 37:15
41:24

remember 9:12
17:9 20:24 29:25
30:20 31:23 34:19
35:9,11,22 38:7,12,
13 39:24 41:18 45:4
46:16,17 47:5,6

removed 33:24

Renee 4:2 5:1,10
30:1 51:4

repair 17:25 18:1,4

repaired 18:22,24

repeat 5:15,23

report 28:22 35:5,12
36:2,8,19 39:6 40:3
46:18,20

Reporter 4:8,11
12:20 26:4,7 37:25

reports 35:22

represent 5:12

request 4:3

reserved 4:17

response 24:13
37:24

responsibility
24:14,15,21

review 53:1

Richard 17:6,8,10
18:15,25 19:7

right 7:13 10:17
11:7 15:7,14,25
19:8,16,22 20:6
24:8,14,17 26:12
28:11,20 29:14 30:4
32:18,19 34:7 36:1,5
37:22 38:5,6,25
39:2,3,5,6,16,18
41:9,19,21 42:3
43:10 44:6,13 45:19,
23 46:8,12,24 47:2,
25 48:5,12,15,22
50:21 51:7,24 52:5,
9,12 53:6

road 6:14 34:4

routine 12:15

rubber 27:22

Rules 4:4

runs 33:20

---

**S**

SAITH 53:11

saved 52:4

Scharfenberg
47:10

Scott 47:10

scratch 28:1

second 35:24

seconds 8:5

seeped 28:15

self-service 22:8

send 16:10,19,24
17:1,4,15,17,18

sends 18:3

September 41:17

service 44:21 45:5
46:14

set 21:2 22:2,11

several 31:17

shakes 18:10 47:14
53:8

shift 8:12,13

shorthand 4:10

shortly 41:23 50:21

show 10:20,21
18:16 25:13 34:5
37:23 38:1 41:16
44:14,19 47:17

showed 40:21

showing 18:11

shows 9:24 42:24

shut 23:14 32:11

shut-off 21:12

shutting 23:17

side 18:10 27:4
37:8,9,10 47:14 53:8

sign 4:12

simple 18:4 45:3,9
47:6

sir 23:19 41:1

sits 48:1

sitting 30:10

situations 11:15

six 6:16,19 14:14

slid 40:22

slipped 39:12

slur 21:24

small 36:20

Smith 4:6 5:7,11
12:24 26:9 32:3,7,14
33:1,6 36:16,18,24
37:2,13,17 38:4
40:13 42:8,12 44:12,
15,18 46:1,11 47:9
50:25 51:3

soaks 28:14 29:12

somebody's 20:7

sorry 9:22 17:18
20:22 21:22 22:7
24:18 25:10 27:1,10
34:2,17,21 37:21
38:2 39:21 41:4
44:21 45:5 49:9
51:13

speak 5:18

spill 28:12,13 29:2
31:8,10 32:11

spilled 31:25 40:23

spills 13:5,7

spoke 27:10

sponge 29:13

Sprinkled 29:7

stain 43:8

stand 21:10 23:2

standing 21:16,21

start 9:24 21:22

started 39:11

stay 36:3

stayed 7:2,5

stays 36:4

stop 23:24 31:3
39:11

stops 24:7

store 7:14,17 9:24,
25 11:19 12:3 22:9
29:17,25 30:16
33:22 34:3 42:14,16,
17 48:25 49:1,5
51:24 52:1

stored 49:3

street 4:6 6:12
33:22

Allison L. Gossett, LCR
tennreporter@gmail.com

stuck 51:23

stuff 11:16,17 14:14

Subject 46:2

subpoena 6:13

supervisor 28:23

supplied 37:5

supposed 7:25 26:2

sures 19:17

swear 4:11

sweep 29:9

Sweetwater 6:11, 14 9:4 30:17 33:22

switched 34:10

sworn 5:3

system 41:7,8,14 49:19 50:1

systems 34:10 50:19

———————

**T**

taking 13:11

talk 11:7 22:7 30:25 33:10 39:10 50:25

talking 22:18 25:3 31:1,12 33:16,19 40:21 42:14 45:6 49:6,20

tank 22:12 44:6

tape 19:14

teach 24:10 47:22

teaches 25:18,19 26:1

tear 20:12,21

tear-away 20:1,2,3, 10

Tellico 4:6

tells 25:25 26:14

Tennessee 4:4,7 17:13

Terry 9:12

testimony 52:25

Thank 42:7,8 44:13 46:12 48:17 52:17 53:9

thereto 4:13

thing 19:21 22:19, 20,23 23:8 24:12 25:3,4 43:21,22 44:8

things 24:25 45:21

think 9:9 37:22

thirds 8:5

thought 31:18,21

throw 14:14

time 6:3 8:14,16,19 10:23 13:23 28:23, 24 32:11 33:2,23 35:24 50:7

times 31:17

tin 28:10,11 29:8

today 9:7 52:18

told 26:25 29:23

took 50:12

top 19:20 20:5 25:1 37:15

torn 27:22

touch 45:7,9

touching 4:14

towards 34:4

train 47:22

training 11:8,9,14 26:7,10,14,16,17 47:13 48:4,5,7,12

transcribe 4:12

transmission 4:15

trash 13:11

trip 13:5

true 32:4

turn 21:7 26:2 27:7, 12

two 9:5,6,8,15 11:8 33:19,25 35:10

Tyler 5:12 50:25

type 35:15,19

typewriting 4:12

———————

**U**

uh-huh 5:19 10:5,14 12:10,17,19 14:24 15:8 22:21 26:11 38:19 39:19 43:11 44:4

unattended 21:19 31:2,11,13 33:17

understand 5:14, 20,23 9:22 14:2 21:4,5,20,23 22:5 35:18 41:3 50:4 51:5,9,16 52:20,25 53:4

up 9:16 10:6,25 12:11 14:25 15:9 21:8 22:4 23:9 28:14 29:1,3,4,6,9,12 35:16 44:5

updated 41:7,10,14

upgraded 50:18 51:8

upset 45:2

use 15:14 22:24,25

used 22:8,9

usually 8:2,8,19 9:2 11:10,25 13:10 14:6, 14 16:16 17:22,24 26:21

———————

**V**

vacation 28:21

valve 21:12

video 34:1 35:3 40:11,14,24 41:6,14 43:1,5,10 48:19,20, 22 49:2,12,13,14 50:7

voice 47:20

———————

**W**

wait 6:5 39:22 52:18

waived 4:15

walk 12:1,3,6,16,25 13:15,18 14:3 15:15, 23 18:22 37:23 38:1

walked 39:10

walking 30:9

Wallace 7:14

wanted 35:2

wearing 52:19

week 39:13

weeks 33:25 35:10

Weiss 5:12

white 29:8

whole 35:24 39:5,6

word 22:15

work 6:21,25 7:1 8:7 11:8 12:4,13 16:5,6, 12,14 17:17,19,20 19:3 26:2 27:7,12 33:3 43:16 48:25

Workday 9:18,20 10:3,4 25:17 48:9, 10,11

worked 6:23 7:10 8:25 11:11

working 8:6,12,13, 20 26:2 31:24 32:10, 16,18,24 44:8 45:20 51:18

works 9:2 21:1 23:7 24:6 25:3,8,13

worried 47:7

worse 53:4

write 46:22

wrong 27:6 38:25 39:15 45:23 46:4,6

wrote 36:13

———————

**Y**

year 40:9

yearly 26:22

years 6:16,19,24 7:8 9:5,6,7,8,15 11:8

yellow 27:19,20

*Allison L. Gossett, LCR*
*tennreporter@gmail.com*

**Incident Review**

| | | | | |
|---|---|---|---|---|
| Incident Date:3/5/2019 9:00:00 AM | RID:62912 | Store:4703627 | Business Unit: 4160 | Market:4183 |
| Store: 4703627 | Store Phone: (423) 337-9010 | Store Address: 705 S Main St Sweetwater TN 37874 | | Created On:3/13/2019 7:15:23 AM |
| Store Manager: Howell, Renee | Report Was Created By: Renee Howell | Location Of The Person Who Created This Report: 4703627 | | |

Initial Statement: she was at pump 4 pumping gas and walked over to pump2 to talk to DANIEL JOHNSON and gas started to over flow and she went back to stop it and then she sliped and fell and I went out to ask her if she was ok and she said yes she was fine then a week later she called and said she had went to dr and had something wrong with her knee

| SM Investigation: | SM Hazard Description: | How Hazard Was Addressed: | Hazard Correction Plan: | SM Prevention Plan: |
|---|---|---|---|---|
| AM Investigation: | | | | |

**People Involved**

There are no injured, witnesses, contacts or suspects associated with this incident

**Injury Review**

There are no injury details

Exhibit 1
RENEE HOWELL
02-24-21
Leach v. Mac's
Allison L. Gossett, LCR

Mac's 000013

Google Maps    757 US-11



Image capture: Jun 2018    © 2020 Google

Sweetwater, Tennessee

 Google

Street View





**Exhibit 2**
RENEE HOWELL
02-24-21
Leach v. Mac's
*Allison L. Gossett, LCR*

**EXHIBIT**

1

**EXHIBIT**

2



# CHERYL ANN LEACH



# THREE CASES SETTING FORTH METHOD OF OPERATION THEORY

## *Hale v. Blue Boar Cafeteria Co.*

Court of Appeals of Tennessee, Western Section, At Jackson

February 21, 1980, Filed

No Number in Original

**Reporter**

1980 Tenn. App. LEXIS 321 *

MRS. BERNICE HALE, PLAINTIFF-APPELLANT, VS. BLUE BOAR CAFETERIA CO., INC., DEFENDANT-APPELLEE.

**Prior History:** [*1] Law Court. Shelby County. Honorable William W. O'Hearn, Judge

**Disposition:** REVERSED, REMANDED

## Core Terms

floor, customers, proprietor, notice, ordinance, dining area, food, defective condition, service area, circumstances, hazardous, dropped, tile floor, new trial, cafeteria, invitee, meal

## Case Summary

### Procedural Posture

Appellant slip-and-fall victim challenged the decision of the Law Court, Shelby County (Tennessee), which in an action to recover damages due to bodily injuries received when she slipped and fell, granted a new trial and directed a verdict in favor of appellee owner.

### Overview

While exiting the dining area of a restaurant to pay her bill, the victim slipped and fell, causing injury. The jury returned a verdict in her favor. The trial court granted the owner's motion for a new trial and directed a verdict. On appeal, the victim claimed, inter alia, that she was entitled to go to the jury on the issue of whether the owner by its chosen method of operating its business created a hazardous condition, foreseeably dangerous to others. The court reversed the judgment, holding that where an invitee in a retail establishment, in a part open to customers and the public, slipped on some substance on the floor and fell, the invitee had to show how it came to be there, and if the substance was not placed there by the proprietor, then she had to show how long the substance was on the floor. Although the victim did not prove who spilled the water on the floor; she did not prove notice to the owner that water was on the floor; and she did not prove how long the water was on the floor, she was still entitled to go to the jury on the issue of whether the owner by its chosen method of operating its business created a hazardous condition, foreseeably dangerous to others.

### Outcome

The court reversed the judgment that granted a new trial and directed a verdict in favor of the owner.

## LexisNexis® Headnotes

Torts > Premises & Property Liability > General Premises Liability > General Overview

HN1[⤓] **Premises & Property Liability, General Premises Liability**

Where the plaintiff is an invitee in a retail establishment, in that part open to customers and the public, and the plaintiff slips on some substance on the floor and falls, the plaintiff must show directly or by circumstances how it came to be there, and if the substance was not placed there by the defendant, then plaintiff must show directly or by circumstances how long the substance was on the floor.

Torts > ... > General Premises Liability > Defenses > General Overview

Torts > Premises & Property Liability > General Premises Liability > General Overview

HN2[⤓] **General Premises Liability, Defenses**

If the proprietor has taken all precautions reasonably necessary to protect his invitees from injury, he is not liable merely because someone is injured on his property.

**Counsel:** Apperson, Crump, Duzane & Maxwell of Memphis for the appellant.

Douglas A. McTyier, Wilson, McRae, Ivy, Sevier, McTyier & Strain of Memphis for the appellee.

**Judges:** MATHERNE, NEARN, EWELL

**Opinion by:** MATHERNE

# Opinion

MATHERNE, J.

The plaintiff sues for damages due to bodily injuries received when she slipped and fell in the defendant's cafeteria. The jury returned a verdict in favor of the plaintiff, upon which judgment was entered. On the defendant's motion for judgment n.o.v. or for a directed verdict or new trial, the trial judge granted a new trial and directed a verdict in favor of the defendant.

In directing a verdict in favor of the defendant, the trial judge stated:

I charged the jury if the alleged liquid was dropped on the floor by anyone other than an agent of the defendant, before rendering a verdict against the defendant it would be necessary to know that the defendant had or should have had notice of it.

It would not be necessary to present such proof if it was dropped by an agent of the defendant, and the thing that is concerning to the Court primarily about this, I think it [*2] was error to charge the ordinance. As a general rule if an ordinance is--some law is charged which is not applicable, it's harmless because it does not have application, but in this case I believe I did lead the jury to believe that that was-- that that constituted a tortious act or an act of safety rather than help. It may not have been harmless, but back to the liquid and the water, if the liquid was dropped by anyone other than an agent of the defendant, it would have been necessary to show that they should have had notice of it, how long it had been there and had an opportunity to clean it up.

As I said and repeat what I said in my charge, it wouldn't be necessary to do if one of their own agents dropped it. That would be similar to the case regarding the lotion that Mr. Duzane mentioned.

I am of the opinion there is no way for the jury to know under the proof who dropped that, whether it was an agent or a customer or someone else, and I believe that I let the jury speculate on that, and I should not have submitted it to them for speculation; and I believe that I must grant the motion for a directed verdict, and I grant the motion for a new trial and grant a motion for a directed [*3] verdict for the defendant in this case.

Thank you very much.

On appeal the plaintiff presents the following issues for review:

*Statement of the Issues*

I. Whether a business invitee is required to show that the proprietor of a business had actual or constructive notice of a specific hazard causing an injury when such proprietor knew or should have known that its chosen mode of operation posed precisely such a hazard to the injured invitee?

II. Whether the trial court's charge with respect to the contents of a municipal health ordinance which proved inapplicable to the factual situation as presented so misled the jury as to constitute fatal error?

III. Whether justice dictates that the verdict of the jury in this case be reinstated because, even though it granted judgment notwithstanding the verdict, the trial court erred in ruling on a controlling question of law?

The defendant operates a self-service cafeteria where customers walk in single file along a common cafeteria line selecting food from an assortment of foods available. After the customer takes his food to a table in one of two dining areas, a waitress, employee of the defendant, comes to the table with a [*4] glass of water and takes the customer's order for tea or coffee to go with the meal. After eating, the customer goes to the cash register and pays for the meal.

The smaller dining area, nearer the end of the food line, is partitioned off from the rest of the room which constitutes the large dining area. Adjacent to the small dining area is a service stand at which is kept ice, water, tea, coffee, glasses and cups, and also a depository for dirty dishes. The floor of this service area is covered with a hard plastic tile surface, whereas the floors in all dining areas are carpeted. Any person in the small dining area must cross the service area in order to go to the cash register, exit the building or go to the rest rooms.

It is customary for customers to visit the service area and serve themselves with water, tea or coffee. It is also a common occurrence during rush hours for spillage of water, tea, coffee, ice or bits of food from dirty dishes to accumulate in varying amounts on the floor of the service area. The defendant's employees clean the floor of the service area before all meals and are instructed to pick up, when observed, any debris on the floor of the entire cafeteria.

[*5] On the day of the accident, the plaintiff, along with her adult daughter and minor son, entered the defendant's premises for a noon meal. After serving their plates with food, this party went to the small dining area and ate their meal, whereupon they started toward the cash register to pay their bills. The daughter and son were in front of the plaintiff as they left the dining area. The plaintiff testified that after she stepped off the carpet in the dining area onto the tile floor of the service area she made a turn toward the cash register whereupon she experienced a sudden, hard fall to the floor. She said that she had looked down at the floor when she stepped from the carpet to the tile floor, but that she was not looking down at the floor when she fell. Both the plaintiff and her daughter testified that prior to the plaintiff's fall they had not observed water or any other substance on the tile floor.

The plaintiff testified that she fell flat on her back and realized immediately that one arm was broken. She stated that while on the floor she observed a small spot of water on the tile floor and that one of her hands, which had contacted the floor during the fall, was wet [*6] with water. She further stated that her slacks were water smudged on one leg from her hip to approximately her knee. The daughter testified that she also saw a small spot of water on the floor after the fall and observed the plaintiff's wet hand and water smudges on the plaintiff's slacks.

It should be noted that the plaintiff wears an artificial limb which replaces her right foot and a portion of her right leg. This situation is the result of injuries she received in an automobile accident many years ago. Material evidence in the record reveals, however, that the effects of this impediment have been considerably overcome by the plaintiff except for the plaintiff's walking a bit slower than most people and exhibiting a slight limp. Two witnesses testified that they had known the plaintiff and had been rather closely associated with her for many months before learning that she wore the artificial limb. The plaintiff, mother of six children, did her housework, painted the interior and exterior of her house and carried on rather normal activities despite the artificial limb.

Material evidence further reveals that as results of this fall both of the plaintively arms were placed in [*7] casts, her coccyx was surgically removed and she must carry a special cushion with her upon which to sit, she does not now have full use of her right arm and she suffers almost constant pain.

The manager of the defendant testified that he went to the scene of the accident, assisted the plaintiff and drove her to the hospital. This witness stated that he

looked for but did not see any water on the floor of the service stand area. Upon learning that someone had fallen and before going to the scene, he instructed a bus boy to bring a mop to the scene. The bus boy, however, testified that he found no water or other substance in the area. The then assistant manager of defendant was not present at the time, but testified that it was a common practice for customers to obtain ice and drinks from the service stand and that it was not unusual for water to accumulate on the tile floor in that area.

The plaintiff's theory for recovery is that the defendant, by the mode in which it chose to operate its business, created a hazardous condition in the service stand area from which it was reasonably foreseeable that harm to others might occur. The plaintiff further insists that the issue is not [*8] whether the defendant had notice or knowledge of the dangerous condition, but whether under these circumstances the defendant exercised reasonable precautions for the safety of its customers. We fail to find a reported Tennessee case on this exact question.

From our review of reported Tennessee cases we understand that in slip and fall cases where the alleged cause of injury was a transitory, temporary or unusual defect, condition or accumulation of foreign substances on floors, the rule is, as summarized by this Court in _Stringer v. Cooper (Tenn. App. 1972) 486 S.W. 2d 751, 757_, as follows:

[7-10] We understand the rule to be that _HN1_[⬆] where the plaintiff is an invitee in a retail establishment, in that part open to customers and the public, and the plaintiff slips on some substance on the floor and falls, the plaintiff must show directly or by circumstances how it came to be there, and if the substance was not placed there by the defendant, then plaintiff must show directly or by circumstances how long the substance was on the floor. This is a reasonable rule. Any member of the general public entering the establishment could cause a substance to be upon the floor which might [*9] create a dangerous condition. The proprietor is not an insurer of the safety of those who enter the premises. _Patterson v. Kroger Company (1964) 54 Tenn. App. 243, 389 S.W. 2d 283_. But if the proprietor was aware of the defective condition or had the reasonable opportunity to be acquainted with the defective condition, shown by the length of time the condition existed, and failed to ascertain its presence and correct it, liability could ensue. _Allison v. Blount National Bank (1965) 54 Tenn. App. 359, 390 S.W. 2d 716_. Therefore, the matter of notice of the defective condition, which

could be implied by circumstances tending to show an unreasonable length of time the defective condition existed prior to injury, is an essential element of the plaintiff's case. Of course, if the proof should show it was the defendant who placed the substance on the floor or caused the defective condition, no circumstances which would constitute notice need be shown for a defendant need not be otherwise notified of what he himself had done.

However, the present lawsuit is not predicated upon a transitory, temporary or unusual circumstance which allegedly caused the injury. If a proprietor of a place of [*10] business need not have notice of a defective condition caused by it or any of its employees, it appears logical not to require notice of a hazardous situation created by the method in which the proprietor chose to operate its business. We, therefore, hold that in situations of this nature it is not a matter of knowledge in or actual or constructive notice to the proprietor. In these situations the questions are: (1) whether the condition created by the chosen method of operation constitutes a hazardous situation foreseeably harmful to others, (2) whether the proprietor used reasonable and ordinary care toward its invitees under those circumstances and (3) whether the condition created was the direct and proximate cause of the plaintiff's injury. Of course, the customer is also required to use reasonable care for his or her own safety. All these questions are issues for the jury, assuming there is material evidence presented from which the jury could so find.

For cases from other jurisdictions which are in accord with this holding see: _Ciminski v. Finn Corporation, Inc. (Wash. App. 1975) 537 P. 2d 850, 85 A.L.R. 3d 991; Jasko v. F. W. Woolworth Co. (Colo. 1972) 494 P. 2d 839;_ [*11] _Bozza v. Vornado, Inc. (N. J. 1964) 200 A. 2d 777; Thomason v. Great Atlantic & Pacific Tea Co. (4th Cir., Va.) 413 F. 2d 51 (1969); Rhodes v. El Rancho Markets (Ariz. App. 1966) 418 P. 2d 613; Forcier v. Grand Union Stores, Inc. (Vt. 1970) 264 A. 2d 796;_ and _Strack v. Great Atlantic & Pacific Tea Co. (Wis. 1967) 150 N. W. 2d 361._

In _Kinser v. Rich's Inc. (6th Cir., Tenn.) 300 F. 2d 902 (1962)_, the defendant placed a bottle of oily hand lotion on a counter so that prospective customers of all ages could sample its contents. There was proof that both customers and employees of the defendant sampled the lotion causing some to drop on the floor. The plaintiff there contended that she slipped on this oily substance and fell. The Court, while recognizing the requirements

of knowledge and notice on the Part of the proprietor as called for in certain Tennessee opinions, held that a jury issue was made out on the question of the defendant's proximate negligence.

Our holding herein does not render the proprietor an insurer of the safety of the customer. In these situations, HN2[↑] if the proprietor has taken all precautions reasonably necessary to protect his invitees from [*12] injury, he is not liable merely because someone is injured on his property. We also note that the customer chooses to shop in a self-service establishment for his own convenience, and it is reasonable that he has the duty to look out for his own welfare. Compare: *Millers of Jackson, Meadowbrook Road, Inc. v. Newell (Miss. 1976) 341 So. 2d 101*.

Under this record the plaintiff did not prove who spilled the water on the floor; she did not prove notice, actual or constructive, to the defendant that water was on the floor; and she did not prove how long the water was on the floor. We hold, however, that the plaintiff was entitled to go to the jury on the issue of whether the defendant by its chosen method of operating its business created a hazardous condition, forseeably dangerous to others. Of course, the issues of reasonable care as exercised by the proprietor, causation and contributory negligence were also to be properly submitted to the jury. We, therefore, hold that the trial judge erred in directing a verdict in favor of the defendant.

Finally, an ordinance of the City of Memphis was pled by the plaintiff and apparently read to the jury. This ordinance relates to the upkeep [*13] of premises for the purpose of preventing contamination of food. The judge charged the jury that if it found that the ordinance was violated it would constitute negligence on the part of the defendant. We hold that this ordinance has no application to the present lawsuit--it being a safe food ordinance and not a safety-of-premises ordinance. Because the jury might have based its verdict on this ordinance and due to the absence of a correct charge on the question of the defendant's negligence in the operation of its cafeteria, we can not consider reinstating the verdict as might otherwise be permissible under *Holmes v. Wilson (Tenn. 1977) 551 S.W. 2d 682, 687*.

The judgment of the trial court is reversed and this lawsuit is remanded to the Circuit Court sitting in Shelby County, Tennessee, for a new trial. The cost in this Court is adjudged against the defendant-appellee for

which execution may issue, if necessary. All costs in the trial court shall abide the decision of that court on the new trial.

MATHENE, J.

NEAHN, J. (Concurs)

EWELL, J. (Concurs)

---

**End of Document**

Tamara Vanderwerf

# *Barrett v. Red Food Stores, Inc.*

Court of Appeals of Tennessee, Middle Section, At Nashville

February 26, 1992, Filed

APP. NO. 01-A-01-9108-CV-00302

**Reporter**
1992 Tenn. App. LEXIS 196 *; 1992 WL 33891

JANICE BARRETT Plaintiff-Appellee VS RED FOOD STORES, INC. Defendant and Third-Party Plaintiff-Appellant/Cross-Appellee VS JOHNSON'S DAIRY, INC. Third-Party Defendant-Appellant/Cross-Appellee

**Prior History:** [*1] APPEALED FROM THE CIRCUIT COURT FOR WARREN COUNTY, TENNESSEE. THE HONORABLE CHARLES D. HASTON, SR., JUDGE. Docket No. 4990

**Disposition:** AFFIRMED AND REMANDED

## Core Terms

Food, floor, ice cream, trial court, indemnity, proprietor, freezer, delivery, spill, vendors, cleanup, third-party, plastic, cart, customers, sleeve, boxes, common occurrence, condensation, injuries, constructive notice, precautions, cleaned, towel, spot

## Case Summary

### Procedural Posture

Appellant food store sought review of the decision of the Circuit Court for Warren County (Tennessee), which entered judgment for appellee injured party in a slip and fall case and which denied the food store's request for indemnity from cross-appellee dairy. The dairy sought review of the trial court's award of a judgment in favor of the food store on the theory of contribution for one-half of the jury verdict.

### Overview

The injured party filed an action against the food store for injuries sustained when she slipped and fell on a wet floor near the food store's ice cream freezer. The food store denied liability and filed a third-party claim against the dairy, seeking indemnity plus costs and attorney's fees. The trial court entered judgment on a jury verdict in favor of the injured party. The trial court found that the dairy's negligence was joint and several and awarded the food store a contribution for half of the verdict and costs. On appeal, the court affirmed the trial court's judgment. The court held that: (1) there was sufficient evidence for the jury to conclude that the spilling of water on the floor was a common occurrence whenever ice cream was stocked in the freezer; (2) the food store failed to take reasonable precautions to protect customers from injury; and (3) there was sufficient evidence in the record to show that the active negligence of both the food store and dairy was the proximate cause of the injured party's slip and fall, and therefore, the food store was not entitled to indemnity and the trial court properly awarded it a judgment over against the dairy for contribution.

### Outcome

The court affirmed the trial court's decision, which entered judgment on a verdict in favor of the injured party and against the food store in a slip and fall accident. The court affirmed the trial court's

determination of joint and several liability as between the food store and the dairy and its award of contribution in favor of the food store. The court remanded the case for the enforcement of its judgment and assessed costs to the food store.

# LexisNexis® Headnotes

Torts > Negligence > General Overview

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

Torts > ... > General Premises Liability > Types of Premises > Stores

## *HN1*[↧] Torts, Negligence

Under Tennessee law in slip and fall cases the plaintiff must show 1) that a store employee spills the water, or 2) that the store proprietor has knowledge of the spill before the accident, or 3) that the proprietor has constructive notice, i.e., by passage of time, or 4) that the spill is a common occurrence.

Torts > ... > Standards of Care > Reasonable Care > General Overview

Torts > Negligence > General Overview

## *HN2*[↧] Standards of Care, Reasonable Care

If liability is to be predicated on constructive knowledge, the proof must show the dangerous or defective condition exists for such length of time that the defendant knows, or in the exercise of ordinary care should have known, of its existence. The requirements of constructive notice may be met where a dangerous condition inside a self-service business is not an isolated one but is reasonably foreseeable to the owner because the condition is established by a pattern of conduct, a recurring incident, or a general or continuing condition and an invitee suffers injuries as a result of the condition. Where a proprietor knows or has reason to

know that his customers are regularly dropping hazardous debris on his floor or steps, the proprietor must take reasonable precautions to protect customers from injuring themselves. This rule applies, not only to self-service stores where customers are regularly dropping hazardous debris on the floor but likewise applies when the proprietor knows or has reason to know that a vendor regularly drops hazardous debris on the proprietor's floor. Then the proprietor must take reasonable precautions to protect customers from injuring themselves.

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals

Torts > ... > Multiple Defendants > Contribution > General Overview

Business & Corporate Law > ... > Duties & Liabilities > Negligent Acts of Agents > General Overview

Torts > ... > Multiple Defendants > Indemnity > General Overview

Torts > ... > Multiple Defendants > Indemnity > Noncontractual Indemnity

## *HN3*[↧] Negligent Acts of Agents, Liability of Principals

The right to indemnity rests upon the principle that everyone is responsible for the consequences of his own wrong, and, if another person has been compelled to pay the damages which the wrongdoer should have paid, the latter becomes liable to the former. Indemnity shifts the entire burden from one tortfeasor, who has been compelled to pay it, to the shoulders of another who should ultimately bear the loss instead. Indemnity generally arises from an express or implied contract. The right to indemnity may, however, arise in the absence of an agreement and by operation of law to prevent an unjust result. This may be due to the relation of the parties to one another and consequent duty owed, e.g., master and servant, or it may be because of a significant difference in the kind or quality of their conduct, "active negligence" and "passive negligence" or mere failure to remedy or discover the negligence.

Civil Procedure > Appeals > Standards of
Review > General Overview

_HN4_[⬇] Appeals, Standards of Review

A reviewing court is not empowered to weigh the
evidence on an appeal from a jury verdict approved by
the trial court.

Counsel: J. RICHARD McGREGOR, 102 N. Chancery
Street, P. O. Box 746, McMinnville, TN 37110-0746,
ATTORNEY FOR PLAINTIFF-APPELLEE.

ROBERT ORR, JR., LEVINE, MATTSON, ORR &
YOUNG, 210 Third Avenue, North, P. O. Box 2708,
Nashville, Tennessee 37219-0708, ATTORNEY FOR
DEFENDANT AND THIRD-PARTY
PLAINTIFF/APPELLANT, RED FOOD STORES, INC.

JOHN E. BRANDON, DAVID J. PFLAUM, WATKINS,
McGUGIN, McNEILLY & ROWAN, 214 Second Avenue
North, Suite 300, Nashville, Tennessee 37201,
ATTORNEYS FOR THIRD-PARTY DEFENDANT-
APPELLANT/CROSS-APPELLEE, JOHNSON'S DAIRY,
INC.

Judges: LEWIS, TODD, CANTRELL

Opinion by: SAMUEL L. LEWIS

# Opinion

OPINION

Defendant, Red Food Stores, Inc. (Red Food), has
appealed from the trial court's entry of judgment on the
jury's verdict of $ 185,000.00 for plaintiff in this slip and
fall case. Red Food also appeals from the trial court's
denial of its request for indemnity from third-party
defendant, Johnson's Dairy, Inc. (Johnson's Dairy).

Johnson's Dairy appeals from the trial court's award of
judgment over in favor of Red Food on the theory of
contribution for one-half [*2] of the jury verdict or $
92,500.00.

THE CASE

Janice Barrett filed suit against Red Food for injuries
she sustained to her right knee when she slipped and
fell on a wet floor near the Red Food ice cream freezer
on 6 July 1987. Red Food answered, admitting that the
plaintiff had fallen, but denied any liability for her injury.
Red Food also filed a third-party claim against
Johnson's Dairy and sought indemnity plus costs and
reasonable expenses, including attorney's fees or in the
alternative, sought contribution on the theory that a
Johnson's Dairy employee was responsible for the water
being on the floor. Johnson's Dairy answered, denying
any liability for plaintiff's injury.

On 31 March 1989, Red Food filed a motion for
summary judgment in its favor on plaintiff's claim. In the
alternative, Red Food moved for summary judgment on
its claim against Johnson's Dairy for indemnity.
Following argument of counsel, the trial court concluded
that a question of fact existed which precluded the
granting of summary judgment in Red Food's favor on
either the plaintiff's claim against Red Food or Red
Food's third-party claim against Johnson's Dairy for
indemnity.

Subsequently, Red Food and [*3] Johnson's Dairy,
with the approval of the trial court and pursuant to
_Tennessee Code Annotated, Section 29-11-104_, agreed
to submit Red Food's third-party claim against
Johnson's Dairy to the trial court to be decided without
the intervention of a jury upon the proof submitted at the
trial of the plaintiff's claim against Red Food.

Plaintiff's suit against Red Food came to trial on 15
October 1990. At the conclusion of plaintiff's proof, Red
Food moved for a directed verdict. Following argument,
the trial court overruled Red Food's motion. At the
conclusion of all the proof Red Food renewed its motion
for a directed verdict, which the trial court also
overruled. The trial court then charged the jury and,
after deliberation, the jury returned a verdict in favor of
plaintiff and against Red Food in the amount of $
185,000.00. On 30 October 1990, judgment was
entered on the jury's verdict for plaintiff for $ 185,000.00.

Subsequently, Red Food filed a motion for a judgment
not withstanding the verdict or, in the alternative, for a

new trial and/or for a remittitur. Red Food also filed a motion for judgment over against Johnson's Dairy for indemnity, or in the alternative, for contribution. [*4] The trial court thereafter entered an order overruling Red Food's post-trial motions except for "the question of contribution" between Red Food and Johnson's Dairy.

On 8 July 1991, the trial court entered an order finding as follows:

[1] That Johnson's Dairy was negligent, which negligence was an active proximate cause of the injuries to the plaintiff Janice Barrett.

[2] That the negligence of Red Foods as previously found by the jury, was also an active proximate cause of the injuries to the plaintiff Janice Barrett and, therefore, Red Food's third-party claim against Johnson's Dairy for common law indemnity plus attorney's fees and expenses should be denied.

[3] That the negligence of Johnson's Dairy was joint and several with the negligence of Red Foods so that Red Foods and Johnson's Dairy are jointly and severally liable in tort for the injuries to the plaintiff Janice Barrett within the meaning and intent of the Uniform Contribution Among Joint Tort-Feasors Act, T.C.A. § 29-11-101, et seq. . .

The trial court then dismissed Red Food's third-party claim against Johnson's Dairy for indemnity plus attorney's fees and expenses, granted Red Food's third-party claim against [*5] Johnson's Dairy for contribution, and entered judgment in favor of Red Food and against Johnson's Dairy in the amount of $ 92,500.00 plus one-half of the costs. Red Food filed its notice of appeal and, thereafter, Johnson's Dairy also filed its notice of appeal.

THE FACTS

On 6 July 1987, plaintiff visited the McMinnville Red Food store to purchase can lids and plastic wrap. While in the store, plaintiff went to the frozen food section looking for "Tri-Taters" which had been advertised as on sale. When plaintiff saw the store was out of this product, she decided to purchase ice cream. At the time Pat Scruggs, an employee of Johnson's Dairy, was putting prices on boxes of ice cream and loading them from a delivery cart into the ice cream freezer. The delivery cart was between the plaintiff and Mr. Scruggs and Mr. Scruggs was between the cart and the freezer. Plaintiff saw that Mr. Scruggs was blocking the freezer

door so she attempted to get close enough to remove a box of ice cream from his cart. She slipped and fell on some water on the floor, causing injuries to her knee. Plaintiff had been standing near the cart for five to ten seconds before she fell.

Mr. Scruggs was a regular [*6] vendor at Red Food but he was not employed by Red Food. As a part of his delivery duties, Mr. Scruggs put the prices on the ice cream boxes after he removed the boxes from a plastic sleeve. Units of six half-gallon boxes were wrapped in a plastic sleeve and condensation would form on the outside of the plastic sleeve while the boxes were on the delivery cart. The amount of condensation depended on the amount of time the ice cream had been outside the truck and freezer. When the plastic sleeve was removed, moisture would drip from it. Mr. Scruggs would put the empty plastic sleeves in a pile at the end of the cart. Condensation would usually fall to the floor around his feet and, when he was finished loading the freezer, he would get a towel from the store's back room and wipe up the water. This was the same procedure he always followed at Red Food.

Mr. Scruggs testified that he knew it was his responsibility to clean up any water he spilled while stocking the ice cream. He does not remember whether anyone had ever seen water on the floor and does not remember whether anyone had ever asked him to clean water up. It was just something he knew he would have to do and he was never told [*7] by anyone from Red Food to load the ice cream in any other manner.

Ed Bailey, Red Food's store manager at the time of plaintiff's accident, was aware there was a possibility that ice cream vendors would get water on the floor during their deliveries. However, he testified that there was not usually very much water and the water would be restricted to a one to two foot area immediately in front of the freezer. Mr. Bailey testified that in his experience as long as the vendors kept the plastic sleeves between themselves and the freezer, there was no danger.

Red Food's store policy was for the vendors to clean up any spillage before leaving the area. This policy was posted at the back door to the store. A hand towel was usually sufficient to clean up any spillage the vendors left. Red Food also had a policy of having its employees sweep the floor a minimum of every two hours. Red Food had never had a problem with Mr. Scruggs creating a mess during his delivery. At the time of plaintiff's accident, Mr. Bailey was not aware that Mr.

Scruggs was in the store delivering ice cream. No one advised Mr. Bailey that there was any water on the floor before the plaintiff fell.

Red Food has a policy [*8] of sweeping the entire store every two hours. A sweeping log is kept showing when the store is swept. The log shows that the store was swept at 10:00 a. m. on 6 July 1987, the day of the accident. According to store policy, if there had been any water on the floor at the 10:00 a.m. sweeping it would have been cleaned up or reported to the store manager, Ed Roy Bailey. It is also the policy of Red Food that all employees at all times, whether going on break, doing price checks, etc. are to take care of any spill or other hazards they may see or report the spill to the front office. It is further a policy of Red Food that a failure to follow that clean up policy will result in severe disciplinary action and, if repeated, will result in termination.

Mr. Scruggs testified that at the time of plaintiff's fall water had dropped off the ice cream boxes in a small area around his feet. Mr. Bailey testified that there was "a little condensation that had dripped off of the package onto the floor" and that the water was around the delivery cart. Mr. Bailey testified that "there wasn't that much water on the floor at the time of the plaintiff's fall."

Plaintiff testified that prior to falling [*9] she did not see any water, know how much water was on the floor, or know how long the water had been on the floor. Plaintiff also testified that there was a low spot that looked like crack in the floor which was shown by a black mark in the area where she fell. photographs were introduced showing the black mark on the floor. Mr. Bailey identified the black mark as a high spot on the floor that was burned with a buffer. Mr. Bailey also testified that he had never had a problem with this area of the floor.

There is no allegation in plaintiff's complaint nor is there any proof in the record that any employee of Red Food put or spilled water on the floor. Likewise, there is no allegation or proof that any employee of Red Food was actually aware of the existence of water on the floor at or near the time plaintiff fell.

It is disputed in the record as to where the water was that caused plaintiff's fall. Mr. Bailey testified that there was not enough water dripping from the ice cream to have run out away from the ice cream cases and toward the high black spot in the tile floor shown in the picture. Plaintiff testified that the water was in the area of the black spot which she described as [*10] a low spot and, also, that there was a crack in the floor.

## THE ISSUES

We discuss Red Food's first three issues together. They are as follows:

1) Whether the trial judge was in error to deny the motion of RED FOODS for summary judgment.

2) Whether the trial court was in error to deny the motion of RED FOODS for directed verdict during the trial of this case.

3) Whether the trial court was in error to deny the post-trial motion of RED FOODS for a judgment notwithstanding the verdict.

Red Food correctly argues that a business proprietor is not the insurer of the safety of visitors to its premises. _McCormick v. Waters, 594 S.W.2d 385, 387 (Tenn. 1980)_. Red Food further argues that a business proprietor is liable for damages caused by a dangerous or defective condition that exists on its premises only if 1) that condition was created by the proprietor or its agent, or 2) if created by someone else, the proprietor had actual or constructive notice of the condition prior to the injury. _Chambliss v. Shoney's, Inc., 742 S.W.2d 271, 273 (Tenn. App. 1987)_.

In _Self v. Wal-Mart, 885 F.2d 336 (6th Cir. 1989)_, the Sixth Circuit [*11] found that _HN1_[⬆] under Tennessee law in slip and fall cases the plaintiff must show 1) that a store employee spilled the water, or 2) that the store proprietor had knowledge of the spill before the accident, or 3) that the proprietor had constructive notice, _i.e._, by passage of time, or 4) that the spill was a common occurrence. _885 F.2d at 338-39_.

In the instant case, the spilling of water on the floor was a common occurrence where plaintiff fell because each time Mr. Scruggs delivered ice cream and stocked the freezer, water would spill on the floor and he was required to use a towel or mop to clean up the water. Mr. Scruggs followed this procedure each time he made deliveries to the store.

Mr. Ed Bailey, Red Food's store manager, was aware of the procedure and that there was a possibility that ice cream vendors would get water on the floor during their deliveries, that he in fact expected water to be on the floor on July 7. Red Food required the vendor to clean up the water before leaving the store and furnished a towel with which to clean up the water.

On the date of the accident, water was on the floor in front of the freezer and was there because of condensation [*12] from the ice cream packages. The plaintiff came upon the scene while Mr. Scruggs was placing ice cream in the freezer and before he cleaned up the spillage where plaintiff fell.

We think that there is sufficient evidence in the record from which the jury could find that the spilling of water on the floor during ice cream deliveries was a recurring incident or common occurrence. It happened or was expected to happen each time Mr. Scruggs made deliveries.

Whether the plaintiff has met her burden of showing constructive notice is a question of foreseeability to be answered by the trier of fact. In _Jones v. Zayre, 600 S.W.2d 730 (Tenn. App. 1980)_, the Court stated: HN2[↑] "If liability is to be predicated on constructive knowledge by the Defendant, the proof must show the dangerous or defective condition existed for such length of time that the Defendant knew, or in the exercise of ordinary care should have known, of its existence." _600 S.W.2d at 732_.

In _Worsham v. Pilot Oil Corp., 728 S.W.2d 19 (Tenn. App. 1987)_, the court stated:

We believe, however, that the requirements of constructive notice may be met where a dangerous condition [*13] inside a self-service business is not an isolated one but is reasonably foreseeable to the owner because the condition is established by a pattern of conduct, a recurring incident, or a general or continuing condition and an invitee suffers injuries as a result of the condition.

_728 S.W.2d at 20_.

In the instant case Red Food knew of the crack or high place in the floor because when the floor was being buffed, the buffer hit the high side. While it is true that no one had fallen before at this location, and that the deliveryman had always cleaned up the water before he left the store, the instant case presents a somewhat different fact situation from _Worsham v. Pilot Oil_ in that the plaintiff here fell before Mr. Scruggs cleaned up the water presenting an issue for the jury of whether it was foreseeable that someone would come along before the water was mopped up. We are of the opinion that the burden shifted to defendant to show what precautions, if any, were taken to protect the customers from injuring themselves.

In _Self v. Wal-Mart Stores, Inc., 885 F.2d 336 (1989)_, the Sixth Circuit in applying Tennessee law, stated: "Where a proprietor [*14] knows or has reason to know that his customers are regularly dropping hazardous debris on his floor or steps, the Tennessee cases teach that the proprietor must take reasonable precautions to protect customers from injuring themselves. . . ." _885 F.2d at 339_.

We are of the opinion that this rule applies, not only to self-service stores where customers are regularly dropping hazardous debris on the floor but would, likewise, apply when the proprietor knows or has reason to know that a vendor regularly drops hazardous debris on the proprietor's floor, then the proprietor must take reasonable precautions to protect customers from injuring themselves.

Here the plaintiff established a common occurrence in that it was expected each time that ice cream vendors delivered ice cream, some water would accumulate on the floor. We are of the opinion that when a common occurrence is shown, a jury question is raised: Whether or not the proprietor took reasonable precautions to protect customers from injury. We are of the opinion that the jury could find that simply furnishing a towel to clean up the water that is usually spilled from the condensation from ice cream is not an adequate [*15] precaution to prevent injury to customers. Red Food's first three issues are without merit.

Red Food's fourth issue is: "Whether the trial court was in error to dismiss RED FOODS' action over against third-party defendant, JOHNSON'S DAIRY, for indemnity."

HN3[↑] "The right to indemnity rests upon the principle that everyone is responsible for the consequences of his own wrong, and, if another person has been compelled to pay the damages which the wrongdoer should have paid, the latter becomes liable to the former" _Southern Coal and Coke Co. v. Beech Grove Min. Co., 53 Tenn. App. 108, 116, 381 S.W.2d 299, 302 (1963)_. Red Food insists that it has wrongfully been compelled to pay damages for which Johnson's Dairy should be held responsible since Johnson's Dairy's negligence was the proximate cause of the plaintiff's injuries.

Indemnity shifts the entire burden from one tortfeasor, who has been compelled to pay it, to the shoulders of

another who should ultimately bear the loss instead.

Indemnity generally arises from an express or implied contract. The right to indemnity may, however, arise in the absence of an agreement and by operation of law to prevent an [*16] unjust result. This may be due to the relation of the parties to one another and consequent duty owed, e.g., master and servant, or it may be because of a significant difference in the kind or quality of their conduct, e.g., "active negligence" and "passive negligence" or mere failure to remedy or discover the negligence.

Velsicol Chemical Corp. v. Rowe, 543 S.W.2d 337, 399 (Tenn. 1976). It is Red Food's insistence that Pat Scruggs, the employee of Johnson's Dairy, removed plastic sleeves from packages of ice cream and spattered or dripped water on the floor in the process and that no employee of Red Food had actual or constructive notice of the existence of the water prior to the time of plaintiff's fall. Red Food insists that its negligence, if any, was "mere failure to remedy or discover the negligence" of Johnson's Dairy.

There is evidence in the record to show that Mr. Scruggs was negligent in allowing water to collect on the floor where store patrons would or could be walking in order to purchase goods from the store. We are also of the opinion that it is clear that there is evidence in the record from which the jury could find that Red Food was [*17] negligent because it was aware that as a common occurrence water was allowed to collect on the floor when ice cream vendors were removing ice cream from packages, pricing it and stocking the ice cream freezer.

We are of the opinion that there is evidence in the record from which it could be found that the active negligence of both Red Food and Johnson's Dairy was the proximate cause of the plaintiff's injuries, and therefore Red Food was not entitled to indemnity. The trial court properly awarded Red Food a judgment over against Johnson's Dairy on the theory of contribution. This issue is without merit.

We pretermit Red Food's fifth issue of whether it is entitled to reimbursement of its costs of defense because of our holding under issue four that it is not entitled to indemnity.

Red Food's sixth issue is: "If all of the foregoing issues are decided in the negative, whether the trial judge was in error to deny the motion of RED FOOdS for a new

trial?"

In overruling Red Food's motion for a new trial, the trial court stated in its order:

This Court has painstakingly and thoroughly reviewed the transcript, the Court file, the briefs of the attorneys and concluded that all of the defendants' [*18] post-trial motions are without merit.

A cursory review of the transcript clearly reveals that the Court had difficulty in passing upon defendants' motion to dismiss at the close of plaintiff's proof. It was a close call and this Court obviously wrestled with the question of whether or not a jury issue had been raised by plaintiff. However, having looked again at the plaintiff's testimony, the Court has concluded that there was a justiciable issue of fact to be passed upon by the jury at the close of plaintiff's case in chief. Furthermore, thereafter the defendants chose to bring forward their proof. Thereupon at the close of the evidence this Court feels there was indeed an issue for the jury to determine.

There is no question that plaintiff's injuries were substantial and the jury's verdict was within the limits of the proof. The Court thus having made an independent examination of the evidence presented concludes that the proof preponderates in favor of the jury verdict and therefore, it is,

ORDERED that all of the defendants' post-trial motions are overruled.

HN4[↑] This Court is not empowered to weigh the evidence on an appeal from a jury verdict approved by the trial court. Given v. Low, 661 S.W.2d 687, 688 (Tenn. App. 1983). [*19] Red Food has in effect asked this Court to weigh the evidence and reach a conclusion contrary to the jury and trial judge. This cannot be done by this Court. This issue is without merit.

We have carefully considered each of the issues raised by Red Food and find them to be without merit. The judgment of the trial court is in all things affirmed and the cause remanded to the trial court for the enforcement of its judgment, for the collection of costs which are assessed to Red Food Stores, Inc., and for any further necessary proceedings.

SAMUEL L. LEWIS, Judge

CONCUR:

HENRY F. TODD, Presiding Judge

BEN H. CANTRELL, Judge

**End of Document**

 Cited
As of: March 12, 2021 1:53 PM Z

# BLEDSOE v. DELTA REF. CO.

Court of Appeals of Tennessee, Western Section, At Jackson

November 4, 1983, Filed

No Number in Original

**Reporter**
1983 Tenn. App. LEXIS 694 *

DOSSIE L. BLEDSOE and wife, LAURA JANE BLEDSOE, Plaintiffs-Appellants, v. DELTA REFINING COMPANY, Defendant-Appellee.

**Prior History: [*1]** LAW COURT. SHELBY COUNTY. HON. WILLIAM W. O'HEARN, Judge

**Disposition:** REVERSED AND REMANDED

## Core Terms

self-service, drivers, fuel, loading dock, customers, loading, floor, island, truck, proprietor, tanker, spills, food, constructive notice, compartment, employees, dumped, notice, hose, service area, diesel fuel, circumstances, foreseeable, premises, hazard, cases, requirement of notice, hazardous condition, petroleum product, concrete

## Case Summary

### Procedural Posture

Plaintiff injured customer appealed from the judgment of the Law Court of Shelby County (Tennessee), which confirmed a jury verdict in favor of defendant petroleum loading dock in the injured customer's tort action against the loading dock for the injuries received by him in a fall on some slippery fuel-covered concrete at the petroleum loading dock, which was a self-service type of operation.

### Overview

The injured customer operated one of 100 tanker trucks that used the dock daily. The dock was operated on a self-serve basis, and no employee was involved in the fuel loading. The injured customer slipped and fell on a mixture of spilled diesel fuel and rain water. It was a common practice for drivers to dump the residue from their empty trucks onto the concrete pad at the dock before loading. The loading dock relied on the customers to clean the area. At trial, the customer did not prove the dock had actual or constructive notice of any fuel spillage. The jury was specially charged that before the customer could recover, in the absence of actual knowledge, he had to prove constructive knowledge of the hazardous conditions. The jury returned a verdict for the dock. On appeal, the court reversed the trial court and remanded the case for a new trial. The court determined the test that applied to the operation of a self-service operation. The questions were whether the chosen method of operation constituted a hazardous situation foreseeably harmful to others, whether the dock used reasonable and ordinary care toward its invitees, and whether the lack of care caused the injury.

### Outcome

The court reversed the judgment of the trial court, which was in favor of the petroleum loading dock, and remanded the injured customer's tort case for a new trial.

# LexisNexis® Headnotes

Torts > ... > Elements > Causation > General Overview

Torts > ... > Standards of Care > Reasonable Care > General Overview

Torts > Premises & Property Liability > General Premises Liability > General Overview

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

## HN1[⬇] Elements, Causation

In slip-and-fall cases where the alleged cause of injury was due to a transitory, temporary, or unusual condition or accumulation of foreign substances on floors, the matter of notice of the defective condition, which could be implied by circumstances tending to show an unreasonable length of time the defective condition existed prior to injury, is an essential element of a plaintiff's case. However, a lawsuit need not be predicated upon a transitory, temporary or unusual circumstance which allegedly caused the injury. If a proprietor of a place of business need not have notice of a defective condition caused by it or any of its employees, it appears logical not to require notice of a hazardous situation created by the method in which the proprietor chose to operate its business. In situations of that nature it is not a matter of knowledge in or actual or constructive notice to the proprietor. In these situations the questions are: (1) whether the condition created by the chosen method of operation constitutes a hazardous situation foreseeably harmful to others, (2) whether the proprietor used reasonable and ordinary care toward its invitees under those circumstances and (3) whether the condition created was the direct and proximate cause of the plaintiff's injury.

Evidence > Relevance > Relevant Evidence

Torts > ... > Standards of Care > Reasonable

Care > General Overview

## HN2[⬇] Relevance, Relevant Evidence

In determining whether a defendant's conduct was characterized by ordinary care, the customary way of doing such acts may be shown, but such evidence is not controlling.

**Counsel:** THOMAS R. PREWITT, SR. and FREDRICK ZIMMERMAN, Armstrong, Allen, Braden, Goodman, McBride & Prewitt, of Memphis, Attorneys for Plaintiffs-Appellants.

ROBERT L. GREEN, Neely, Green & Fargarson, of Memphis, Attorney for Defendant-Appellee.

**Judges:** TOMLIN, J., CRAWFORD, J. (Concurs), SUMMERS, Sp.J. (Concurs)

**Opinion by:** TOMLIN

# Opinion

TOMLIN, J.

This is a slip-and-fall case with a slightly different twist. The plaintiff brought suit in the Circuit Court of Shelby County for injuries received by him in a fall on some slippery fuel-covered concrete at the defendant's petroleum loading dock in Memphis, which is a self-service type of operation. At the trial below, the plaintiff did not prove actual or constructive notice of any fuel spillage on the part of the defendant. At the request of the defendant, the jury was specially charged by the trial judge that before the plaintiff could recover, in the absence of actual knowledge, he had to prove constructive knowledge of the hazardous conditions complained of. The jury returned a verdict for the defendant. On appeal, the plaintiff raises two issues.

*STATEMENT* [*2] *OF THE ISSUES*

I. Whether a business invitee is required to show actual or constructive notice of a specific hazard causing an injury when defendant knew or should have known that its chosen method of operation posed precisely such a hazard to the injured invitee.

II. Whether the trial court erred in excluding evidence comparing defendant's facility and operation unfavorably with another Memphis fuel supplier. We hold that neither actual nor constructive notice need be proven in this case by the plaintiff, and that under the circumstances, the excluded testimony should have been allowed to go to the jury. We reverse the trial court and remand for a new trial.

The plaintiff at the time of his injury was a part-time employee of a gasoline distributor in Jackson, Tennessee. One of his principal duties was to drive his employer's tractor-trailer tanker truck periodically from Jackson to Memphis to the defendant's facilities to pick up a load of various types of petroleum products.

The defendant is in the business of refining gasoline and other petroleum products from oil. It also stores and sells these products to petroleum distributors throughout the mid-South by means of a self-service [*3] loading dock. The self-service loading facility of the defendant was shown at trial to have four lanes for loading--that is, the facility could accommodate four tanker trucks at one time. The loading lanes were separated by concrete islands on which were located meters, valves, pumps, and other equipment for the purpose of loading the tank trucks.

The record reveals that the only employee of the defendant present on the premises of the loading facilities during business ours was located in a small house, called a "doghouse," at the entrance to the facility, which every truck had to pass coming in and going out of the loading dock area. It was testified that the normal procedure for a driver coming to the facility to take on a load of petroleum products was first to stop at this doghouse and pick up a card to be used for the purpose of activating the computer-operated pumping equipment. Then the driver would pull his tanker into one of the four lanes of the facility for loading. The proof showed that gasoline, diesel fuel, and jet fuel were available at the four lanes.

The defendant's facility is what is known in the trade as a "bottom-loading" facility, which simply means that the [*4] petroleum products were pumped into a valve in the bottom of the tanker trucks, rather than into the

top. On the day of the accident, the plaintiff had followed the above-described procedure and had completed the filling of two of the three compartments in his tanker with particular grades of gasoline. Lane 1 in which he was loading was an outside lane. This fact is important since the proof showed that it was raining at the time and that it had been raining for some time. The plaintiff was supposed to fill the third compartment of his tanker with a different grade of gasoline from that placed into the first two compartments. He unhooked the hose from the second compartment and started to secure the necessary hose to fill the third compartment. That hose, located on the end of a swivel boom, was swung back almost flush with the roof-support beams. It also was caught on another hose similarly situated. It was necessary for the plaintiff to step up on the raised concrete island on which the pumping equipment was located in order to untangle the hose. At this time the plaintiff slipped on a mixture of what was testified to be spilled diesel fuel and rain water, causing him to fall. In [*5] falling, his head struck a cast iron fitting on the end of one of the hoses, and his back struck the edge of the concrete island.

There was testimony at trial to the effect that perhaps as many as 100 tanker trucks a day used the defendant's fuel-loading facility. There was also testimony that it was not desirable to mix one kind of fuel with another; hence, when a tanker truck pulled up to the loading dock, the driver would check the fuel compartment to determine if there was any residue of the previous load in the tank compartment. If so, it was testified to be a "common practice" for most drivers to dump this residue onto the concrete pad at the loading dock where it could flow away from the dock through a drain into an underground storage tank. While defendant provided a special facility for the dumping of fuel some distance away from the loading dock, it was not used by many of the drivers.

The safety director for the defendant testified that following complaints about slippery conditions around the islands, a water hose was provided on each island to be used by the drivers, or any other persons, for the purpose of washing down the islands and the loading area. The proof was [*6] also to the effect that the defendant did not regularly keep an employee on duty at the loading dock for the purpose of keeping them clean. Rather, it relied upon the truck drivers to wash down any spills from loading or any fuel dumped out at the loading dock. A fuel inspector who was at the defendant's loading dock daily for some two weeks prior to the accident testified that, while most of the drivers did wash

down their dumped fuel, some did not.

Officials of the defendant testified that oral instruction were given to its drivers as to the steps to take when fuel was dumped, but that no instructions, written or oral, were given to drivers who were not employed by it regarding the dumping of the fuel or the washing down of the fuel after it was dumped. The safety director of the defendant testified that it was the duty of the driver who caused the spill to clean it up, and as for those drivers not employed by the defendant, it simply relied upon their experience as to what should be done.

The record revealed that the defendant had no maintenance personnel regularly assigned to the docks, that it had no regular wash-down program utilizing detergents, and that it knew that drivers [*7] from time to time did not wash down spills. As one employee described it, if the driver didn't wash down his spill, the next driver would have to work in it.

As for inspection of the premises by the defendant, the chief maintenance supervisor testified that he checked the fuel dock "several times a week" to see if fuel had accumulated on the island, or when he had time. Another maintenance employee testified that he checked the loading dock islands two or three times during an eight-hour shift, if time permitted.

There was proof in the record that the plaintiff, when he stepped up on the island, slipped on a mixture of diesel fuel and water. It is not questioned that the plaintiff failed to prove that the defendant, or its employees, had actual knowledge of the existence of diesel fuel on the island at lane 1 at the time he fell, nor did the plaintiff prove how long the diesel fuel had been present on the island.

Inasmuch as there was no proof of actual knowledge of the presence of the diesel fuel on the part of the defendant, at the request of its counsel, the trial judge, at the conclusion of his general charge to the jury, gave the following special request, here quoted in part:

Before [*8] you can predicate or establish negligence on the part of a defendant in a case such as this based on constructive knowledge, you must find that a defective and dangerous condition did exist at the time this occurrence took place and that it existed for such a length of time that the defendant, in the exercise of ordinary care, should have known of its existence.

I. THE NEED FOR ACTUAL OR CONSTRUCTIVE NOTICE BY DEFENDANT

The theory of the plaintiff is that the defendant, by choosing to operate its loading dock facility in the manner in which it did, created a hazardous condition in that area as a result of which it was reasonably foreseeable that harm to a person using that facility might occur. The plaintiff also takes the position that under these circumstances the requirement of notice or of knowledge of the dangerous condition is inapplicable, the only issue being whether under these conditions and circumstances the defendant exercised reasonable caution for the safety of the drivers using the loading dock.

The general rule in this state and also in the majority, if not all, of the jurisdictions in this country regarding liability in slip-and-fall cases is that before an owner [*9] of a premises can be held liable to an invitee, it must be shown that either the owner or his employees created the hazardous condition which caused the fall, or failing that, that the owner knew or should have known that the hazardous condition existed before the accident. *Jones v. Zayre, Inc., 600 S.W.2d 730, 732 (Tenn.App. 1980)*; *Gargaro v. Kroger Grocery & Baking Co., 118 S.W.2d 561 (Tenn.App. 1938)*.

However, with the advent of self-service merchandising, first evidenced in the retail food industry, the courts began to recognize that certain hazards were created by this method of doing business that were not normally associated with food stores that were non-self-service. Therefore, the courts have backed away from a strict application of the actual or constructive notice requirement. This trend of cases, which has become well established during the past decade, has been described as either expanding the notice requirement or representing an exception to the notice requirement.

Our state has aligned itself with this "trend" that has developed in the area of self-service operations. In *Hale v. Blue Boar Cafeteria Company, Inc.,* 5 Tennessee Attorney's Memo 13-6 (1980), [*10] an unreported decision of this Court authored by then Presiding Judge Matherne, filed February 21, 1980, the defendant operated a self-service cafeteria where customers selected food from an available assortment, then took it to their tables in one of two dining areas. Waitresses employed by the defendant would bring the customers water and take their beverage orders. After eating, the customers would walk to the cash register to pay. The smaller dining area, selected as the site for eating by the plaintiff, was adjacent to a service stand at which was kept water, beverages, glasses and cups. The floor of the service area was covered with hard tile, in contrast to the carpeting in the dining areas. It was

necessary for any person occupying the small dining area to cross this service area in order to reach the cash register and to exit the building.

The proof also showed that it was customary for patrons to go to the service area to help themselves to refills of beverages. It was also a common occurrence during rush hours for spillage of water, other beverages, and bits of food from the dirty dishes to accumulate in varying amounts on the floor of the service area. The defendant's [*11] employees were instructed to clean the service area floor prior to all meals and to pick up any debris on the floor when it was observed to be present. The plaintiff in *Boar* slipped and fell to the floor of the service area as she was approaching the cash register. Both she and her daughter testified that there was water on the floor at the time of the fall.

Writing for this Court, Judge Matherne cited the previous case of *Stringer v. Cooper, 486 S.W.2d 751 (Tenn.App. 1972)*, for the proposition that *HN1*[↑] in slip-and-fall cases where the alleged cause of injury was due to a transitory, temporary, or unusual condition or accumulation of foreign substances on floors:

The matter of notice of the defective condition, which could be implied by circumstances tending to show an unreasonable length of time the defective condition existed prior to injury, is an essential element of the plaintiff's case.

Whereupon, the Court then noted the unusual circumstances of this case:

However, the present lawsuit is not predicated upon a transitory, temporary or unusual circumstance which allegedly caused the injury. If a proprietor of a place of business need not have notice of a defective [*12] condition caused by it or any of its employees, it appears logical not to require notice of a hazardous situation created by the method in which the proprietor chose to operate its business. We, therefore, hold that in situations of this nature it is not a matter of knowledge in or actual or constructive notice to the proprietor. In these situations the questions are: (1) whether the condition created by the chosen method of operation constitutes a hazardous situation foreseeably harmful to others, (2) whether the proprietor used reasonable and ordinary care toward its invitees under those circumstances and (3) whether the condition created was the direct and proximate cause of the plaintiff's injury.

The Court then concluded:

Under this record the plaintiff did not prove who spilled the water on the floor; she did not prove notice, actual or constructive, to the defendant that water was on the floor; and she did not prove how long the water was on the floor. We hold, however, that the plaintiff was entitled to go to the jury on the issue of whether the defendant by its chosen method of operating its business created a hazardous condition, foreseeably dangerous to others.

In so [*13] holding, this Court reversed a directed verdict granted by the trial court and remanded the case for a new trial.

One of the landmark cases in this area of the law is *Ciminski v. Finn Corporation, Inc., 13 Wash.App. 815, 537 P.2d 850 (1975)*. The facts in *Ciminski* were similar to the facts in *Blue Boar*. The plaintiff was a customer in the defendant's self-service cafeteria-styled restaurant, which had counters upon which various foods were "displayed for purchase. At the end of the food line were pieces of meat on carving tables from which the carvers served the customers. The plaintiff fell a few feet from the meat carvers, near the kitchen door, while going to the restroom. There was testimony that in the area near the meat and the kitchen door there tended to be spills, the area was greasy at times, and pieces of lettuce, butter, and other foods were sometimes dropped by the customers. The restaurant had no written policy concerning maintenance of the area, and no one employee was responsible for policing the area.

In reversing summary judgment in favor of the defendant and remanding the case for trial, the Court said:

It is common knowledge that the modern merchandising [*14] method of self-service poses a considerably different situation than the older method of individual clerk assistance. It is much more likely that items for sale and other foreign substances will fall to the floor. Clerks replenish supplies by carrying them through the area the customer is required to traverse when selecting items. Customers are naturally not as careful in handling the merchandise as clerks would be . . . . Such conditions are equally typical of self-service restaurants and the most common self-service operation, the modern supermarket.

An owner of a self-service operation has actual notice of these problems. In choosing a self-service method of providing items, he is charged with the knowledge of the foreseeable risks inherent in such a mode of operation . . . . In a self-service operation, an owner has for his

pecuniary benefit required customers to perform the tasks previously carried out by employees. Thus, the risk of items being dangerously located on the floor, which previously was created by the employees, is now created by other customers. But is the very same risk and the risk has been created by the owner by his choice of mode of operation. He is charged [*15] with the creation of this condition just as he would be charged with the responsibility for negligent acts of his employees. A pattern of conduct, such as self-service, is as permanent and the risks from such pattern as foreseeable, as a deceptive condition. An owner is required to take reasonable precautions against such deceptive conditions on his premises to prevent injury to patrons.

*537 P.2d at 853.*

. . . .

Thus, it is not necessary to show actual or constructive notice of the specific hazard causing injury, and it becomes the task of the jury to determine whether the proprietor has taken all reasonable precautions necessary to protect his invitees from these foreseeable risks.

*Id. at 854.*

For cases from other jurisdictions also dealing with self-service restaurants or grocery stores, see *Lingerfelt v. Winn-Dixie Texas, Inc., 645 S.W.2d 485, 487 (Okla. 1982)*; *Jasko v. F. W. Woolworth Co., 494 P.2d 839 (Col. 1972)*; *Safeway Stores v. Smith, 656 P.2d 255 (Col. 1983)*.

In the case of *Pimentel v. Roundup Co., 649 P.2d 135 (Wash.App. 1982)*, the Washington Court of Appeals extended the application of the exception to the notice requirement from self-service [*16] food stores to a retail merchandise store that had chosen to utilize the self-service method of marketing.

The Court in *Pimentel* quoted with approval an excerpt on slip-and-fall cases from an annotation in *85 A.L.R.3d 1000*, entitled "Store or Business Premises Slip and Fall: Modern Status of Rules Requiring Showing of Notice of Proprietor of Transitory Interior Condition Allegedly Causing Plaintiff's Fall." We quote with approval a portion of that annotation, which states:

Courts are recognizing, either explicitly or implicitly, that

by utilizing the self-service marketing method the store owner or business proprietor is himself creating the dangerous condition, and that therefore the owner or proprietor is deemed to have actual notice of the condition, so that no proof of notice by the plaintiff is necessary.

*Id. at 1005.*

We are further of the opinion that, restating what this Court said in *Blue Boar,* our holding in this case does not make the proprietor or operator of a business an insuror of the safety of the customers. If the operator in self-service operations has taken all precautions that are reasonably necessary to protect his customers from injury, [*17] he is not liable merely because someone is injured on his premises.

There can be no doubt from the proof in this record that the defendant was operating a self-service petroleum-loading facility. There was no program of regular maintenance, the defendant had no employee assigned on a regular basis to clean up the area, and it relied solely upon its customers--the truck drivers--to clean up the spills in the loading dock area. It is clear that the defendant in the case at bar chose a self-service method of marketing. Having done so, he must accept the responsibilities attendant with that method. We therefore hold that the trial judge was in error in giving the special request concerning constructive knowledge.

II. THE EXCLUDED TESTIMONY.

As part of the plaintiff's proof an independent tanker truck driver was offered as a witness to show a comparison between the defendant's loading facility and that of a company called "Tasco," another petroleum products supplier in Shelby County. The witness was asked to describe the general condition of the defendant's facility during a six-month period prior to the accident and to compare it with the condition found at Tasco. The trial judge limited [*18] the period of proof to sixty days rather than six months, and inasmuch as the witness could not testify with certainty that he had been at the defendant's facility during the sixty-day period prior to the plaintiff's accident, obviously no proof could be offered. There was a proffer of proof for the record of this witness' experiences with both facilities during the six-month period prior to the accident. We are of the opinion that the court was in error in refusing to allow the proffered testimony to be admitted. Such weaknesses in his testimony, such as the difference in age of the two facilities, would go to the weight of the

evidence, not its admissibility. As stated in the case of _McGee v. Nashville White Trucks, Inc., 633 S.W.2d 311, 316 (Ct.App.M.S. 1981)_, cert. denied 1982: _HN2_[↑] "In determining whether a defendant's conduct was characterized by ordinary care, the customary way of doing such acts may be shown, but such evidence is not controlling. _Nashville C & St. L. Ry v. Wade, 127 Tenn. 154, 153 S.W. 1120 (1913)_." See also _Easterly v. Advance Stores Co. Inc., 432 F.Supp. 7 (E.D.Tenn. 1976)_.

Accordingly, the judgment of the trial court is reversed. This cause [*19] is remanded to the Circuit Court of Shelby County for a new trial in accordance with the principles set forth in this opinion. Costs in this cause are taxed to the defendant, for which execution may issue, if necessary.

TOMLIN, J.

CRAWFORD, J. (Concurs)

SUMMERS, Sp.J. (Concurs)

---

**End of Document**

# CHERYL ANN LEACH



# PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

# IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE
## AT MADISONVILLE

CHERYL ANN LEACH and husband,
JOHN LEACH, SR.
    **Plaintiffs**

v.

    **No. V20-0187S**
    **Jury Demanded**

MAC'S CONVENIENCE STORES, LLC
    **Defendant**

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Come the Plaintiffs pursuant to **Tenn.R.Civ.P.** 56.03 and file this Response to Defendant, Mac's Convenience Stores, LLC's Statement of Material Facts in Support of Its Motion for Summary Judgment.

1.    On August 8, 2019, the Plaintiff stopped at the Mac's located at 708 South Main Street in Sweetwater, Tennessee to get gasoline. (Compl. ¶ 5; Exhibit 1, p. 49:1-10, 55:14-19).

    **RESPONSE:**    This fact is undisputed for purposes of ruling on the Motion for Summary Judgment.

1

2. The Plaintiff parked in front of the pump closest to Main Street and furthest from the Mac's convenience store building. (Exhibit 1, p. 64:22-66:4; Exhibit 2).

   **RESPONSE:** This fact is undisputed for purposes of ruling on the Motion for Summary Judgment.

3. The Plaintiff paid for the gasoline at the pump with her Exxon credit card. (Exhibit 1, p. 66:5-7).

   **RESPONSE:** This fact is undisputed for purposes of ruling on the Motion for Summary Judgment.

4. The Plaintiff selected a grade of gasoline and inserted the pump into her vehicle's gasoline tank. (Exhibit 1, p. 73:16-24).

   **RESPONSE:** This fact is undisputed for purposes of ruling on the Motion for Summary Judgment.

5. The Plaintiff pulled the handle to begin pumping the gasoline and engaged the automatic pumping mechanism. (Exhibit 1, p. 73:25-74:11).

   **RESPONSE:** This fact is undisputed for purposes of ruling on the Motion for Summary Judgment.

2

6. After engaging the automatic pump mechanism on the handle, the Plaintiff walked toward the front of her vehicle to speak with Sweetwater Police Officer Daniel Johnson. (Exhibit 1, p. 75:2-76;13; Exhibit 2).

**RESPONSE:** This fact is disputed. The Plaintiff, after having engaged the automatic pumping mechanism walked to the front passenger door which is just a very short distance to speak with Police Officer Daniel Johnson. The Plaintiff walked to the front driver's side door.

7. The Plaintiff was approximately four feet away from where the engaged gasoline pump was inserted into her vehicle. (Exhibit 1, p. 69:8-70:7, 75:17-23; Exhibit 2).

**RESPONSE:** Plaintiff disputes that this is exactly four feet as she stated in her deposition that she did not know how far it was but it was to the front driver's side door.

> Q     All right. So did you stay right next to the pump?
> A     No.   My gas tank is right beside the back passenger side door.  I was right at the front driver's side door talking to Daniel.  So I wasn't right next to it, standing right there next to it.
> Q     So you went from close to the back passenger door where your pump was.
> A     Uh-huh.
> Q     And then you walked to the front of your car.

3

        A      No, it wasn't to the front of the car.  It was next to the driver's side door, which is maybe from here – I don't know how wide doors are, so maybe from here to here (indicating).

        Q      So are you signifying about four feet or so?

        A      Yeah.  I'm not very good with the feet, but --.

8.      While talking with Officer Johnson, the Plaintiff heard gasoline spilling. (Exhibit 1, p. 76:14-77:1).

**RESPONSE:**      For purposes of the Motion for Summary Judgment, Plaintiffs do not dispute that Plaintiff heard gasoline spilling.

9.      The Plaintiff looked and saw gasoline running down the side of vehicle onto the pavement. (Exhibit 1, p. 60:5-24, 77:5-7, 13-16, 20-23).

**RESPONSE:**      For purposes of the Motion for Summary Judgment, Plaintiff does not dispute that she saw gasoline running down the side of her vehicle onto the pavement.

10.     The Plaintiff saw the gasoline on the ground. (Exhibit 1, p. 60:5-24, 78:6-10).

**RESPONSE:**      For purposes of the Motion for Summary Judgment, Plaintiff does not dispute that she saw gasoline on the ground.

4

**11.** The Plaintiff had the most knowledge about the gasoline spilling. (Exhibit 1, p. 78:3-5).

**RESPONSE:** Plaintiff disputes that she has the most knowledge about the gasoline spilling. Plaintiff had no knowledge as to how the actual mechanism of the automatic shutoff valve on the gasoline pump worked so the Defendants had superior knowledge of how the shutoff mechanism on the gasoline pump worked and that it could malfunction and allow a spill to occur. Plaintiff's description of exactly what happened is found on page 60 of her deposition and is as follows:

> So I had the nozzle set for it to fill up, and I was talking to Daniel Johnson that was getting gas on the other side. We had National Night Out two nights before that on Tuesday Night, and we were talking about the National Night Out. Then I heard water or liquid, whatever you call it, and I looked, and the nozzle didn't stop, and gas was pouring out down the side of my car and on the ground.
> So I went and got the nozzle and put it up and slipped on the gas, and when I slipped on the gas, my left foot slipped and went outward, and my left knee went inward and hit the ground. Daniel saw me fall, and he came over and helped me up, and he went and got the stuff that you sprinkle on it and sprinkled it down, and he told the guy that was with him to go inside and get somebody inside the store. So that woman came out and wrote down on a piece of paper her name and phone number to call if there was ever any issues and asked if I was okay. (Deposition of C. Leach, p. 60)

**12.** Nobody else knew the gasoline was spilling. (Exhibit 1, p. 77:25-78:2).

5

**RESPONSE:** Officer Daniel Johnson knew the gasoline had spilled because he actually came over and saw the gasoline spilled and helped to clean it up. (Affidavit of Daniel Johnson)

13. The Plaintiff fell as she was putting the pump handle back in its holder on the pump. (Exhibit 1, p. 60:5-24, 81:4-16).

**RESPONSE:** As outlined above, and as stated in her deposition, Ms. Leach fell as she was putting the pump handle back into the holder on the pump. For purposes of the Motion for Summary Judgment, the Plaintiff admits that she slipped on the gas and her left foot slipped and went outward as stated in her deposition at page 60. (See answer to number 9 above.

THIS the18th day of March, 2021.

 

 

W. HOLT SMITH, BPR # 004557
209 Tellico Street North
Madisonville, Tennessee 37354
Phone:     (423) 442-4012
Fax:        (423) 442-1038

W. TYLER WEISS, BPR # 028801
WORTHINGTON & WEISS
409 N. College Street
Madisonville, Tennessee  37354
Phone:          (423) 442-5353
Fax:             (423) 442-3866

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of March, 2021 a true and exact copy of this document was emailed to:

Sean W. Martin - swmartin@carrallison.com
Chancey R. Miller - cmiller@carrallison.com
CARR ALLISON
736 Market Street, Suite 1320
Chattanooga, Tennessee 37402

W. HOLT SMITH

7

**IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE**

CHERYL ANN LEACH and Husband, &ast;
JOHN LEACH, SR. &ast;
 &ast;
 Plaintiffs, &ast;
 &ast;
v. &ast; No. V20-0187S
 &ast;
MAC'S CONVENIENCE STORES, LLC, &ast; JURY DEMANDED
 &ast;
 Defendant. &ast;

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Mac's Convenience Stores, LLC ("Mac's"), by and through

counsel, to submit its Reply in Further Support of its Motion for Summary Judgment filed pursuant

to Rule 56 of the *Tennessee Rules of Civil Procedure.*

**I. The Plaintiff saw the gasoline spill prior to her fall.**

In her Response, the Plaintiff glosses over the fact she knew about the gasoline spill prior

to her fall. There is no dispute she saw the spill on the pavement before she fell. This is the key

fact for summary judgment because "liability in premises liability cases stems from superior

knowledge of the condition of the premises." *Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn.

2004); *see also Green v. Roberts*, 398 S.W.3d 172, 177 (Tenn. Ct. App. 2012) ("[D]uty is based

upon the assumption that the owner has superior knowledge of any perilous condition that may

exist on the property."). "Whether a defendant owed or assumed a duty of care to a particular

plaintiff is a question of law for the court to decide." *Green*, 398 S.W.3d at 177.

The Plaintiff's knowledge of the spill prior to her fall necessarily means Mac's did not have

superior knowledge of the spill giving rise to a duty of care. *Id.* In fact, Mac's had no knowledge

of the spill until being alerted to the fall by an unknown customer. (Exhibit 3, p.29:19-22). When

asked, "Would you say you have the most knowledge about it spilling," the Plaintiff answered, "Yes." (Exhibit 1, p.78:3-5). This alone is enough for summary judgment under the duty of care standard set forth by the Tennessee Supreme Court in *Blair*. *Blair*, 130 S.W.3d at 764; *Jones v. Exxon Corp.*, 940 S.W.2d 69, 73 (Tenn. Ct. App. 1996).

## II. The Tennessee Supreme Court rejected the "Method of Operation" theory of premises liability propounded by the Plaintiff.

The Plaintiff urges this Court to deny summary judgment due to Mac's purported constructive notice of the spill resulting from its "method of operation." In support of this argument, the Plaintiff cites cases that are no longer good law. *See, e.g., Hale v. Blue Boar Cafeteria Co.*, 1980 Tenn. App. LEXIS 321 (Tenn. Ct. App. 1980) (overruled as stated in *Blair v. West Town Mall*, 130 S.W.3d at 764-66 (Tenn. 2004)).

In *Blair v. West Town Mall*, the Tennessee Supreme Court rejected the "method of operation" theory of premises liability put forth by the Plaintiff. *Blair*, 130 S.W.3d at 764-66. The Supreme Court described *Blue Boar*, cited by the Plaintiff and attached to her brief, as follows:

> The first line of cases is based on the idea that the premises owner's method of operating the business indirectly resulted in creation of the dangerous condition, although the acts of third parties also contributed to its creation. Therefore, notice need not be shown. This approach to the method of operation theory is exemplified in *Hale v. Blue Boar Cafeteria Co.*, 1980 Tenn. App. LEXIS 321, No. 22, 1980 WL 150173 (Tenn. Ct. App. Feb. 21, 1980). The plaintiff in *Blue Boar* slipped and fell on water that had been spilled in the self-service beverage area of a cafeteria. The plaintiff claimed that the dangerous condition was created by the method in which the cafeteria chose to conduct its business - the self-service method of providing beverages.

*Id.* at 764. "**Having fully considered these differing approaches, we reject the analysis applied in *Blue Boar* and *Trebing*.**" *Id.* at 765 (emphasis added). "These elements of method of operation do not add anything to the analysis of premises liability cases." *Id.* "In fact, they muddy the inquiry

2

into the question at hand - whether the premises owner either created or had actual or constructive notice of the dangerous condition." *Id.*

Since its rejection in *Blair*, the "method of operation" theory of premises liability has failed in other courts in Tennessee. *See, e.g., Layne v. Walmart, Inc.*, 2020 U.S. Dist. LEXIS 156370, at *14-15 (E.D. Tenn. 2020); *Benn v. Public Bldg. Auth.*, 2010 Tenn. App. LEXIS 408, at *13 n.2 (Tenn. Ct. App. 2010). In *Layne*, Judge Lee of the Eastern District of Tennessee granted summary judgment to Walmart under the plaintiff's method of operation theory. *Layne*, 2020 U.S. Dist. LEXIS 156370, at *14-17. Judge Lee held "[i]n *Blair*, the Tennessee Supreme Court rejected a line of cases that held the creation theory to apply when a business owner indirectly causes a dangerous condition." *Id.* at *14-15 (referring to *Hale v. Blue Boar Cafeteria Co.*, 1980 Tenn. App. LEXIS 321). "Abrogating *Hale* and similar cases, the Tennessee Supreme Court explained in *Blair* that the concepts of 'creation' and 'notice' require something more than, and distinct from, mere foreseeability and declared that a plaintiff advancing a creation theory must show the dangerous condition was 'directly created' by the owner." *Id.* at *15. More directly, in *Benn*, Judge McClarty of the Tennessee Court of Appeals for the Eastern Grand Division held "[t]he Tennessee Supreme Court reached it decision after firmly rejecting the 'method of operation' theory of premises liability." *Benn*, 2010 Tenn. App. LEXIS 408, at *13 n.2.

In rejecting the "method of operation" approach, the Tennessee Supreme Court held "in Tennessee, plaintiffs may prove that a premises owner had constructive notice of the presence of a dangerous condition by showing a pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence." *Id.* at 765-66. The Supreme Court determined "[m]ethod of operation is not a useful title for this theory." *Id.* at 766. "The term method of operation suggests that the owner's method of operation, or way of doing business, is a

3

part of the inquiry." *Id.* "But under the theory we now adopt, the owner's way of doing business is not determinative." *Id.* "The question is whether the condition occurs so often that the premises owner is put on constructive notice of its existence." *Id.* This is often referred to as the "common occurrence theory." *Benn*, 2010 Tenn. App. LEXIS 408, at *13.

Mac's did not have actual or constructive notice of the spill prior to the Plaintiff's fall. Mac's only learned about the spill when another customer reported the Plaintiff's fall; therefore, it did not have actual notice. (Exhibit 3, p. 29:19-22). According to the Plaintiff, the spill was present for a matter of seconds prior to her fall; thus, it did not exist for such a length of time to establish constructive notice. (Exhibit 1, p.79:24-80:22). Finally, an incident like this had never occurred before at Mac's, and as such, Mac's did not have constructive notice under the common occurrence theory. (Exhibit 3, p.23:16-21, 33:7-9). Without actual or constructive notice, judgment is appropriate as a matter of law. *Blair*, 130 S.W.3d at 764.

**III.     The Plaintiff's fall was not foreseeable.**

The Plaintiff argues her fall was somehow foreseeable to Mac's despite no prior similar incidents. This argument is without merit.

First and foremost, the Plaintiff again cites bad law in her brief. She cites *Brookins v. The Round Table, Inc.* for the proposition that foreseeability is an issue for the jury. 624 S.W.2d 457 (Tenn. 1981). However, *Brookins* is a dram shop case that is no longer good law in Tennessee. *Id.* "The rule of foreseeability stated in *Brookins* was replaced by Tenn. Code Ann. §§ 57-10-101 and -102." *Biscan v. Brown*, 2003 Tenn. App. LEXIS 875, at *22 (Tenn. Ct. App. 2003) (citing *Worley v. Weigel's, Inc.*, 919 S.W.2d 589, 592 (Tenn. 1996).

Foreseeability is actually part of the duty analysis under current Tennessee law on premises liability. *Green*, 398 S.W.3d at 177. "If the injury that occurred could not have been reasonably

4

foreseen, the duty of care does not arise." *Id.* "The plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the defendant's power more probably than not would have prevented the injury." *Id.* Accordingly, duty is a question of law for the Court to decide. *Id.*

The incident in this matter was clearly not a reasonably foreseeable probability. A similar incident had never occurred at Mac's prior to August 8, 2019. (Exhibit 3, p.23:16-21, 33:7-9); *Blair*, 130 S.W.3d at 766. In her deposition, Mac's employee Renee Howell testified as follows:

> Q:    Have you had an occasion where a customer complained about Pump Number 4 not shutting off?
>
> A:    No, sir.
>
> Q:    Never?
>
> A:    No.
>
> . . .
>
> Q:    What are you saying?
>
> A:    I've never had an issue with that pump. Never.

(Exhibit 3, p.23:16-21, 33:7-9). Mac's had no reason to foresee the spill or the Plaintiff falling due to a spill she knew was there. *See Jones v. Exxon Corp.*, 940 S.W.2d 69, 73 (Tenn. Ct. App. 1996) ("The record is clear that Mrs. Jones saw the gasoline which caused her fall. We do not believe that Exxon could or should have foreseen that Mrs. Jones would fall into the very gasoline spill of which she made Exxon aware. The fact that she did fall was a 'remote possibility,' not a 'reasonably foreseeable probability.'").

**IV.    The Plaintiffs do not have proof the gasoline pump malfunctioned on August 8, 2019.**

In her Response, the Plaintiff presumes the spill resulted from a malfunction of the gasoline pump. However, Mac's inspects the gasoline pumps daily. (Exhibit 3, p.11:18-13:22, 19:10-20).

5

The Plaintiff has not presented any evidence the pump malfunctioned as opposed to a problem with her own vehicle or user error. Simply put, the cause of the spill is unknown. Mac's employee Renee Howell put it best in her deposition when she testified as follows:

> Q:     If it was working properly, it would have shut off in time for it not to spill, wouldn't it?
>
> Mr. Miller:     Object to the form. But you can answer.
>
> Q:     Go ahead and answer.
>
> A:     If it was working properly? You leave -- well, I'm not going to say that. Was her car working right? Was the little flap in there working right? It's 50/50.
>
> Q:     What do you mean "50/50"?
>
> . . .
>
> A:     Well, there's, I'm sure, a device in her car just as well as in my pumps. Which one wasn't working? I have no idea. I'm not a mechanic. I'm not a gas . . .
>
> Q:     Are you saying that half the time it doesn't work? Is that what you are saying?
>
> A:     No.
>
> Mr. Miller:     Object to the form.
>
> Q:     What are you saying?
>
> A:     I've never had an issue with that pump. Never.

(Exhibit 3, p.32:10-33:9). Even if the Plaintiff could prove there was a problem with Mac's gasoline pump, she still could not recover because she had greater knowledge of the spill compared to Mac's. In this way, the purported gasoline pump malfunction is a distraction from Plaintiff's actions after the spill and effort to hold Mac's strictly liable for the Plaintiff's fall.

6

## CONCLUSION

In sum, the Plaintiff cannot establish the duty element of her negligence claim against Mac's because she had superior knowledge of the gasoline spill. Accordingly, Mac's respectfully requests the Court grant its Motion for Summary Judgment.

Respectfully submitted,

**CARR ALLISON**

BY: _Chancey R. Miller_

**SEAN W. MARTIN, BPR #020870**
**CHANCEY R. MILLER, BPR #036124**
Attorneys for Defendant
736 Market Street, Suite 1320
Chattanooga, TN 37402
(423) 648-9832 / (423) 648-9869 FAX
swmartin@carrallison.com
cmiller@carrallison.com

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that the foregoing document has been delivered to all counsel for parties in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope, or by hand delivering same to each such attorney as follows:

W. Holt Smith
209 Tellico Street North
Madisonville, TN 37354

W. Tyler Weiss
409 N. College Street, Suite 1
Madisonville, TN 37354

This _29th_ day of _March_, 2021.

BY: _Chancey R. Miller_

**SEAN W. MARTIN, ESQ.**
**CHANCEY R. MILLER, ESQ.**

7

IN THE CIRCUIT COURT FOR MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and Husband,    )
JOHN LEACH, SR.,    )
    )
    )
    )
        Plaintiffs,    )
    )
v.    )   No. V20-0187S
    )
    )
MAC'S CONVENIENCE STORES, INC.,    )
    )
    )
    )
        Defendant.    )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF DELORES RENEE HOWELL

February 24, 2021

========================================================

Allison L. Gossett
Licensed Court Reporter
P.O. Box 50182
Knoxville, Tennessee 37950
(865) 696-6323
tennreporter@gmail.com

EXHIBIT

3

1    APPEARANCES:

2

3    FOR THE PLAINTIFF:

4    W. Holt Smith, Esq.
     209 Tellico Street North
5    Madisonville, Tennessee 37354

6
     W. Tyler Weiss, Esq.
7    Worthington & Weiss
     409 North College Street, Suite 1
8    Madisonville, Tennessee 37354

9

10   FOR THE DEFENDANT:

11
     Chancey R. Miller, Esq.
12   Carr Allison
     736 Market Street, Suite 1320
13   Chattanooga, Tennessee 37402

14

15   _____

16

17

18

19

20

21

22

23

24

25

Allison L. Gossett, LCR
tennreporter@gmail.com
Page 2
Case 3:21-cv-00159-JRG-HBG   Document 1-1   Filed 04/28/21   Page 159 of 178   PageID #:
163

```
 1                   INDEX TO EXAMINATION

 2   Examination:                                    Page

 3   By Mr. Smith . . . . . . . . . . . . . . . . .   5

 4

 5                    INDEX TO EXHIBITS

 6
     No.          Description                         Page
 7
     Exhibit 1    Incident report  . . . . . . . . .  36
 8
     Exhibit 1A   Incident report, enlarged on . . . . 36
 9                posterboard

10   Exhibit 2    Google Maps image  . . . . . . . .  42

11   Exhibit 3    Photograph . . . . . . . . . . . .  44

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    D E P O S I T I O N

 2            The deposition of DELORES RENEE HOWELL, taken

 3      at the request of the Plaintiffs, for purposes of

 4      Discovery, pursuant to the Tennessee Rules of Civil

 5      Procedure, on the 24th day of February, 2021, at the

 6      offices of W. Holt Smith, 209 Tellico Street,

 7      Madisonville, Tennessee, before Allison L. Gossett,

 8      Licensed Court Reporter.

 9            It is agreed that the deposition may be taken

10      in machine shorthand by Allison L. Gossett, Licensed

11      Court Reporter, and that she may swear the witness and

12      thereafter transcribe her notes to typewriting and sign

13      the name of the witness thereto, and that all

14      formalities touching caption, certificate, filing,

15      transmission, etc., are expressly waived.

16            It is further agreed that all objections except

17      as to the form of the questions are reserved to on or

18      before the hearing.

19

20

21

22

23

24

25
```

Case 3:21-cv-00159-JRG-HBG   Document 1-1   Filed 04/28/21   Page 161 of 178   PageID #: 165

```
 1                    DELORES RENEE HOWELL,

 2    called as a witness at the instance of the Plaintiffs,

 3    having been first duly sworn, was examined and deposed

 4    as follows:

 5            (Deposition commenced at 9:57 a.m.)

 6                        EXAMINATION

 7    BY MR. SMITH:

 8            Q        Will you give us your full name,

 9    please, ma'am.

10            A        Delores Renee Howell.

11            Q        Now, Ms. Howell, I'm Holt Smith and

12    this is Tyler Weiss and we represent Ms. Leach, Cheryl

13    Leach.  I'm going to ask you some questions.  I have a

14    mask on; you have a mask on.  If you don't understand

15    my question, please ask me to repeat it, okay --

16            A        Okay.

17            Q        -- before you answer?

18                     And also it's better if you speak out

19    loud and say yes and no and not huh-uh or uh-huh.  You

20    understand that, don't you?

21            A        Yes.

22            Q        If there's any question you don't

23    understand, please have me repeat it before you answer

24    it.

25            A        Okay.
```

1    Q        Okay.  Well, you can delete that,

2    okay?  Can you delete that?

3        A        I can probably mark it out.  I can't

4    delete it.

5        Q        Mark it out with a pen or pencil,

6    okay, if you print it.

7                 All right, let's talk about your

8    training.  You went to work as a manager two years ago.

9    What training did you receive?

10       A        It's usually all on the computer.  Or

11   when we worked with the other manager when I was

12   assistant manager.

13       Q        What did you find out on the computer?

14   What training did you receive on the computer?

15       A        How to handle situations.  How to do

16   paperwork.  There's all kinds of stuff.  It's just all

17   kinds of stuff.

18       Q        Is part of your duties to inspect the

19   store every day?

20       A        Yes.

21       Q        Tell us about that.  Do you have a

22   form you fill out?

23       A        A form to fill out?

24       Q        Yeah.

25       A        Usually not.  You just -- we have a --

```
 1    it's called a five-minute walk.

 2              Q         Okay.

 3              A         We walk through the store.  Make sure

 4    all the lights work.  Make sure all -- there's no

 5    debris anywhere or anything outside.

 6              Q         Five-minute walk, it's called?  Can

 7    you print that too, ma'am?

 8              A         Yeah.  I have one.

 9              Q         You have one?

10              A         Uh-huh.

11                        (Nods head up and down.)

12              Q         Where do you have it?

13              A         It's at work.

14              Q         On the computer?

15              A         No.  It's a daily routine that we do.

16              Q         The five-minute walk is?

17              A         Uh-huh.

18              Q         You have to do it every day?

19              A         Uh-huh.

20                        THE COURT REPORTER:  Can you answer

21    yes or no.

22                        THE WITNESS:  Oh.

23              A         Yes.

24    BY MR. SMITH:

25              Q         When you do the five-minute walk, do
```

1    you inspect outside, too?

2           A      Yes.

3           **Q      What all do you inspect outside?**

4           A      Make sure there's not anything on the

5    ground to trip you, no spills, no nothing.

6           **Q      How often do you check to make sure**

7    **there's no spills?**

8           A      Yes.

9           **Q      How often?  Every day?**

10          A      We're usually in and out all day

11   checking trash, taking trash out to the dumpster.

12          **Q      How often do you inspect the pumps?**

13          A      We inspect those daily.

14          **Q      Yeah, but when you're in and out that**

15   **five minute -- is that part of your five-minute walk?**

16          A      Yes.

17          **Q      How often do you do the five-minute**

18   **walk, how often every day?**

19          A      Every morning I get there.

20          **Q      More than once a day or just once a**

21   **day?**

22          A      I do it once a day, yes.

23          **Q      What time?  6:00?**

24          A      Sometimes 6:00.  Sometimes when I --

25   it's actually when it's daylight out, I'm not going to

```
 1        A       Call him.

 2        Q       Do you have a phone number for him?

 3        A       Yeah.  It's at work.

 4        Q       Okay.  Can you get that phone number

 5   and give it to Mr. Miller?

 6        A       Yes.

 7        Q       This is a phone number for Richard.

 8   He's the head of maintenance, right?

 9        A       Yeah.

10        Q       Okay.  Tell us what you do to check

11   the pumps every day.  Do you check the pumps out every

12   day?

13        A       Yes.  You lift the handle.  Make sure

14   it's connected.  There's not -- make sure the tape is

15   on there.  And that's about it.

16        Q       All right.  Lift the handle, make

17   sures it's connected to where?  What do you mean

18   "connected"?

19        A       To the little -- make sure it's

20   connected at the top.

21        Q       Okay.  Now, it has like a thing that

22   if a person drives away, then it comes apart, right,

23   automatically?

24        A       Yes.

25        Q       What's that called?
```

1          A          No.

2          **Q          You stand there?**

3          A          I will hold it, yes.

4          **Q          But it's for the convenience of the**

5     **customer; you can do it if you want to, can't you?**

6          A          You can, yeah.

7          **Q          And explain how that works, the lock-y**

8     **thing, you called it.**

9          A          You pull up the gas pump lever and you

10    lock the little lock on it.

11         **Q          And then you can put it in there and**

12    **it will automatically fill your --**

13         A          Let it fill your car.

14         **Q          Does it shut off by itself?**

15         A          It should, yes.

16         **Q          Okay.  Have you had an occasion where**

17    **a customer complained about Pump Number 4 not shutting**

18    **off?**

19         A          No, sir.

20         **Q          Never?**

21         A          No.

22         **Q          How about any other pumps?**

23         A          I'm sure there is, but there's no

24    guarantee it's going to stop.  And I don't -- I don't

25    know.  I don't know what you're trying to get at, is

1    yes.  If not, I clean it up and we go on.

2         Q       **The spill from Mrs. Leach's case, did**

3    **you clean it up yourself or did somebody else do it?**

4         A       I cleaned it up.

5         Q       **Tell us about that.  What did you do**

6    **to clean it up?**

7         A       Sprinkled the product that's in the

8    white tin.

9         Q       **Do you sweep that up once you do that?**

10        A       Yeah.

11        Q       **And where do you --**

12        A       It like soaks it up like a -- like a

13   big sponge.

14        Q       **All right, now let me ask you about**

15   **Mrs. Leach's case, okay?**

16                **When were you first aware that**

17   **Mrs. Leach had fallen at the Circle K store?**

18        A       Excuse me?

19        Q       **When were you first aware that she had**

20   **fallen?**

21        A       Someone come in, said someone had fell

22   on Pump 4.  So I go out.

23        Q       **Do you know who told you that she had**

24   **fallen at Pump 4?**

25        A       I don't remember.  My store was full.

1    wouldn't it?

2                    MR. MILLER:  Object to the form.

3    BY MR. SMITH:

4         Q        Is that true?

5                    MR. MILLER:  Object to the form.

6                    You can answer.

7    BY MR. SMITH:

8         Q        You can answer.

9         A        Okay.  What was the question?

10        Q        If it was working properly, it would

11   have shut off in time for it not to spill, wouldn't it?

12                   MR. MILLER:  Object to the form.

13                   But you can answer.

14   BY MR. SMITH:

15        Q        Go ahead and answer.

16        A        If it was working properly?  You

17   leave -- well, I'm not going to say that.  Was her car

18   working right?  Was the little flap in there working

19   right?  It's 50/50.

20        Q        What do you mean "50/50"?

21                   MR. MILLER:  Object to the form.

22        A        Well, there's, I'm sure, a device in

23   her car just as well as in my pumps.  Which one wasn't

24   working?  I have no idea.  I'm not a mechanic.  I'm not

25   a gas . . .

```
 1    BY MR. SMITH:

 2           Q        Are you saying that half the time it

 3    doesn't work?  Is that what you're saying?

 4           A        No.

 5                    MR. MILLER:  Object to the form.

 6    BY MR. SMITH:

 7           Q        What are you saying?

 8           A        I've never had an issue with that

 9    pump.  Never.

10           Q        Did you talk with Daniel Johnson that

11    day about what happened?

12           A        Yes, I did.

13           Q        What did he say?

14           A        As well as I did her.

15           Q        What did he say?

16           A        He said she was over there talking to

17    him, left her gas pump unattended.  Which you should

18    never do.  Number one, it could fall out, gas go

19    everywhere.  Number two, she was over there talking to

20    him, gas overflows, she runs back, she falls.

21           Q        Is there a camera located at your

22    store in Sweetwater Circle K on Main Street?

23           A        Yes, there is.  But at that time,

24    eight days later, they had moved -- removed the DVR.

25    She didn't call me until two weeks later.
```

Case 3:21-cv-00159-JRG-HBG   Document 1-1   Filed 04/28/21   Page 170 of 178   PageID #: 174

1     review your deposition and you can change it, okay?

2          A       Okay.

3          Q       Because I know sometimes I'm hard to

4     understand.  And with this mask, it makes it worse.

5          A       Okay.

6          Q       Do you have any questions of me right

7     now?

8          A       (Shakes head from side to side.)

9          Q       Thank you.

10          (Deposition concluded at 10:43 a.m.)

11           FURTHER THIS DEPONENT SAITH NOT.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2    STATE OF TENNESSEE

 3    COUNTY OF KNOX

 4

 5              I, Allison L. Gossett, Licensed Court

 6    Reporter, do hereby certify that I reported in machine

 7    shorthand the foregoing proceedings; that the foregoing

 8    pages, numbered 1 to 54, inclusive, were typed by me

 9    using computer-aided transcription and constitute a

10    true and accurate record of said proceedings.

11              I further certify that I am not an attorney

12    or counsel of any attorney or counsel connected with

13    the action, nor financially interested in the action.

14              Witness my hand this date, March 8, 2021.

15

16

17    _____
      Allison L. Gossett, LCR
18    LCR 028, Exp. 06/30/2022

19

20

21

22

23

24

25
```

# IN THE CIRCUIT COURT OF MONROE COUNTY, TENNESSEE

CHERYL ANN LEACH and husband,
JOHN LEACH, SR.,

      Plaintiffs,

vs.                    **Docket No. V-20&0187S**

MAC'S CONVENIENCE STORES, LLC,

      Defendant.

---

## ORDER REGARDING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

    This matter came on to be heard in the Circuit Court of Monroe County, Tennessee on the 5th day of April, 2021. This matter is before the court based upon the defendant's, Mac's Convenience Stores, LLC's Motion for Summary Judgment. The court has considered the defendant's motion, memorandum of law in support of the motion, the statement of undisputed material facts, the arguments of counsel, and the applicable case law. The court has also considered the plaintiffs' memorandum in response to the motion for summary judgment, the plaintiffs' attorneys argument, as well as the case law provided to the court by the plaintiffs. The court finds as follows:

### BRIEF STATEMENT OF FACTS

    Based upon the pleadings before the court, the court finds that there is no dispute that the plaintiff was at the defendant's convenience store getting gas for her automobile on August 8, 2019. The plaintiff placed the nozzle from the gas pump in her car to put gas in

Case 3:21-cv-00159-JRG-HBG   Document 1-1   Filed 04/28/21   Page 173 of 178   PageID #: 177

her car. The plaintiff activated the device on the gas pump nozzle so as to allow the car to be automatically filled and to automatically stop once the gas reached a certain level in the tank. All parties agree that the gas nozzle failed to automatically shut off, and gas ran down the side of the car and onto the ground surrounding the area around where the plaintiff's vehicle was. The parties agree that the plaintiff immediately ran over to remove the nozzle from her vehicle and shut off the gas flow, and proceeded to put the hose and nozzle back into the gas pump. All parties agree that it was at about that point that the plaintiff attempted to take another step but slipped and fell due to the gas spill. The plaintiff alleges injuries to her knee and body, as well as damages as a result of the alleged injuries.

The plaintiff alleges that the defendant was negligent in failing to exercise due care to inspect the pump so as to know that the pump was broken or had a defective nozzle, thus creating a dangerous or hazardous condition. The plaintiff also alleges that the defendant was negligent by failing to maintain and inspect the gas pumps. The plaintiff also alleges that the defendant was negligent by failing to warn the public of what the plaintiff claims to be a dangerous condition, and by failing to take the necessary steps to protect the general public. The plaintiff also makes other allegations concerning her slip and fall, and ultimately the cause of her alleged injuries.

The defendant answered by making the argument that the plaintiff had superior knowledge of any alleged dangerous or defective condition. The defendant also alleges that the plaintiff was also negligent, as well as making other general denials.

The court finds, and there is no dispute, at this point, that the plaintiff was injured when she slipped on gasoline that spilled when the gas pump that she was using at the defendant's convenience store did not automatically stop as it is designed to do under normal conditions. The plaintiff argues that the cause of her injury was the malfunction of the

Case 3:21-cv-00159-JRG-HBG   Document 1-1   Filed 04/28/21   Page 174 of 178   PageID #:
178

gasoline pump's automatic shutoff device. The plaintiff argues that due to the pump's failure

to automatically stop that gas spilled on the ground, causing a slick condition that resulted in

her injury after she took action to stop the gas from continuing to flow out of her car and onto

the ground. The court finds that the case of *Bledsoe v. Delta Refining Co.*, 1983 Tenn. App.

LEXIS 694, is of significance. In that case, the court held that with the advent of self-service

merchandising, courts have begun to recognize that certain hazards are created by the

method of doing business which were not normally associated with the operation of the

business before self-serving merchandise became prevalent. For that reason, courts have

backed away from the strict application of actual or constructive notice requirements:

> However, with the advent of self-service merchandising, first
> evidenced in the retail food industry, the courts began to recognize
> that certain hazards were created by this method of doing business
> that were not normally associated with food stores that were non-
> self-service. Therefore, the courts have backed away from a strict
> application of the actual or constructive notice requirement. This
> trend of cases, which has been described as either expanding the
> notice requirement or representing an exception to the notice
> requirement.

> *Bledsoe v. Delta Refining Co.*, p. 4.

The notice requirement is met if the plaintiff can prove that the defendant's method of

operation created a hazardous condition foreseeably harmful to others. *Martin v.*

*Washmaster Auto Center, USA*, 946 S.W.2d 314 (Tenn. App. 1996). The requirements of the

method of operation theory are as follows: (1) Whether the condition created by the chosen

method of operation constitutes a hazardous situation foreseeably harmful to others;

(2) Whether the proprietor used reasonable and ordinary care towards its invitees under

these circumstances, and (3) Whether the condition created was a direct and proximate

cause of the plaintiff's injury. *Martin*, Id at 320.

The court holds that the defendant's employees are responsible for inspecting the pumps as part of their normal job duties. The defendant's employees acknowledged that at times the automatic shutoff valves will from time to time malfunction. (See deposition of Dolores Renee Howell, p. 22-29).

The court finds that Circle K made the decision to allow the automatic pumping system to be used at their pumps, and thus are responsible for the conditions caused by the use of said pumps. Whether or not the defendant, Mac's Convenience Stores, were properly maintained and in proper working order or were in a defective or dangerous conditions is, in the opinion of the court, a question for the trier of fact. The court finds that the plaintiff, at this stage in the litigation, need only present proof which if believed by a jury, makes her theory of the case more probable than not. (See *Browder v. Pettigrew*, 541 S.W.2d 402 (Tenn. 1976)).

Whether or not Mrs. Leach was 50% or more at fault is also, in the opinion of the court, in dispute. There is no question that Mrs. Leach was standing a few feet away from her pump talking to another individual while the gas was pumping into her car. There is also no question that when Mrs. Leach saw the gas running down the side of her car and pouring onto the ground, that she quickly responded by taking the necessary steps to remove the nozzle and attempt to replace it into the pump. There is no question that during this action, that Mrs. Leach slipped and allegedly suffered injury. Whether or not her actions constitute more than 50% fault is a question of fact for the jury, and should be submitted to the jury. Furthermore, the court finds that whether or not the defendant's chosen mode of operation posed a hazard to the plaintiff is also a question that needs to be determined by the trier of fact. Whether or not the defendant, through its employees, was aware of any defective condition in the pump and/or the nozzle apparatus, and/or whether or not the defendant failed to ascertain the presence of any defective condition and to correct it, are also

Page 4 of 6

questions of fact for the jury to determine. This court is particularly moved by the Tennessee Court of Appeals ruling in *Barrett v. Red Food Stores, Inc.*, 1992 Tenn. App. LEXIS 196\*; 1992 WL 33891. In that case, the Court of Appeals held as follows:

> We believe, however, that the requirements of constructive notice
> may be met where a dangerous condition inside a self service
> business is not an isolated one but is reasonably foreseeable to
> the owner because the condition is established by a pattern of
> conduct, a recurring incident, or a general or continuing condition
> and an invitee suffers injuries as a result of the condition. Citing
> *Worshum v. Pilot Oil Corp.*, 728 S.W.2d 19 (Tenn. App. 1987)).

The court finds that it is reasonably expected that the plaintiff could and would normally assume that the defendant's gas pumps would operate and/or be of such a condition to operate normally by shutting off when the pump's automatic shutoff device was activated.

Ultimately, the court finds that the plaintiff has offered sufficient argument and made sufficient pleadings to establish that there are several questions of fact that must be determined by a jury. The motion for summary judgment is respectfully denied. This is a final order.

IT IS SO ORDERED.

THIS 13th day of April, 2021.

J. MICHAEL SHARP, JUDGE

FILED
TIME 3:20 AM/PM
APR 13 2021
MARTHA M. COOK
CIRCUIT COURT CLERK

Page 5 of 6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon the following by delivering the same via U. S. Mail and/or via facsimile to the parties listed below:

Holt Smith, Esq.
209 Tellico Street N.
Madisonville, TN 37354-1188
Ph: 1-423-442-4012
Fx: 1-423-442-1038
Email: whs4849@bellsouth.net
*Attorney for Plaintiffs*

Tyler W. Weiss, Esq.
Worthington & Weiss, P.C.
409 N. College Street, Suite 1
Madisonville, TN 37354
Ph: 1-423-442-5353
Fx: 1-423-442-3866
Email: tweiss@worthingtonweiss.com
*Attorney for Plaintiffs*

Sean W. Martin, Esq.
Chancey R. Miller, Esq.
CARR ALLISON
736 Market Street, Suite 1320
Chattanooga, TN 37402
Ph: 1-423-
Fx: 1-423-648-9869
Email: swmartin@carrallison.com
Email: cmiller@carrallison.com
*Attorneys for Defendant*

This ⟋ day of April, 2021.

D. CLERK

Page 6 of 6